## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CASE NO. 3:22-CV-167-RJC-DCK

ADRIANNA E. BLACKWELL,
as Administratrix of the Estate of D.W.
Deceased,

        Plaintiff,

v.

GARRY MCFADDEN, Mecklenburg Co.,
in his official capacity; DWIGHT
DWAYNE. WELLER, Mecklenburg Co., in
his individual and official capacities;
TIFFANY PARKER WILLIAMS,
Mecklenburg Co., in her individual and
official capacities; AKEEM DWAYNE
COMAS, Mecklenburg Co., in his individual
and official capacities; HENRIETTA
SAUNDERS; Mecklenburg Co., in her
individual and official capacities; EDDIE
BUFFALOE, NC Dept. of Pub. Safety, in
his official capacity; CHARLES MOORE,
NC Dept. of Pub.
Safety, in his individual capacity; TAMMY
GUESS, NC Dept. of Pub. Safety, in her
individual capacity; KIM COWART, NC
Dept. of Pub. Safety, in their individual and
official capacities; SAMUEL PAGE,
Rockingham Co., in his official capacity;
ANGIE WEBSTER, Rockingham Co., in her
individual and official capacities;
MECKLENBURG COUNTY; STATE OF
NORTH CAROLINA;
LIBERTY MUTUAL INSURANCE;
PLATTE RIVER INSURANCE
COMPANY,

        Defendants.

_____/

**PLAINTIFF'S FIRST
AMENDED
COMPLAINT**

**Jury Trial Demanded**

# INTRODUCTION

## "Purgatory Cannot Be Worse Than Hell."[1]

1. This is an action brought under 42 U.S.C. § 1983, North Carolina state law, and federal disability rights law arising from the death of 17-year-old juvenile D.W. (hereinafter, "D.W.").

2. "IICSARNKM."

3. "If I commit suicide a real nigga killed me."[2] This is a lyric from a song called, "Point Guard", by artist NoCap. These same lyrics were spoken by D.W. two weeks prior to his death while he was in the custody of the Rockingham County Sheriff's Office.

4. D.W.'s death on November 21, 2020, followed a promising yet short life that was punctuated by tumult, childhood trauma, depression, substance abuse, and family tragedy. D.W. experienced in his life a long charade of educators, mental health professionals, law enforcement officials, and juvenile detention administrators – all of whom took a cavalier approach in their treatment of our most vulnerable and susceptible: a juvenile. Indeed, these professionals were familiar with D.W.'s struggles for many years. They copiously documented his struggles.

5. D.W. died on November 21, 2020, while in pretrial detention inside a juvenile detention facility operated by Mecklenburg County, under an intergovernmental agreement between Mecklenburg County and the North Carolina Department of Public Safety. D.W.'s death followed an initial arrest by Rockingham County officials on November 5, 2020, and a subsequent two-week stay at a juvenile detention facility operated by the North Carolina Department of Public Safety, located in Alexander County.

---

[1] *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004). In *Jones*, for example, the Ninth Circuit emphasized that the conditions of confinement for pre-trial detainees cannot be "more restrictive" than those an inmate faces following a criminal conviction, "[o]r, to put it more colorfully, purgatory cannot be worse than hell."
[2] NoCap, *Point Guard* (Globe Life Entertainment 2018)(https://youtu.be/KFKDOMK7zM4?t=75)

6. On the day of his death, jailers provided D.W. with all the tools to live out the rap lyrics.[3] First, they ensured that he existed in obscurity: he was transferred several hours away from his mother and support network. While detained in Mecklenburg County, D.W. was assigned to a cell with no cell mate and left to languish for approximately 2.5 hours in a cell that lacked basic surveillance cameras. Completely alone, he was left to his own thoughts for endless hours. Then, he was provided the chosen and most obvious methods of suicide: bedsheets, sharp objects, and a metal fixture from which to tie bedsheets. For a teenager known to have been a victim of sexual abuse at a tender age and actively suffering from substance abuse, to be left alone without observation and forced to his own thoughts of self harm – this amounted to purgatory.

7. D.W. was allegedly found hanging from a bedsheet tied around his neck and attached to a metal grate covering the fire alarm affixed to the ceiling of his jail cell.

8. Authorities also discovered large quantities of blood around his mouth and near the toilet of his jail cell.

9. More disturbing, a handwritten suicide note was discovered. In the note, D.W. wrote: "*tell my family I'm sorry*", followed by "*IICSARNKM*" with ☹. The acronym: "if I commit suicide then a real nigga killed me" – the same rap lyric that authorities had noted D.W. repeating to himself just two weeks earlier.[4]

10. D.W. wrote the suicide note using a pencil – a sharp object that jail administrators had previously determined he should not have access to. The pencil was never recovered.

11. As the contents of his suicide note reveals, D.W. belonged to a high-risk population for jail suicide. Officials with Rockingham County, the Juvenile Justice Section of the Division of

---

[3] *Id.*
[4] *Id.*

Adult Correction and Juvenile Justice of the Department of Public Safety, and Mecklenburg County were all aware of this through the North Carolina Juvenile Online Information Network ("NC JOIN") – a robust statewide database that houses confidential information tracking the movements, court orders, processes, program assignments, referrals, and case notes of juveniles, such as D.W., who find themselves in the juvenile justice system.

12. Juveniles are psychologically and developmentally different from adults. One's youth is a time and condition of life when a young person like D.W. may be most susceptible to influence and psychological damage.

13. It is in the interest of juveniles that children, like D.W., be safeguarded from abusee and harm.

14. On the day of D.W.'s death, corrections staff failed to conduct timely "tours" of the wing of the jail where D.W. was housed. Instead, on-duty corrections staff members falsified public records to suggest that they had checked on D.W.'s wellbeing at proper intervals when in fact they had not. Indeed, this failure to adequately monitor was so widespread that it amounted to a habit – a habit known to supervisory staff within the facility. This failure to monitor allowed D.W. the time he needed to allegedly hang himself and meet his untimely demise.

15. On or about November 21, 2020, after notification of D.W.'s death, D.W.'s mother Adrianna Blackwell arrived at Atrium Heath Carolina Medical Center located in Charlotte, North Carolina to identify a reported juvenile body. Thereafter, she took the pictures identified in Figure 1 to confirm it was in fact, D.W. Adrianna Blackwell used her Apple iPhone 11 at 8:59 P.M. and 9:00 P.M. In this manner, she affirmatively identified her son's remains. *See Fig. 1.*

3

**FIGURE 1**



**JURISDICTION AND VENUE**

16. This Court has subject-matter jurisdiction under 42 U.S.C. §§ 1983, 1343, and 12132; 28 U.S.C. § 1331; 29 U.S.C. § 794; and the Fourteenth Amendment. Plaintiff seeks monetary damages for constitutional torts and monetary damages under two federal disability rights statutes.

17. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all state law claims because each state law claim arose out of the same set of facts and is so related to the federal law claims that it forms part of the same case or controversy.

18. Any supplemental state-law claims brought against state parties are properly brought in this Court and not in the North Carolina Industrial Commission because Defendants acted with gross negligence (not ordinary negligence) and because those Defendants associated with the North Carolina Department of Public Safety are sued in their individual capacities.

19. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred in the Western District of North Carolina.

**PARTIES**

**Plaintiff**

20. Plaintiff ADRIANNA BLACKWELL is the lawfully designated Administratrix of the estate of her deceased minor son, D.W.. Where applicable herein, Plaintiff Blackwell brings this action in a representative capacity.

21. Plaintiff Blackwell is the personal representative of D.W.'s estate per NC GEN STAT *id.* §§ 28A-18-1, 28A-18-2, 28A-18-3.

22. Plaintiff Blackwell is a resident of North Carolina.

**Mecklenburg County and the State of North Carolina**

5

23. Under Chapter 153A of the North Carolina General Statutes, Defendant MECKLENBURG COUNTY is a body politic and corporate. Under N.C. Gen. Stat. §§ 153A-216, 153A-218, Mecklenburg County is responsible for appropriating funds for jail design, construction, and maintenance, and is responsible for putting the jail into operation. Defendant Mecklenburg County is sued only as to Count VII (federal disability rights statutes).

24. Defendant STATE OF NORTH CAROLINA, through its Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice, of the Department of Public Safety, is responsible for administering the detention of pretrial detainees who are under the age of 18.

25. These responsibilities of Defendant State of North Carolina are enumerated in NC GEN STAT § 143B-806. These duties and powers include, but are not limited to, administering a sound intake program, evaluating the needs of each juvenile, ensuring a system of protective supervision, establishing procedures for substance abuse testing, developing comprehensive multidisciplinary services, collecting data in a comprehensive manner, and providing for the transportation of juveniles to and from juvenile facilities.

26. To that end, the State of North Carolina establishes minimum guidelines for the design, construction, and maintenance of any county-run facility that is permitted to house juvenile detainees. *See, e.g.*, *Id.* §§ 153A-221, 143B-821. When a county undertakes the care and custody of pretrial detainees who are under the age of 18, for example, they do so only with the blessing and careful regulation of the State of North Carolina.

27. In addition to overseeing county-operated juvenile detention facilities throughout the state, the State of North Carolina directly operates approximately seven juvenile detention facilities. The staff at these state-operated juvenile detention facilities are state employees, not county employees. Plaintiff sues Defendant State of North Carolina only as to Count VIII (state disability rights statutes).

**Sheriff's Surety Bond**

28. Defendant Platte River Insurance Company is incorporated under the laws of Nebraska and has its principal place of business in Middleton, Wisconsin.

29. Defendant Platte River Insurance Company was the surety company that provided a bond to Mecklenburg County Sheriff McFadden in November 2020, pursuant to *id.* § 58-76.

30. Defendant Liberty Mutual Insurance is incorporated under the laws of Massachusetts.

31. Defendant Liberty Mutual Insurance is the surety company that provided a bond to Rockingham County Sheriff Page in November 2020, pursuant to *id.*

32. Plaintiff sues Liberty Mutual Insurance and Platte River Insurance Company to recover on the two Sheriff's bonds, respectively, for the neglect and/or malfeasance of Sheriff McFadden, Sheriff Page, and their employees whose actions and inactions proximately caused D.W.'s death.

**Sheriffs McFadden and Page**

33. Defendant GARRY MCFADDEN is the current Mecklenburg County Sheriff and was the Mecklenburg County Sheriff in November 2020. He is sued in his official capacity for both state-law and federal-law claims.

34. As the Sheriff, Defendant McFadden is charged with the care and custody of the jail pursuant to N.C. Gen. Stat. § 162-22, is a keeper of the jail pursuant to N.C. Gen. Stat. § 162-55 and appoints other keepers of the jail.

35. At all relevant times, Defendant McFadden acted under the color of state law.

36. As the Sheriff, Defendant McFadden is the final policymaker for Mecklenburg County on matters related to the care and custody of inmates at the county jail, including the care and custody of juveniles who are held as pretrial detainees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

7

37. Upon information and belief, in November 2020, Defendant McFadden had an active insurance policy and/or surety policy covering himself and his employees against liability for wrongful death caused by negligence.

38. Pursuant to N.C. Gen. Stat. § 153A-435, the above-described insurance policy and/or surety policy acts to waive state-law governmental immunity for wrongful death liability. Consequently, Defendant McFadden and the individual Mecklenburg County defendants may not avail themselves of a state-law governmental immunity defense as to state-law wrongful death and negligence claims naming them in their individual capacities, to the extent of coverage.

39. Defendant SAMUEL PAGE is the current Rockingham County Sheriff and was the Rockingham County Sheriff in November 2020. He is sued only in his official capacity for state-law claims.

40. Upon information and belief, in November 2020, Defendant Page had an active insurance policy and/or surety policy covering himself and his employees against liability for wrongful death caused by negligence.

41. Pursuant to N.C. Gen. Stat. § 153A-435, the above-described insurance policy and/or surety policy acts to waive state-law governmental immunity for wrongful death liability. Consequently, Defendant Page and his subordinate, Defendant Angie Webster, may not avail themselves of a state-law governmental immunity defense as to state-law wrongful death claims, negligence claims, and criminal negligence claims, to the extent of coverage.

**Secretary Eddie Buffaloe**

42. Defendant EDDIE BUFFALOE is the current secretary of the North Carolina Department of Public Safety. Secretary Buffaloe is sued only in his official capacity.

43. As the secretary of the North Carolina Department of Public Safety, Defendant Buffaloe is

8

the head of the executive department responsible for ensuring the proper housing of pre-trial detainees who are under 18. *See , e.g.*, *Id.* §§ 143B-800, 143B-821, 143B-806, 15A-521.

44. As the secretary of the North Carolina Department of Public Safety, Defendant Buffaloe is the head of the executive department responsible for ensuring that local law enforcement agencies have ready access to relevant information on specific juveniles with whom they come into contact. *See , e.g.*, *Id.* § 143B-806.

45. As the secretary of the North Carolina Department of Public Safety, Defendant Buffaloe is the head of the executive department responsible for administering clinical, psychological, and psychiatric services to juveniles in pre-trial detention – even those juveniles housed in a county-operated juvenile detention facility. *See , e.g.*, *Id.* § 143B-815.

46. Defendant Buffaloe is sued as to Count VII.

**Individual Defendant of the Rockingham County Sheriff's Office**

47. Defendant ANGIE WEBSTER, in November 2020, was an employee of the Rockingham County Sheriff's Office.

48. Defendant Webster is sued in both her individual and official capacities with regard to all state-law claims.

49. In October and November 2020, Defendant Webster assisted with an investigation leading to D.W.'s arrest.

50. Defendant Webster was present when D.W. was arrested on November 5, 2020.

51. As part of her involvement in the criminal investigation of D.W., Defendant Webster participated in an interview of D.W. on November 5, 2020 that lasted for more than six hours, without his mother present.

52. Although D.W. was arrested on November 5, 2020, the criminal investigation of D.W. did not end on that day. It continued for several days after D.W.'s arrest,

9

and Defendant Webster continued her involvement in the criminal investigation after the arrest.

53. Defendant Webster became aware that D.W. had suicidal thoughts on or about November 9, 2020.

**Individual Defendants of the NC Department of Public Safety**

54. Defendant TAMMY GUESS, in November 2020, was a contracted service provider of the North Carolina Department of Public Safety. She is sued only in her individual capacity.

55. In November 2020, Defendant Guess performed work duties at the state-operated Alexander Regional Juvenile Detention Center in Alexander County.

56. At all relevant times, Defendant Guess acted under the color of state law.

57. In November 2020, Defendant Guess was a licensed clinical mental health counselor (LCMHC) and was contracted by the North Carolina Department of Public Safety to ensure that juvenile detainees at the Alexander facility received adequate mental health care.

58. Defendant Guess' job position was not created by statute.

59. Defendant Guess did not take an oath of office as a pre-requisite to assuming her job responsibilities at the Alexander County facility.

60. Upon information and belief, Defendant Guess is not a certified law enforcement officer.

61. Upon information and belief, Defendant Guess is not a corrections officer.

62. Defendant Guess is not a public official for purposes of state-law public official immunity.

63. Defendant CHARLES MOORE, in November 2020, was a contracted service provider of the North Carolina Department of Public Safety. He is sued only in his individual capacity.

64. In November 2020, Defendant Moore performed work duties at the state-operated

10

Alexander Regional Juvenile Detention Center in Alexander County.

65. At all relevant times, Defendant Moore acted under the color of state law.

66. Defendant Moore is a licensed clinical mental health counselor (LCMHC) and was employed and/or contracted by the North Carolina Department of Public Safety to ensure that juvenile detainees at the Alexander facility received adequate mental health care.

67. Defendant Moore's position was not created by statute.

68. Defendant Moore did not take an oath of office as a pre-requisite to assuming his job responsibilities at the Alexander County facility.

69. Upon information and belief, Defendant Moore is not a certified law enforcement officer.

70. Upon information and belief, Defendant Moore is not a corrections officer.

71. Defendant Moore is not a public official for purposes of state-law public official immunity.

72. Defendant KIM COWART, in November 2020, was employed by the North Carolina Department of Public Safety as the director of the Alexander Regional Juvenile Detention Center.

73. Defendant Cowart is sued in her individual capacity with regard to any federal-law claims naming her as Defendant. She is sued in both her individual and official capacities with regard to any state-law claims naming her as Defendant.

74. Defendant Cowart had personal knowledge of D.W. during the approximately two weeks that he was housed at the Alexander Regional Juvenile Detention Center.

75. At all relevant times, Defendant Cowart acted under the color of state law.

**Individual Defendants of the Mecklenburg County Sheriff's Office**

76. Defendant DWIGHT DWAYNE WELLER was employed by the Mecklenburg County Sheriff's Office as a juvenile corrections officer in November 2020. Defendant Weller was

11

on duty at the detention facility where D.W. died on November 21, 2020.

77. Defendant Weller is sued in his individual capacity with regard to any federal-law claims naming him as Defendant. He is sued in his individual and official capacities with regard to any state-law claims naming him as Defendant.

78. At all relevant times, Defendant Weller acted under the color of state law.

79. In November 2020, Defendant Weller was a keeper of the jail per N.C. Gen. Stat. § 162-55.

80. On November 21, 2020, Defendant Weller was responsible for security in the unit in which D.W. was housed.

81. Defendant AKEEM DWAYNE COMAS was employed by the Mecklenburg County Sheriff's Office as a supervisory employee in November 2020 within the juvenile detention facility where D.W. died. Defendant Comas was on duty on November 21, 2020.

82. Defendant Comas is sued in an individual capacity with regard to any federal-law claims. Comas is sued in both an individual and official capacity with regard to any state-law claims.

83. Upon information and belief, Defendant Comas was the direct supervisor of Defendant Weller on November 21, 2020.

84. Upon information and belief, Defendant Comas had supervisory responsibilities within the jail pod where D.W.'s cell was located on November 21, 2020.

85. At all relevant times, Defendant Comas acted under the color of state law.

86. In November 2020, Defendant Comas was a "keeper of the jail", per NC GEN. STAT. *Id.* § 162-55.

87. Defendant TIFFANY PARKER WILLIAMS was employed by the Mecklenburg County Sheriff's Office with the rank of sergeant in November 2020 within the juvenile detention facility where D.W. died. Defendant Williams was on duty as a supervisor on November 21, 2020.

88. Defendant Williams is sued in her individual capacity with regard to any federal-law claims. Defendant Williams is sued in both individual and official capacities with regard to any state-law claims.

89. Upon information and belief, Defendant Williams had supervisory responsibilities within the jail pod where D.W.'s cell was located on November 21, 2020.

90. At all relevant times, Defendant Williams acted under the color of state law.

91. In November 2020, Defendant Williams was a "keeper of the jail", per N.C. Gen. Stat. § 162-55.

92. Defendant Henrietta Saunders was employed by the Mecklenburg County Sheriff's Office with the rank of captain in November 2020 within the juvenile detention facility where D.W. died. Defendant Saunders was on duty as a supervisor on November 21, 2020.

93. Defendant Saunders is sued in her individual capacity with regard to any federal-law claims naming her as Defendant. She is sued in both her individual and official capacities with regard to any state-law claims naming her as Defendant.

94. At all relevant times, Defendant Saunders acted under the color of state law.

95. In November 2020, Defendant Saunders was a "keeper of the jail", per *id.*

## FACTUAL ALLEGATIONS

### D.W.'s Background

96. At all relevant times, D.W. was a resident of North Carolina.

97. D.W. had a traumatic life up to the day of his November 2020 arrest.

98. NC-JOIN, a computer database system allowing local and state law enforcement in North Carolina to share information about juveniles, painted an alarming portrait of D.W. in November 2020 at the time of his initial arrest.

99. NC-JOIN reported that, according to his previous intake history, D.W. was a sexual assault

victim.

100. NC-JOIN indicated that D.W. was a victim of Indecent Liberties with a Minor on May 3, 2006, a victim in a matter of Assault with a Deadly Weapon on December 30, 2008, and "Involved/Other" in a child abuse/assault matter on April 8, 2011.

101. NC-JOIN indicated that D.W. had suffered a serious head injury that required him to be hospitalized as a young child.

102. NC-JOIN indicated that D.W.'s father was incarcerated at the time of his arrest.

103. In January 2017, an NCDPS employee noted in NC-JOIN that D.W. had been victimized by a caregiver and that a caregiver had failed to protect against a subsequent victimization for sexual abuse and criminal victimization.

104. On this same report, the NCDPS employee stated that D.W.'s behavior indicated a need for an additional mental health assessment, due to fights and impulsive risk taking.

105. During the months leading up to D.W.'s death, NC-JOIN painted a picture of a rapidly declining personal situation for D.W..

106. On or about May 20, 2020, NCDPS employee James E. Goff assessed D.W. and noted the need for additional mental health assessment and treatment due at Rockingham Youth Services due to D.W.'s anger management issues.

107. Also in May 2020, D.W. was placed on short term suspension for 5 days from Dalton McMichael High School.

108. On or about July 7, 2020, NCDPS employee James E. Goff again assessed D.W. and again noted in NC-JOIN that D.W.'s behavior indicated the need for additional mental health assessment and treatment due to D.W.'s reports of restlessness and impulsive risk taking. James E. Goff also noted substance abuse within the past 12 months.

14

109. On or about August 19, 2020, NCDPS employee James E. Goff again noted in NC-JOIN the need for additional mental health assessment and treatment due to D.W.'s anxiety, restlessness, and impulsive risk taking.

110. Upon information and belief, D.W. was robbed at gunpoint and forced by his assailants to strip off his clothing approximately three weeks prior to his arrest.

111. D.W. often coped with his mental health by using substances, and it had been noted that D.W. had been drunk or high while at school.

112. D.W. easily lost his temper.

113. D.W.'s anxiety caused him to be shaky.

114. D.W. regularly experienced bad thoughts or bad dreams, including flashbacks.

115. D.W.'s flashbacks included incidents where he had seen someone be badly hurt.

116. D.W. indicated to personnel of the NC Department of Public Safety and/or personnel at the Mecklenburg County Detention Center the following:

a) that he experienced trouble falling asleep;

b) that he lost his temper or had a short fuse;

c) that he had thought about getting back at someone he had been angry at;

d) that he felt too tired to have a good time;

e) that he perceived that things didn't seem real;

f) that he had used alcohol or drugs to help feel better;

g) that he felt angry a lot;

h) that he didn't want to go to school anymore;

i) that he had been drunk or high while at school;

j) that he was often frustrated;

k) that he had used drugs and alcohol simultaneously; and

l)  that he stayed mad for a long time when he got mad.

117.  Despite overwhelming evidence to the contrary found in NC-JOIN, NCDPS employee Adam Haughn on or about October 20, 2020, noted no known substance abuse within the past 12 months, no history of physical, sexual, or emotional abuse, and no other history of criminal victimization. Additionally, Mr. Haughn indicated there was no need for mental health care.

118.  In an egregious example of the cavalier approach followed by NCDPS staff in the assessment of high-risk juveniles, Mr. Haughn mindlessly and unquestioningly accepted D.W.'s answers to prompt questions without bothering to verify those responses in the computer database made available to him for this very purpose. Sadly, Mr. Haughn was not the last NCDPS staff member to act in such a cavalier fashion.

119.  If Mr. Haughn had devoted only a few seconds to review NC-JOIN, he would have known that D.W. was found to have contrary indicators as recently as May, July, and August of the same year.

120.  At all relevant times, NC-JOIN indicated that D.W.'s needs for substance abuse treatment were not met.

121.  At all relevant times, NC-JOIN indicated that D.W.'s needs for mental health treatment were not met.

122.  At all times relevant, Defendants knew through NC-JOIN that D.W. had a history of victimization by caregivers, mental health issues, substance abuse issues, and issues with his school behavior.

123.  At all times relevant, D.W. was a person with a disability.

124.  At all times relevant, D.W. had a mental impairment that substantially limited one or more of his major life activities.

16

125. At all times relevant, D.W. had a record of a mental impairment.

126. At all times relevant, D.W. was regarded as having such an impairment.

127. At all times relevant, D.W. was qualified to participate as a juvenile the State's new Raise the Age law.

### North Carolina's "Raise the Age" Law

128. Under the state's "Raise the Age" law, which went into effect in December 2019, most 16- and 17-year-olds charged with crimes would no longer be sent to adult court automatically. North Carolina was the last state in the country to adopt such a change. In anticipation for this significant policy change, the NC Department of Public Safety had been preparing to adjust to the law for two years leading up to the incident that gives rise to the current suit.[5]

129. In preparation, Mecklenburg County's North Detention Center, also known as Jail North, was chosen to become the Mecklenburg County Juvenile Detention Center to house juvenile defendants from across the state.

130. At the outset, Sheriff McFadden had stated, "It is a task to care for someone else's child" and expressed hope "that the families and parents understand that we're going to take care of their kids, and we're going to give them the best tools they could receive."[6]

131. Upon information and belief, those tools included educational programming as well as physical and mental health services.

132. During the time period leading up to D.W.'s death, the North Carolina Department of Public Safety paid the cost for half of the beds at Mecklenburg's Jail North complex.

133. Upon information and belief, William Lassiter, Deputy Secretary of Juvenile Justice at

---

[5] https://www.charlotteobserver.com/article239291008.html#storylink=cpy
[6] https://www.wcnc.com/article/news/local/mecklenburg-county-opens-new-juvenile-detention-center/275-bd6a3baa-b85f-4849-9374-e1a6571f70ab

the Department of Public Safety and subordinate of Defendant Buffaloe, was aware in 2020 that transportation continued to pose an issue for law enforcement.

134. Defendant Buffaloe and Defendant McFadden shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals.

135. Upon information and belief, Defendant McFadden and Defendant Buffaloe failed to engage in an "interactive process" for the development of accommodations for juveniles with mental impairments.

**D.W. is Taken into Custody and Expresses Suicidal Ideations**

136. On November 5, 2020, law enforcement officers with the Rockingham County Sheriff's Office arrested D.W., who was then 17 years old. Sheriff deputies took D.W. to the Rockingham County Law Enforcement Center the same day.

137. By taking D.W. into custody on November 5, 2020, the Rockingham County Sheriff's Office, its sheriff's deputies, and agents created a special relationship with

D.W., per the state-law public duty doctrine. This special relationship was not limited to the several hours during which D.W. was in their custody, but extended to the time after D.W. was transferred out of their custody.

138. By taking D.W. into custody on November 5, 2020, the Rockingham County Sheriff's Office, its sheriff's deputies, and agents promised protection to D.W..

139. Rockingham County law enforcement officials were aware on November 5, 2020, that D.W. was 17-years-old.

140. This was not the first time that D.W. had been arrested in North Carolina, and law enforcement officers with the Rockingham County Sheriff's Office were aware of this on November 5, 2020.

18

141. Upon information and belief, after bringing D.W. to the Rockingham County Law Enforcement Center, a law enforcement official would have seen several prior entries under D.W.'s name using NC-JOIN.

142. Upon information and belief, the Rockingham County Sheriff's Office employees are trained to consult NC-JOIN after arresting someone they know to be under 18.

143. D.W. was questioned for approximately six hours, without his mother, on November 5, 2020, at the Rockingham County Law Enforcement Center. During this time, he was briefly left alone in the interview room. While alone, the surveillance camera captured D.W. saying to himself: "if I commit suicide a real nigga killed me." D.W. was also heard saying, "you are a criminal; you deserve to die" (referring to himself) and can be seen crying.

144. On November 5, 2020, at the direction of staff from the North Carolina Department of Public Safety, employees of the Rockingham County Sheriff's Office transported D.W. to the Alexander Regional Juvenile Detention Center in Alexander County.

145. No employee of the Rockingham County Sheriff's Office made any notation in the NC-JOIN system regarding the above-described comments that were captured on the surveillance footage.

**D.W. is Housed in Alexander County**

146. D.W. was housed at the Alexander Regional Juvenile Detention Center from November 5, 2020, until November 20, 2020.

147. The Alexander Regional Juvenile Detention Center is operated by the state of North Carolina, through the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety.

148. The corrections staff and other professionals at the Alexander Regional Juvenile Detention Center are employed by the North Carolina Department of Public Safety or

19

otherwise contracted by the North Carolina Department of Public Safety.

149.    N.C. Gen. Stat. § 143B-806 incorporates the duties and powers of the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety.

150.    Upon information and belief, the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety has a duty to administer a sound admission or intake program for juvenile facilities, including the requirement of a careful evaluation of the needs of each juvenile prior to acceptance and placement.

151.    Upon information and belief, the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety has a duty to operate juvenile facilities and implement programs that meet the needs of juveniles receiving services and that assist them to become productive, responsible citizens.

152.    Upon information and belief, the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety has a duty to provide for the transportation to and from any state or local juvenile facility of any juvenile.

153.    Upon information and belief, the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety has a duty to ensure a statewide and uniform system of juvenile intake and protective supervision.

154.    Upon information and belief, the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety has a duty to establish procedures for substance abuse testing for juveniles adjudicated delinquent for substance abuse offenses. D.W. was one such juvenile.

155.    Upon information and belief, the Juvenile Justice Section of the Division of Adult

Correction and Juvenile Justice of the Department of Public Safety has a duty to develop and administer a comprehensive juvenile justice information system to collect data and information about delinquent juveniles for the purpose of developing treatment and intervention plans and allowing reliable assessment and evaluation of the effectiveness of rehabilitative and preventive services provided to delinquent juveniles.

156.    By taking D.W. into custody on November 5, 2020, the Alexander Regional Juvenile Detention Center created a special relationship with D.W..

157.    Upon information and belief, when a new juvenile, like D.W., arrives to the Alexander Regional Juvenile Detention Center, staff are instructed to consult NC-JOIN to familiarize themselves with the child's background.

158.    If the officials at the Alexander facility had consulted NC-JOIN, they would have known that D.W. was believed to have been a sexual assault victim in the past.

159.    If the officials at the Alexander facility had consulted NC-JOIN, they would have known that D.W. was believed to have been a victim of an assault with a deadly weapon when he was approximately five or six years old.

160.    If the officials at the Alexander facility had consulted NC-JOIN, they would have known that D.W.'s father was presently in jail.

161.    If officials at the Alexander facility had consulted NC-JOIN, they would have been aware of several additional facts of D.W.'s past life that are traditionally associated with a high risk of suicidal ideation.

162.    During the sixteen days that D.W. was detained at the Alexander facility, Defendants Moore, Guess, and Cowart knew that D.W. presented with more than one indicator associated with suicidal ideation.

163.    When D.W. arrived at the Alexander facility during the late-night hours of November 5,

21

2020, a staff person conducted a suicide assessment and made a notation in NC-JOIN indicating a "suicide alert" for D.W.. Defendants Guess, Moore, and Cowart knew this fact either contemporaneous to the decision or the following day.

164. On November 6, 2020, Defendant Guess performed a second suicide assessment and kept D.W. on suicide alert. In D.W.'s self-harm prevention order from November 6, 2020, Defendant Guess stated D.W. reported fleeting suicidal thoughts.

165. On November 7, 2020, Defendant Moore performed a suicide assessment on D.W. and removed D.W. from suicide alert.

166. The same day, a staff person recommended on a self-harm prevention order that D.W. not be permitted to have sharp objects.

167. D.W.'s self-harm prevention order states pencils and pens are to be removed from his room.

168. Upon information and belief, Defendant Cowart, as the supervisor of the Alexander facility, became aware of the decision to take D.W. off of suicide alert within 24 hours of the decision being made. Upon information and belief, Defendant Cowart ratified that decision.

169. Upon information and belief, Defendant Guess was aware of and ratified the decision to take D.W. off of suicide alert.

170. Upon information and belief, both Defendant Guess and Defendant Moore were authorized by the North Carolina Department of Public Safety to change a detained juvenile's suicide alert status if the clinical evidence indicated that doing so was appropriate.

171. Meanwhile, on November 9, 2020, Defendant Webster with the Rockingham County Sheriff's Office re-reviewed the surveillance footage of D.W.'s criminal interrogation that

22

took place in Rockingham County on November 5, 2020.

172.    Upon reviewing the footage, Defendant Webster took note that D.W. had made statements indicative of suicidal ideation. Specifically, Defendant Webster took note of D.W.'s statement, captured on the surveillance footage, that: "if I commit suicide a real nigga killed me."

173.    Upon information and belief, neither Defendant Webster nor any of Defendant Webster's colleagues in Rockingham County communicated this to officials with the North Carolina Department of Public Safety prior to D.W.'s death.

174.    Upon information and belief, no Rockingham County official made any notation in the NC-JOIN system regarding D.W.'s comments captured in the November 5 video.

175.    On November 9, 2020, Defendant Webster knew that D.W. was being housed at the Alexander facility and knew how to contact personnel at the Alexander facility.

176.    On November 9, 2020, Defendant Webster knew that the discovery she had made on the November 5, 2020, camera footage was important to D.W.'s future wellbeing.

177.    On or about November 9, 2020, D.W. learned that Rockingham officials had charged him with first-degree murder.

178.    The same day, D.W. shared with Defendant Guess that he had been charged with murder. D.W. expressed that he was feeling anxious and depressed following this news. He also reported to Defendant Guess difficulty sleeping.

179.    On or about November 9, 2020, Defendant Guess had concerns and requested an additional consult for D.W..

180.    On November 10, 2020, D.W. reported to Defendant Moore that he felt anxious and scared. Defendant Moore made the observation that D.W. had a "flat" affect. In response to these indicators, Defendant Moore simply told D.W. that he should feel free to reach out if

23

he needs someone.

181.   On November 10, 2020, Defendant Moore listed D.W.'s mental health status as outside normal limits ("ONL"), and like Defendant Guess the day prior, requested an additional consult for D.W..

182.   Upon information and belief, Defendant Moore and Defendant Guess did not enter the specific observations from November 9 and November 10 into NC-JOIN.

183.   Upon information and belief, neither Defendant Guess, nor Defendant Moore, nor Defendant Cowart ever recommended or ordered that D.W. be placed back on suicide alert.

184.   Upon information and belief, D.W. was not seen by a psychiatrist to be evaluated for possible medication.

185.   Upon information and belief, professionals at the Alexander Regional Juvenile Detention Center did not conduct a mental health consultation for D.W. on November 18, 2020.

186.   Upon information and belief, personnel at the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety were aware that D.W. suffered from severe emotional disturbance, a developmental disability, or an intellectual disability.

187.   Upon information and belief, personnel at the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety were aware that the disturbance or disability substantially contributed to D.W.'s delinquent behavior.

188.   Upon information and belief, personnel at the Juvenile Justice Section of the Division of Adult Correction and Juvenile Justice of the Department of Public Safety failed to recommend D.W. for a psychiatric residential treatment facility placement.

**D.W. is Taken to Mecklenburg County and Commits Suicide**

189.  Upon information and belief, on or about November 19, 2020, NCDPS staff made the decision to transfer D.W. from the Alexander facility to a county jail in Mecklenburg County.

190.  Upon information and belief, on November 20, 2020, at 4:40 PM, NCDPS employees Ron Adams and T. Harris transferred D.W. to Mecklenburg County.

191.  Upon information and belief, NCDPS personnel failed to complete the required chain of custody transfer form. If they had completed this form, it would have included critical information about D.W.'s mental health status.

192.  Upon information and belief, Defendant Cowart – as the Director of the Alexander facility – was charged with ensuring that any juvenile transported out of her facility was accompanied by the necessary paperwork and that transportation staff had ready access to such documentation when the time came for the juvenile to be transported.

193.  Upon information and belief, NCDPS transportation staff are instructed to deliver each juvenile's file when transferring a juvenile between detention centers. This includes all documentation listed on the Detention Center Records Checklist (Form DC 045).

194.  Upon information and belief, several critical pieces of information about D.W.'s mental health status were missing from D.W.'s paper file that was delivered to Jail North by Ron Adams and T. Harris.

195.  On November 21, 2020, beginning at 12:33 am, a Mecklenburg employee noted in NC-JOIN that D.W. needed to be housed in a single room, without cell mates.

196.  D.W. was placed on suicide alert at this time. He was not placed on the more stringent suicide watch.

197.  Upon information and belief, suicide watch requires constant observation of a detainee.

198.  Jail North is operated by the Mecklenburg County Sheriff's Office, under an agreement

with the North Carolina Department of Public Safety. *See Id.* § 153A-218.

199.    Although the day-to-day operations at Jail North are performed by employees of the Mecklenburg County Sheriff's Office, the facility operates as a juvenile detention facility only with the permission of the North Carolina Department of Public Safety.

200.    For example, upon information and belief, the Mecklenburg County Sheriff's Office recently re-located its juvenile detention center to the current location at Jail North, in part, because the North Carolina Department of Public Safety communicated new statewide operational requirements for juveniles in custody.

201.    For example, upon information and belief, the Mecklenburg County Sheriff's Office is required to utilize forms and templates provided by the North Carolina Department of Public Safety when documenting certain details about the care and custody of juveniles housed in Mecklenburg.

202.    For example, under N.C. Gen. Stat. § 143B-820, the Mecklenburg County Sheriff's Office was eligible to receive a per diem payment from the North Carolina Department of Public Safety for the cost of caring for D.W. prior to his suicide.

203.    Upon information and belief, Mecklenburg County sought a per diem payment from the North Carolina Department of Public Safety to compensate it for the time D.W. spent in its facility.

204.    Under N.C. Gen. Stat. § 143B-819, the North Carolina Department of Public Safety determines which counties are invited to operate a juvenile detention facility. The Mecklenburg County Sheriff's Office is not capable of unilaterally choosing to assume the role of housing pretrial detainees who are under 18.

205.    Despite direction by the North Carolina Department of Public Safety, Defendant McFadden and his subordinates are still deemed to be keepers of the jail under state law. As

such, Defendant McFadden and his subordinates had an independent, non-delegable duty to care for juveniles housed in Jail North.

206. Despite direction by the North Carolina Department of Public Safety, Defendant McFadden and his subordinates still maintain an independent obligation to ensure that the conditions of confinement for juvenile detainees at Jail North do not fall short of that required by the Fourteenth Amendment.

207. By taking D.W. into custody on November 20, 2020, the Mecklenburg County Sheriff's Office, its corrections officers, and agents created a special relationship with D.W., per the state-law public duty doctrine.

208. By taking D.W. into custody on November 5, 2020, the Mecklenburg County Sheriff's Office, its corrections officers, and agents promised protection to D.W..

209. Shortly after D.W.'s arrival to Jail North, he was placed on suicide alert. D.W. was never taken off suicide alert while he was a detainee in Mecklenburg County.

210. As noted previously, NC-JOIN would have alerted Mecklenburg County officials to additional indicators that D.W. may be suicidal. This includes past history of sexual victimization by adults when D.W. was a young child, indications that D.W. struggled with anger problems, indications that D.W. struggled with substance abuse, and indications that D.W. had an extensive school disciplinary history.

211. Upon information and belief, suicide alert and suicide watch are accompanied by differing degrees of monitoring and safety precautions.

212. As a detainee on suicide alert, corrections officers were required, at least, to glance inside D.W.'s cell once every ten minutes, sufficient to observe D.W. and confirm his ongoing safety.

213. Despite being placed on suicide alert, D.W. was placed in a cell that contained multiple furnishings. Upon information and belief, not all of the furnishings were fastened to the

27

floor or walls of the cell.

214.    Despite being placed on suicide alert, D.W. was placed in a cell that contained metal grating located in the ceiling.

215.    Despite being placed on suicide alert, on November 21, 2020, D.W. had access to at least one sharp object inside his cell—a writing utensil.

216.  Despite notes in his file from Alexander County that states D.W. was to not have bedsheets nor sharp objects, both were items were in his cell on the day of his death.

217.    Upon information and belief, D.W. did not meet or otherwise interact with any licensed social workers or any licensed mental health professionals during his stay at Jail North.

218.    Upon information and belief, neither Defendant Webster nor any other employees of the Rockingham County Sheriff's Office communicated with any officials at Jail North on November 20 or November 21, 2020, prior to D.W.'s death, to share the concerning things they had observed on the November 5, 2020, Rockingham surveillance video.

219.    The cell where D.W. was housed on November 21, 2020, was referred to as an observation cell. Despite this nomenclature, the cell did not have a surveillance camera located inside the cell.

220.    Upon information and belief, there were no surveillance cameras installed inside D.W.'s cell to ensure that the entire cell could be observed by corrections staff.

221.    Consequently, corrections officers were unable to determine whether D.W. was safe at any given moment.

222.    Upon information and belief, Defendant McFadden, Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders placed a juvenile detainee with a disability, D.W., in inappropriate security classification because no accessible cells or beds were available.

28

223. Upon information and belief, Defendant McFadden, Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders failed to make an individualized assessment to include, at a minimum, a determination of whether D.W. posed a risk, whether any risk is eliminated after his mental health treatment, and whether his segregation is medically indicated and a solo cell was appropriate.

224. During the two hours leading up to his death, neither Defendant Weller nor any other staff member of the Mecklenburg County Sheriff's Office visually observed D.W. within the required ten-minute intervals.

225. Defendant Weller was on duty on November 21, 2020, inside the pod of Jail North where D.W.'s cell was located.

226. Defendant Weller was responsible for conducting periodic "tours" of this pod. A tour involves a corrections officer walking past each of the occupied cells, peering inside each individual cell and making appropriate notations in jail records.

227. Upon information and belief, Defendant Weller knew on the morning of November 21, 2020, that his colleagues had placed D.W. on suicide alert the previous evening. If Defendant Weller did not know, he should have known, given the readily-available information in NC-JOIN and elsewhere.

228. During the late morning and early afternoon of November 21, 2020, D.W. was located inside his cell.

229. At 11:36 am, after serving D.W. lunch, Defendant Weller opened D.W.'s cell door, had a brief conversation, and closed the door again.

230. Approximately 2.5 hours later, at 1:56 pm, Defendant Weller found D.W.'s lifeless body hanging in his cell. For 2.5 hours, Defendant Weller had failed to make any visual observations of D.W..

231. Between approximately 12:10 pm and 12:55 pm, Defendant Weller was on break, and another corrections officer substituted for Defendant Weller during this time.

232. At approximately 12:55 pm, Defendant Weller returned to work.

233. Upon information and belief, between 12:55 pm and 1:19 pm, Defendant Weller did not visually observe D.W. inside his cell.

234. At 1:19 pm, Defendant Weller walked through the pod and spoke briefly with another juvenile. Upon information and belief, Defendant Weller did not visually observe D.W. inside his cell during this particular tour.

235. At 1:29 pm, Defendant Weller walked again throughout the pod but did not visually observe D.W. inside his cell.

236. At 1:43 pm, Defendant Weller walked past D.W.'s cell again. Upon information and belief, Defendant Weller glanced briefly into D.W.'s cell but did not visually observe D.W..

237. At 1:56 pm, Defendant Weller found D.W.'s lifeless body dangling from a bedsheet that had been fastened to a metal grate in the ceiling. It is believed that D.W. hung himself using his jail-issued bedsheet. How long had D.W. been hanging? It is unlikely we will ever know.

238. Upon information and belief, Defendant Weller noted different time entries in different documents to refer to the same items.

239. Upon information and belief, Defendant Weller and other Mecklenburg County Defendants falsified records to make it appear that Defendant Weller had observed D.W. within the required ten-minute intervals. For example, documentation completed by Defendant Weller and other Mecklenburg County Defendants made the false representation that Defendant Weller discovered D.W.'s lifeless body hanging at 1:50 pm (not 1:56 pm). Additionally, Defendant Weller made notations indicating that he made visual observation of D.W. on several prior occasions that same afternoon, when in fact he failed to even glance

inside D.W.'s cell.

240. Upon information and belief, Defendants of Mecklenburg County and Defendant McFadden falsified time logs that were submitted to the Department Health and Human Services ("DHHS") and DHHS Chief Jail Inspector Christopher Wood.

241. Upon information and belief, Defendants of Mecklenburg County and Defendant McFadden falsified time logs that were submitted to NCDPS.

242. Upon information and belief, Defendants of Mecklenburg County and Defendant McFadden falsified time logs that were handwritten by Defendant Weller.

243. Upon information and belief, Defendants of Mecklenburg County and Defendant McFadden falsified time logs that were submitted to Correct Care solutions.

244. Upon information and belief, Defendants of Mecklenburg County and Defendant McFadden did not promptly refer D.W. to a mental health professional. It was not until the date and time of D.W.'s death where Correct Care Solutions is present to observe D.W.

245. Upon information and belief, Defendants of Mecklenburg County and Defendant McFadden falsified time logs that the jail maintains internally in that Defendant Weller's handwritten time logs do not mirror time logs presented to DHHS Chief Jail Inspector Christopher Woods and NCDPS. Moreover, the time logs do not mirror the video footage of Defendant Weller's jail round checks on November 20, 2020 or November 21, 2020.

246. Upon discovering that D.W. was allegedly hanging inside his cell at 1:56 pm, Defendant Weller immediately called for assistance.

247. Upon information and belief, it is reported in the medical examiner's preliminary summary of circumstances surrounding death, that D.W. was found hanging by the neck with a bed sheet secured to a metal grill in the ceiling. Additionally, the same document states D.W. left a note apologizing to his family.

31

248. At 1:57 pm, additional corrections officers arrived to assist Defendant Weller inside D.W.'s cell.

249. After unsuccessful attempts to revive D.W. at Jail North, D.W. was transported to a Charlotte-area hospital. D.W. was pronounced dead at 3:12 pm on November 21, 2020.

250. Upon information and belief, the pencil D.W. used to write a note was never recovered.

251. Upon information and belief, EMS records show D.W.'s mouth full of blood.

**Several Law Enforcement Agencies Throughout North Carolina Have Acknowledged the Institutional Shortcomings within Mecklenburg Jails**

252. Following D.W.'s death, the North Carolina Department of Health and Human Services was contacted, and the agency opened an investigation.

253. Upon information and belief, due to COVID-19 restrictions, the North Carolina Department of Health and Human Services compliance investigation was conducted by telephone and email (not in person).

254. Upon information and belief, since D.W.'s death, the Department of Public Safety – Juvenile Justice Division made the decision to gradually reduce the number of juveniles housed within Jail North and to eventually remove all non-Mecklenburg County Juveniles from Jail North. NCDPS intends to place them in other facilities outside Mecklenburg County.

255. Upon information and belief, since D.W.'s death, a second partner agency that routinely contracted with the Mecklenburg County Sheriff's Office made the decision to gradually reduce the number of its detainees housed within Mecklenburg County jails. The U.S. Marshals Service, which has sent federal detainees under its custody to Mecklenburg County jail facilities since at least the 1990s, recently decided to end its contract and to find alternative places to house its detainees.

256. Upon information and belief, both NCDPS and the U.S. Marshals Service made these

decisions, in part, because it became clear that Defendant McFadden's staff were failing to conduct pod tours with adequate frequency.

257.    Upon information and belief, Defendant McFadden says a contributing factor to the issue inside juvenile jails right now is a 2019 law that raised the age for juveniles to be charged as an adult. That resulted in large numbers of 16 and 17-year-olds who ended up going through the juvenile justice system instead of the adult jails.

258.    Defendant McFadden has previously stated: "North Carolina was not adequately equipped to handle this number of juveniles . . . So, they asked the Mecklenburg County Sheriff's office 'will you take juveniles from outside of the county and house them here?'"[7]

259.    Upon information and belief, prior to November 2020, Defendant McFadden subjectively understood that there was inadequate staff employed by his agency to meet the detainees' minimal needs, given the number of detainees then being housed on an average night at his facilities.

260.    On or about March 8, 2022, Major Sherae DeLeon Brown ("Major Brown") took over the daily command of Detention Center Central in December 2021 and spoke about MCO's "plan of correction." N.C.G.S. 153A-224.

261.    On or about March 8, 2022, Major Brown stated "Supervision rounds and inmate observation requirements were not being met consistently due to staffing constraints."

262.    On or about December 10, 2021, Defendant McFadden, when told his staff was not making the rounds as required by the minimum state-law standards, he responded, "that is true."

---

[7] https://www.fox46.com/crime-and-public-safety/mcso-reassigning-juvenile-detention-officers-to-alleviate-main-

263.  Upon information and belief, multiple staff members at the Mecklenburg County Jail in 2020 and 2021 expressed concerns that jail staff were not conducting the pod tours with adequate frequency. In response, McFadden stated, "[w]ell, we don't have the staff to make those standards."

264.  Upon information and belief, the Mecklenburg County Board of Commissioners wants to close the juvenile detention center.

265.  Upon information and belief, in 2022, Defendant McFadden and the North Carolina Department of Public Safety discussed the relocation of all female juvenile inmates and all non-Mecklenburg County male juvenile inmates to other facilities.

**Defendant McFadden Maintained an Unconstitutional Custom or Practice During the Years Leading up to D.W.'s Death**

266.  During the 2.5 years leading up to D.W.'s death, the Mecklenburg County Sheriff's Office struggled with an unusually large number of in-custody deaths within its facilities.

267.  In-custody deaths during this time period were caused, at least in part, by a failure to adequately supervise the jail pods. Put differently, the moving force behind multiple deaths leading up to D.W.'s death was the failure of jail staff to supervise the detainees within their charge.

268.  For example, on July 11, 2018, Jerome Thompson committed suicide by freely exiting his second floor cell and, without being observed, intentionally jumped from the second-floor balcony head first. He later died from his injuries. It was later discovered that there existed widespread evidence that Mr. Thompson was suicidal, yet the staff of Mecklenburg County Sheriff's Office failed to note this in their system.

34

269. For example, on October 3, 2018, Karla Griffin committed suicide within the Mecklenburg County jail cell. Upon information and belief, Griffin placed a trash bag over the window of the door, preventing officers from looking inside the cell. During at least four pod rounds, an officer walked by the cell but did not glance into the window and, therefore, did not notice that the window was obscured. The Sheriff at the time acknowledged that "the quality of supervision rounds conducted was not sufficient to meet the state standard."

270. In addition to the two examples noted above, there is believed to have been at least one additional suicide that took place within the Mecklenburg County jail in 2018.

271. The three suicides in 2018 prompted then-Sheriff Carmichael to comment that he had never seen such a large number of in-custody deaths in such a short time period during his 30+ year law enforcement career.

272. The problems continued after 2018. For example, on April 2, 2019, Michael Trent died of a fentanyl overdose in the Mecklenburg County jail. Upon information and belief, employees of the Mecklenburg County Sheriff's Office failed to observe him inside his cell with the frequency required by state law.

273. As of the date of this filing, another inmate in custody of Defendant McFadden was pronounced dead on June 11, 2022.

274. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to conduct proper intakes on juveniles from the time D.W. entered their custody and control and until discharge.

275. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to screen and assess D.W., and rather relief on self-reporting of individual Defendants.

276. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to have robust staff training on suicide prevention, mental health and substance use.

277. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to Require all staff to constantly be on alert for signs of suicide risk.

278. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to have adequate medical and mental health staffing.

279. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to Limit the use of isolation and increase social support.

280. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to Have plans and procedures for transfer to appropriate and safe treatment for at-risk individuals.

281. Upon information and belief, Mecklenburg County Defendants and NCDPS Defendants failed to evaluated both internal and external reviews of each D.W. event with staff and D.W. debriefing

282. Upon information and belief, the quality of supervision rounds conducted by Defendants was not sufficient to meet the state standard in 10A NCAC 14J .0601.

283. Mecklenburg County Jail North should have put D.W. on a special watch. The rule states: "a previous record of a suicide attempt or a previous record of mental illness shall warrant observation at least four times an hour" (10A NCAC 14J .0601). According to the jail's records, well more than the required time passed between the last time staff saw D.W. alive and when they discovered him in distress.

284.    Jail rules require screening whenever someone is admitted to a jail.[8] The purpose of the screening is to identify medical needs and risks to health and safety. When someone is identified at risk of suicide, they are to be placed on "special watch" rounds.[9] This special watch round requires an in-person check by an officer four times an hour on an irregular basis, with not more than 20 minutes between rounds.[10] Defendants failure to identify D.W.'s medical risks and place him on special watch was a deadly decision,

<u>**COUNT I**</u>
**42 U.S.C. § 1983**
**Deliberate Indifference under the Fourteenth Amendment**
**Against Defendants Weller, Williams, Comas, Saunders, and Cowart**

285.    This Count is brought against Defendants Weller, Williams, Comas, Saunders and Cowart. All Defendants in this Count are sued in their individual capacities.

286.    At all relevant times, Defendants Williams, Comas, and Saunders knew or should have known that Defendant Weller was not conducting the proper surveillance of inmates within the required ten-minute intervals for juveniles who have been placed on suicide alert. Specifically, they should have known this because, upon information and belief, it was common practice in Jail North to conduct constitutionally inadequate pod tours.

287.    Defendants Williams, Comas, and Saunders were on duty at Jail North on the day of D.W.'s death. These three Defendants knew, or reasonably should have known, that the pod where Defendant Weller was stationed contained a detainee who had been recently transferred to the facility and who screened as possibly suicidal. Armed with this knowledge, Defendants Williams, Comas, and Saunders should have taken steps to ensure that line staff were performing their appointed rounds in a constitutionally compliant manner.

---

[8] 10A NCAC 14J .1002
[9] 10A NCAC 14J .0601
[10] *Id.*

288.　As a proximate result of this negligent supervision, D.W. was left unattended in his cell with instruments of suicide for approximately one hour (and possibly more than one hour) before Defendant Weller discovered that something was wrong.

289.　The above-named Defendants violated D.W.'s rights under the Fourteenth Amendment by intentionally and deliberately, with conscious disregard, failing to act when they knew or should have known that D.W. faced a substantial risk of serious harm, and by disregarding such risk by failing to take reasonable measures, which were readily available, to avoid that risk.

290.　Suicidal ideation is a serious medical need, as that term is understood in the context of the Fourteenth Amendment Due Process rights of pre-trial detainees.

291.　At all times relevant herein, D.W. was a pre-trial detainee.

292.　Defendants Weller, Williams, Comas, and Saunders had subjective knowledge of D.W.'s risk of suicide during the 18 hours leading up to his death on November 21, 2020.

293.　Defendants Weller, Williams, Comas, and Saunders failed to take adequate steps to ensure D.W.'s safety in the Mecklenburg County Detention Center. Their failures amounted to a deliberate indifference of a substantial risk of serious harm, and it also amounted to a deliberate indifference to a serious medical need.

294.　Upon information and belief, an intake staff person on November 20, 2020, assigned D.W. to a cell that contained a metal grate located high up within the cell, despite knowing that D.W. presented with indicia of suicidal ideation.

295.　Defendant Weller was deliberately indifferent the following day by failing to adequately monitor D.W.'s jail cell during the two hours prior to D.W.'s hanging himself.

296.　Specifically, Defendants Williams, Comas, and Saunders failed to ensure that their subordinates were adequately monitoring D.W.'s jail cell and failed to step in to monitor the

same when they should have known that such monitoring was not occurring at ten-minute intervals.

297.   Defendant Cowart had subjective knowledge of D.W.'s risk of suicide during the approximately two weeks during which D.W. was in their care and custody at the Alexander facility.

298.   Defendant Cowart consciously disregarded readily available information about D.W.'s condition. Specifically, Defendant Cowart disregarded information available to her through the NC-JOIN computer system. This amounted to a conscious disregard of the substantial likelihood of harm, as well as a conscious disregard of a serious medical need.

299.   Defendant Cowart, although aware of D.W.'s suicidal risk, failed to properly classify him or to notify Mecklenburg that he was a suicide risk and had expressed suicidal ideations. This failure to act led directly to D.W.'s death.

300.   As a proximate result of each of these Defendants' deliberate indifference, D.W. died.

## **COUNT II**
### **42 U.S.C. § 1983 –** *Monell Violation*
### **Custom & Practice in Violation of the Fourteenth Amendment Due Process Clause**
### **Against Defendant McFadden in his official capacity**

301.   Mecklenburg County was responsible for the formulation and execution of policies regarding the conditions of confinement of detainees in Jail North.

302.    At all relevant times, the Mecklenburg County Sheriff's Office was acting under color of state law, had in effect *de facto* practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of officers and other care providers who worked and/or were contracted at their two respective law enforcement agencies.

303.   The Mecklenburg County Sheriff's Office maintained a custom or practice of conducting

39

lax, poorly-documented, and irregular pod tours and of allowing personnel to conduct cursory checks of juveniles without ensuring that there is a visual observation of the juvenile on each pass.

304. This custom or practice is evidenced by some of the examples provided herein. During the 2.5 years leading up to D.W.'s death, it is believed that at least four individuals committed suicide within Mecklenburg jail facilities under circumstances similar to those in this case.

305. The individual Defendants employed by Mecklenburg County acted in such an overtly reckless manner to suggest that the Mecklenburg County Sheriff's Office – despite the content of written policies – maintained a custom and practice of deliberate indifference. Specifically, Defendant Weller's actions indicate that juvenile corrections officers assigned to Jail North regularly, habitually, and without discipline failed to conduct pod "tours" in a manner that prevents constitutional deprivations.

306. In the several years prior to November 2020, Mecklenburg County had experienced several jail suicides that were caused, in part, by a failure of staff to adequately supervise to the minimal requirements of the Fourteenth Amendment.

307. As a direct and proximate result of said practices and customs, D.W. was denied his rights under the Fourteenth Amendment.

### COUNT III
### N.C. Gen. Stat. § 28A-18–2 – Wrongful Death
### Against Defendants McFadden, Weller, Williams, Comas,
### Saunders, Moore, Guess, Cowart, and Webster

308. In this Count, Defendants Moore and Guess are sued only in their individual capacities. Defendant McFadden is sued only in his official capacity. Defendants Weller, Williams, Comas, Saunders, Moore, Guess, Cowart, and Webster are sued in both their individual and official capacities.

309. Between November 9, 2020, and November 21, 2020, Defendant Webster was grossly

negligent in her failure to communicate actual knowledge that she possessed of D.W.'s fragile emotional state to employees of the North Carolina Department of Public Safety, employees of the Mecklenburg County Sheriff's Office, and by failing to notate the same in the NC-JOIN computer system.

310.   Defendant Webster was not merely negligent in this failure, but was grossly, wantonly, recklessly, and willfully negligent because she knew in the moment that she should communicate her special knowledge to others who were in a position to use the knowledge. She subjectively understood in the moment that the knowledge she possessed was urgent in nature, was relevant to those who had current custody of D.W. and was important to ensuring D.W.'s safety. Such communication was as simple as picking up the phone or making a notation in a computer system that she regularly used for other purposes. She did none of these things.

311.   The above-described gross negligence of Defendant Webster was a proximate cause of D.W.'s death on November 21, 2020. If this knowledge had been known to either the North Carolina Department of Public Safety prior to November 20, 2020, or the Mecklenburg County Sheriff's Office prior to November 21, 2020, the others could have noted this in their files. This additional information would have led to D.W.'s being placed on the more restrictive suicide watch on November 21, 2020, rather than the less restrictive suicide alert that day.

312.   Between November 7, 2020, and November 20, 2020, Defendants Moore, Guess, and Cowart were grossly negligent in their decision to remove D.W. from suicide alert, their failure to adequately consult existing notations in NC-JOIN in making their determinations about D.W.'s risk for suicide, by failing to place him back on suicide alert following the November 9, 2020 news that D.W. had been charged with first degree murder, by failing to

41

determine that his proper designation was on suicide watch rather than suicide alert, and by failing to adequately communicate many of the indicators of suicide risk to the Mecklenburg County Sheriff's Office on November 20, 2020 when D.W. left their facility.

313.   Defendants Moore, Cowart were not merely negligent in this failure, but were grossly, wantonly, recklessly, and willfully negligent because these Defendants knew in the moment that the NC-JOIN system was at their disposal and intended for this purpose, knew in the moment that D.W. was facing serious criminal charges that the professional literature indicates should trigger heightened awareness in these situations, and knew in the moment that several determinations they made on their suicide screening forms were plainly inaccurate and inconsistent with D.W.'s already-documented history.

314.   On November 21, 2020, Defendants Weller, Comas, Williams, and Saunders were grossly negligent in their failure to adequately consult existing notations in NC-JOIN in making their determinations about D.W.'s risk for suicide, by failing to determine that his proper designation was on suicide watch rather than suicide alert, by placing him in a cell within Jail North that contained a metal grate fastened high up in the cell, by allowing D.W. to possess sharp objects such as writing utensils, by failing to monitor D.W.'s cell in ten-minute intervals, and by performing pod "tours" in such a deficient manner that Defendant Weller is believed to have merely passed by D.W.'s cell without actually looking inside the cell.

315.   On November 20 and 21, 2020, Defendants Weller, Comas, Williams, and Saunders were not merely negligent, but were grossly, wantonly, recklessly, and willfully negligent because, among other things, Defendant Weller intentionally fabricated jail records in an effort to falsely show that he had performed adequate monitoring of D.W. during the hours leading up to his death, because Defendant Weller passed by D.W.'s cell without

42

even attempting to look inside the cell on several occasions, and because Defendants Williams, Comas, and Saunders knew or had reason to know that Defendant Weller regularly failed to conduct pod tours in an adequate fashion and were in a position to correct that behavior prior to D.W.'s death.

316. Had Defendants acted pursuant to the requisite standards of care, they could and would have prevented D.W.'s death.

317. At all times material hereto, the circumstances that lead to D.W.'s death were preventable through adherence to well-established protocols.

318. The above-mentioned Defendants owed a recognized duty of care to D.W.. This duty of care derives from several sources, which combined, imposed a duty on Defendants to take steps to place D.W. out of harm's way, to communicate with one another about D.W.'s risk indicators, and to regularly monitor him. This duty of care derives from several sources including, but not limited to, provisions of North Carolina statutes pertaining to jailers and juvenile detention, the Appalachian State University Model Policies and Procedures Manual for North Carolina Jails (found at: 10A N.C.A.C. 14J, *et seq.*); provisions of the American Correctional Association "CORE" standards, the American Correctional Association, Standards for Small Jails; and the National Commission on Correctional Health Care, Standards for Health Services in Jails.

319. Defendants breached this standard of care in multiple ways as described above.

320. Defendants' acts and omissions, neglect, wrongful acts, and deliberate indifference as specifically described above proximately caused D.W.'s death on November 21, 2020.

<u>**COUNT IV**</u>
**N.C. Gen. Stat. § 28A–18–1 – Survival Action for Pain and Suffering**
**Against Defendants Weller, Williams, Comas, and Saunders**

321. Defendants named in this Count are sued in both their individual and official capacities.

43

322. For the reasons explained in Count III, above, Defendants were grossly, wantonly negligent in breaching the widely-accepted standards of care that they owed to D.W. between November 5, 2020, and November 21, 2020. As a result of this breach of the standard of care, not only did D.W. hung himself. This hanging resulted not only in death, but also in a period of pain and suffering prior to his death.

323. Per N.C. Gen. Stat. § 28A-18–1, Plaintiff seeks compensation for this pain and suffering.

<u>**COUNT V**</u>
**N.C. Gen. Stat. § 162-55 – Injury to Prisoner by Jailer**
**Defendants Weller, Williams, Comas, and Saunders**

324. Defendants named in this Count are sued in both their individual and official capacities.

325. D.W. was committed to the custody and care of Sheriff McFadden and his subordinates on November 20 and 21, 2020. Defendant Weller, as juvenile corrections staff on duty during the afternoon of November 21, 2020, had a responsibility under N.C. Gen. Stat. § 162-55 to ensure D.W.'s health and safety. Defendants Williams, Comas, and Saunders, as supervisory employees with direct supervisory authority over Defendant Weller, were equally responsible for D.W.'s health and safety on the afternoon of November 21, 2020.

326. The above-named Defendants were considered assistant jailers at the Jail North facility on November 21, 2020. As assistant jailers who held their position under the authority of Sheriff McFadden, each of the above-named defendants was a keeper of the jail, per *id.* .

327. The actions and omissions of Defendants Weller, Williams, Comas, and Saunders were in violation of N.C. Gen. Stat. § 162-55, as their actions caused a wrong and injury to D.W., which was contrary to law.

328.    The conduct of these four Defendants was so careless and reckless that it demonstrated a total disregard of the consequences and a heedless indifference to the safety, wellbeing, and rights of D.W.. In other words, Defendants' actions amounted to criminal negligence.

329.    Specifically, Defendant Weller knew or should have known of D.W.'s high risk of suicide. Defendant Weller should have known to monitor D.W. at least once every ten minutes. Instead, an interval of at least 23 minutes elapsed between observations during Defendant Weller's duty. And more likely, one hour actually elapsed between observations during Defendant Weller's duty. For example, Defendant Weller likely failed to make visual confirmation of D.W.'s wellbeing between 12:55pm when he returned from his work break until 1:56pm when Defendant Weller discovered D.W.'s lifeless body dangling from a ligature inside his cell.

330.    Upon information and belief, Defendant Weller then fabricated jail records and lied to investigators about the timeline. Most notably, Defendant Weller lied about the time that he discovered D.W.'s lifeless body, in order to make it appear that less time elapsed since the prior pod "tour." Additionally, Defendant Weller recklessly conducted pod tours between 1:00pm and 1:43pm in such a manner that he did not confirm that D.W. was safe inside his cell. Instead, Defendant Weller performed either a cursory glance inside the cell or failed to glance at all inside the cell.

331.    Defendants Williams, Comas, and Saunders were supervisors on duty during the relevant hours and knew or should have known that it was common practice for Defendant Weller and other juvenile corrections officers in that particular pod to perform their pod tours in such a recklessly deficient manner that harm was almost certain to result to juveniles – such as D.W. – who had displayed indications of suicidal tendencies.

332.    Defendants' criminally negligent conduct was a proximate cause of D.W.'s

45

death. Plaintiff is entitled to treble damages under this Count.

**COUNT VI**
**42 U.S.C. § 12132 and 29 U.S.C. § 794**
**Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the**
**Rehabilitation Act**
**Against Defendant Mecklenburg County**

333.   Defendant Mecklenburg County is a "public entity," per 42 U.S.C. § 12131.

334.   During all relevant times, Defendant Mecklenburg County received federal financial assistance per 29 U.S.C. § 794.

335.   D.W. was a "qualified individual," with a mental illness and disability that substantially limited his major life activities, per 42 U.S.C. § 12131 and 29 U.S.C. § 794.

336.   Title II of the ADA applies to local government entities and protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities. 42 U.S.C. §§ 12131-12132.

337.   At all times relevant herein, Plaintiff was a qualified individual with a disability.

338.   Defendant Mecklenburg County's local confinement facilities must comply with Title II of the ADA and relevant provisions of the Rehabilitation Act, just as do other state and local government-operated facilities.

339.   Congress enacted the ADA to remedy various forms of disability discrimination, including "failure to make modifications to existing facilities and practices." *Id.* § 12101(a)(5).

340.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.

341.   Pursuant to Title II of the ADA and its implementing regulations, public entities are required to "make reasonable modifications in policies, practices, or procedures when the

46

modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

342.  Section 504 states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); 11 C.F.R. § 9420.3.

343.  Defendant Mecklenburg County is covered within the meaning of Section 504 because it is a local government that provides services, programs, and activities and receives federal financial assistance. 29 U.S.C. § 794.

344.  The ADA regulations include a provision, usually termed the "integration mandate," that directs "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" (28 C.F.R. § 35.130(d)). The regulation that deals specially with program access in  jails (28 C.F.R. § 35.152) adds some detail to this general mandate. It provides, in pertinent part: (b)(2) Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals.

345.  Defendants were required to provide detained individuals with disabilities equal access to facilities as they provide to non-disabled detained individuals. Specifically, Defendant must provide modifications to otherwise applicable policies and procedures as necessary to ensure individuals with disabilities have equal access to the facilities.

346.  Defendant has discriminated against Plaintiff on the basis of his disabilities by denying him equal access to the services, programs, and facilities at the state prison where he was housed.

347. Defendant's actions constitute discrimination as medical and mental health care are among the services provided and denial of particular treatments needed by people with disabilities.

348. Defendant violated the ADA and the Rehabilitation Act by failing to provide services to D.W. on an equal basis as it would provide to similarly-situated detainees who did not suffer from mental and emotional health disorders. Consequently, Defendant provided a quality of care that was different, separate, and worse than the services provided to other juvenile detainees who did not present with a disability.

349. Defendant violated the ADA and the Rehabilitation Act by failing to engage in an "interactive process" for the development of accommodations.

350. As a result of the acts, omissions and misconduct of the Defendant, D.W. died, and Plaintiff has suffered, is now suffering, and will continue to suffer damages and injuries.

**COUNT VII**
**N.C. Gen. Stat. § 168A-7**
**North Carolina Persons with Disabilities Protection Act**
**Against Defendants Buffaloe and State of North Carolina**

351. Defendant Buffaloe is the official responsible for ensuring that the state's juvenile detention facilities comply with the North Carolina Persons with Disabilities Protection Act.

352. Defendant State of North Carolina is sued for its failure to ensure that its juvenile detention facilities are compliant with the North Carolina Persons with Disabilities Protection Act. Put differently, the State of North Carolina is sued in this Count to ensure that it affords those detained juveniles who suffer from mental health disabilities with equal access to services and programs to meet their minimal emotional needs, as it provides to those detained juveniles who do not suffer from such disabilities.

353. The Alexander Regional Juvenile Detention Center is a covered governmental entity, per N.C. Gen. Stat. § 168A-3, because it is an institution operated by a state agency.

354. At all times relevant herein, D.W. was a qualified person with a disability for purposes of

48

the North Carolina Persons with Disabilities Protection Act.

355. As detailed above, D.W. was repeatedly denied the benefits of services, programs, or activities to which he was otherwise entitled, because of his disability.

356. Defendant is required to provide detained juveniles with disabilities equal access to facilities as they provide to non-disabled detained juveniles. Specifically, Defendant must provide modifications to otherwise applicable policies and procedures as necessary to ensure juveniles with disabilities have equal access to the facilities.

357. Defendant has discriminated against Plaintiff on the basis of his disabilities by denying him equal access to the services, programs, and facilities at the state prison where he was housed.

358. Defendant's actions constitute discrimination as medical and mental health care are among the services provided and denial of particular treatments needed by juveniles with disabilities.

359. Defendant violated the North Carolina Persons with Disabilities Protection Act by failing to provide services to D.W. on an equal basis as it would provide to similarly-situated juvenile detainees who did not suffer from mental and emotional health disorders. Consequently, Defendant provided a quality of care that was different, separate, and worse than the services provided to other juvenile detainees.

360. Defendant violated the ADA and the Rehabilitation Act by failing to ensure that juvenile detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals.

361. Defendant violated the ADA and the Rehabilitation Act by failing to engage in an "interactive process" for the development of accommodations.

362. Under the North Carolina Persons with Disabilities Protection Act, a covered governmental entity shall administer its services, programs, and activities in the most integrated setting appropriate to the needs of persons with disabilities.

49

363.  Under this Count, Plaintiff seeks declaratory and injunctive relief to ensure that current and future pre-trial detainees who are under the age of 18 – like her son – are afforded access to programs and services on an equal basis, regardless of the detainee's mental health status.

## COUNT VIII
### N.C. Gen. Stat. § 28A-18–2 – Wrongful Death (Negligent Architectural Design) Against Defendant McFadden

364.  Defendant McFadden owed a duty of care to D.W. in the design and construction of the Mecklenburg County cell in which D.W. was placed. McFadden owed a duty of care owing from his role as the Sheriff of Mecklenburg County.

365.  Defendant McFadden's negligence stems from the fact that there was an exposed metal grate located high up within D.W.'s cell on November 21, 2020. Ordinary care would have required that a juvenile presenting with suicidal thoughts not be placed in a cell with ligatures and a fixture from which to fasten a ligature high up within the cell. It is commonly understood among professionals who administer jails and prisons that detainees who are inclined to commit suicide typically act on those desires in the same, uniform manner: by hanging themselves from within the cell. Indeed, pretrial detainees have previously accomplished this act within Mecklenburg jails. Additionally, jail suicides are far more common than prison suicides. Consequently, an ordinary duty of care is owed to jail detainees to remove such foreseeable methods of committing suicide.

366.  This standard of care is evidenced by a procedures manual issued by the North Carolina Department of Public Safety, which instructs jail personnel that there should be specific cells designated for suicide watch, and that they should be "free of any items that readily could be used to attempt/complete suicide" such as "open-holed grates or hooks." An open-holed grate was precisely what D.W.'s cell featured.

367.  Defendant was not merely negligent in this oversight of design, but was grossly,

50

wantonly, recklessly, and willfully negligent because suicide by hanging is such a well-known and well-documented phenomena among administrators of prisons and jails that failing to eliminate this easy-to-remedy hazard amounts to more than ordinary negligence.

368. The above-described gross negligence was a proximate cause of D.W.'s death on November 21, 2020.

**COUNT IX**
**N.C. Gen. Stat. § 153A-224 – Wrongful Death (Negligence Per Se)**
**Against Defendants McFadden, Weller, Williams, Comas, and Saunders.**

369. With the exception of Defendant McFadden, all Defendants named in this Count are sued in both their individual and official capacities.

370. N.C. Gen. Stat. § 153A-224 states: "No person may be confined in a local confinement facility unless custodial personnel are present and available to provide continuous supervision in order that custody will be secure and that, in event of emergency, such as fire, illness, assaults by other prisoners, or otherwise, the prisoners can be protected. These personnel shall supervise prisoners closely enough to maintain safe custody and control and to be at all times informed of the prisoners' general health and emergency medical needs."

371. N.C. Gen. Stat. § 153A-224 is a safety statute expressly enacted to protect a detainee like D.W. whose liberty has been taken and who is confined in a local detention facility.

372. The Mecklenburg County Detention Facility is a local confinement facility for purposes of *id.* .

373. The actions and omissions of Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders including failing to keep D.W. under special watch and failing to take adequate steps to ensure D.W.'s safety in the Mecklenburg County Detention Center violated their affirmative obligation under N.C. Gen. Stat. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care for D.W., as well as state regulations on observing inmates and reporting medical concerns.

51

374. Their breaches of the affirmative duty imposed by a safety statute constituted negligence per se.

375. As a proximate result of Defendants Weller's, Williams', Comas', and Saunders', negligence, D.W. suffered agonizing pain and humiliating abandonment, until he died.

376. Sheriff McFadden is liable, under the doctrine of *respondeat superior*, both under common law and by statute, for the actions and omissions of Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders, that led to D.W.'s death. The Sheriff's duty to operate the county jail in a safe manner is a non-delegable duty under *id.* § 162-24.

377. Further, Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders are individually liable. Their actions demonstrated malice and willful and wanton and reckless disregard for D.W.'s safety. Conduct that exceeds the scope of authority or that shows such malice and willful or wanton or reckless disregard for a pre-trial detainee pierces the shield of public officer immunity.

378. Plaintiff, in her capacity as Administrator of the Estate, is entitled to recover from Defendant McFadden, Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders jointly and severally, all damages for wrongful death as allowed by *id.* § 28A-282(b).

379. Plaintiff also seeks and is entitled under Chapter 1D and N.C. Gen. Stat. § 28A-18 to punitive damages against Defendant McFadden, Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders. The actions of Defendant McFadden, Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders showed malice.

## <u>COUNT X</u>
### Action on the Bond
### Against Defendants Liberty Mutual Insurance, Platte River Insurance Company, McFadden, and Page

380. Platte River Insurance Company was the surety company that provided the bond to Sheriff

McFadden.

381.    Liberty Mutual Insurance was the surety company that provided the bond to Sheriff Page.

382.    The actions of the individual Mecklenburg County defendants and Defendant Webster of Rockingham County constituted neglect and malfeasance in their employment and were taken under the auspices of the office of the Sheriff. As a proximate result, the decedent died.

383.    Further, the negligence described above should be covered by the two respective bonds, as those Defendants were acting under the non-delegable authority of the Sheriff at all times.

384.    Plaintiff brings this action for wrongful death on the Sheriff's bond.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following:

    a.  Trial by jury;

    b.  Judgment against Defendants for all wrongful death damages recoverable under N.C. Gen. Stat. § 28A-18, including punitive damages;

    c.  Judgment for pain and suffering under the survivor statute;

    d.  Judgment under 42 U.S.C. § 1983 for compensatory damages;

    e.  Judgement under the ADA and  Section 504 of the Rehabilitation Act   for compensatory damages;

    f.  Judgment against Defendant Weller, Defendant Williams, Defendant Comas, and Defendant Saunders under 42 U.S.C. § 1983 for punitive damages;

    g.  Costs of this lawsuit;

    h.  Judgment against Defendant Liberty Mutual Insurance and Platte River Insurance Company for action on the bond;

    i.  Reasonable attorneys' fees under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and North

53

Carolina Persons with Disabilities Protection Act;

j.   Reasonable funeral expenses;

k.   Apportion the compensatory damages jointly and severally, where appropriate;

l.   Treble damages pursuant to N.C. Gen. Stat. § 162-55 as to any Defendant identified as a keeper of the jail and who committed wrongful acts contributing to D.W.'s death, regardless of that Defendant's potential criminal liability.

m.   Injunctive and declaratory relief pursuant to the North Carolina Persons with Disabilities Protection Act;

n.   the Court grant such other and further relief as it deems equitable and just.

Respectfully submitted, this 12th day of June 2022.

s/ Micheal L. Littlejohn Jr_____
Micheal L. Littlejohn Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC PO
Box 16661 Charlotte,
NC 28297
Telephone: (704) 322-4581
Fax: (704) 625-9396
Email: mll@littlejohn-law.com
*Counsel for Plaintiff*

s/ Abraham Rubert-Schewel
Abraham Rubert-Schewel
N.C. Bar # 56863
TIN FULTON WALKER &
OWEN, PLLC
119 E. Main Street
Durham, NC 27701
Tel: (919) 451-9216
Email: schewel@tinfulton.com
*Counsel for Plaintiff*

54

ADRIANNA E. BLACKWELL,
as Administratrix of the Estate of D.W.
Deceased,

    Plaintiff,

v.

GARRY MCFADDEN, Mecklenburg Co.,
in his official capacity; DWIGHT
DWAYNE. WELLER, Mecklenburg Co., in
his individual and official capacities;
TIFFANY PARKER WILLIAMS,
Mecklenburg Co., in her individual and
official capacities; AKEEM DWAYNE
COMAS, Mecklenburg Co., in his individual
and official capacities; HENRIETTA
SAUNDERS; Mecklenburg Co., in her
individual and official capacities; EDDIE
BUFFALOE, NC Dept. of Pub. Safety, in
his official capacity; CHARLES MOORE,
NC Dept. of Pub.
Safety, in his individual capacity; TAMMY
GUESS, NC Dept. of Pub. Safety, in her
individual capacity; KIM COWART, NC
Dept. of Pub. Safety, in their individual and
official capacities; SAMUEL PAGE,
Rockingham Co., in his official capacity;
ANGIE WEBSTER, Rockingham Co., in her
individual and official capacities;
MECKLENBURG COUNTY; STATE OF
NORTH CAROLINA;
LIBERTY MUTUAL INSURANCE;
PLATTE RIVER INSURANCE
COMPANY,

    Defendants.

_____/

       **CERTIFICATE OF**
        **SERVICE**

The undersigned certifies that on June 12, 2022, the foregoing *PLAINTIFF'S FIRST AMENDED COMPLAINT* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, and notice thereof was served in accordance therewith via electronic mail, to:

Alex R. Williams      awilliams@ncdoj.gov,

Jake William Stewart      jstewart@cshlaw.com, kbenson@cshlaw.com

Patrick Houghton Flanagan      phf@cshlaw.com, kpeel@cshlaw.com

Sean F. Perrin      sean.perrin@wbd-us.com, stephanie.hanley@wbd-us.com

Ashby Thackston Ray      aray@ncdoj.gov

Andrew Adams Kasper      aak@parryfirm.com


**Littlejohn Law, PLLC and Tin Fulton Walker, Owen PLLC**

BY:
/s/ Micheal L. Littlejohn Jr._____
Micheal L. Littlejohn, Jr.,N.C. Bar #49353
Abraham Rubert-Schewel N.C. Bar # 56863
Email: mll@littlejohn-law.com
Email: schewel@tinfulton.com
*Attorneys for Plaintiff*