# Exhibit 2

# Bruce Sherald Deposition Transcript

1          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF NORTH CAROLINA
2               CHARLOTTE DIVISION
          Case No. 3:22-CV-167-RJC-DCK
3


4

ADRIANNA ESTHER BLACKWELL, as Adminitratrix of )
5   the Estate of D.W.,                            )
                                                   )
6               Plaintiffs,                        )
                                                   )
7       v.                                         )
                                                   )
8   GARRY L. MCFADDEN, MECKLENBURG COUNTY, STATE OF)
    NORTH CAROLINA, DWIGHT DWAYNE WELLER, TIFFANY  )
9   PARKER WILLIAMS, AKEEM DWAYNE COMAS, HENRIETTA )
    SAUNDERS, EDDIE M. BUFFALOE, JR., CHARLES      )
10  MOORE, TAMMY GUESS, KIM COWART, SAMUEL PAGE,   )
    ANGIE WEBSTER, LIBERTY MUTUAL INSURANCE and    )
11  PLATTE RIVER INSURANCE COMPANY,                )
                                                   )
12              Defendants.                        )

13

14

15

16

17              DEPOSITION OF BRUCE SHERALD

18          DATE TAKEN:   April 24, 2024

19          TIME BEGAN:   9:55 a.m.

20          TIME ENDED:   12:18 p.m.

21          LOCATION:     Remote via Zoom

22          REPORTED BY:  Charla Lynch, Court Reporter
                          EVERYWORD, INC.
23                        (888) 341-1114

24              **SERVING THE CAROLINAS**

25

```
 1              A P P E A R A N C E S

 2   On behalf of the Plaintiffs:
          Michael L. Littlejohn, Jr., Esquire
 3        LITTLEJOHN LAW, PLLC
          227 West 4th Street, #B-113
 4        Charlotte, NC 28202
          (704)322-4581
 5

 6   On behalf of the Defendants:
          Sean F. Perrin, Esquire
 7        WOMBLE BOND DICKINSON, LLP
          301 S. College Street, Suite 3500
 8        Charlotte, NC 28202
          (704)331-4900
 9        Sean.perrin@wbd-us.com

10        Jake Stewart, Esquire
          CRANFILL SUMMER LLP
11        2907 Providence Road, Suite 200
          Charlotte, NC 28211
12        (704)332-8300
          Jstewart#cshlaw.com
13
          Jilliann L. Tate, Esquire
14        DAVIS & HAMRICK, LLP
          635 West Fourth Sreet
15        Winston-Salem, NC 27101
          (336)725-8385
16        Jilliann@davisandhamrick.com

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2   WITNESS                                    PAGE

3   BRUCE SHERALD

4       By Mr. Littlejohn Jr.              4, 89
        By Ms. Tate                          85
5       By Mr. Perrin                        88

6

7

8                      E X H I B I T S

9

    EXHIBIT        DESCRIPTION                PAGE
10

     A          Video                        53
11
     B          Handwritten Time Logs        57
12
     C          Completed Suicide Observation  59
13              Record

     D          Blank Suicide Observation    64
14              Record

15

16

17

18

19

20

21

22

23

24

25

1    BRUCE SHERALD, after having been first duly sworn,

2        was examined and testified as follows:

3

4

5                    DIRECT EXAMINATION

6

7    BY MR. LITTLEJOHN, JR.:

8        Q.    Good morning, Mr. Sherald.  How are

9    you doing?

10        A.    I'm good, sir.

11        Q.    I represent the plaintiff, Adrianna

12    Blackwell on behalf of the Estate of Demond

13    Wisonant in this case.  Your sworn testimony today

14    is going to be recorded by a court reporter and

15    every question that I ask and every question that

16    you give me will be taken down verbatim.  It is

17    important for you to answer out loud and if

18    possible try not to nod your head like you may in

19    casual conversation.  If you don't understand any

20    of these questions, please let me know.  You you

21    can say -- you can ask me to clarify a question or

22    some part of it.  You can ask me to rephrase the

23    entire question or please break up the question.

24    Just let me know so that you can better understand

25    it, so I can make sure to get an accurate answer

1    from you.

2         A.   That's fine.

3         Q.   The court reporter cannot write

4    everything down that is said if you and I both are

5    talking, so I'm going to wait for you to complete

6    an answer before I hop in, and I would ask that

7    you do the same as well; allow me to ask the

8    question before you attempt to answer.

9         A.   Okay.

10        Q.   And if possible, please wait for me to

11   finish my question before you start to answer.

12   And if you have any acronyms or lingo -- I know a

13   lot of times, with law enforcement, there may be

14   acronyms and lingo that's specifically used.  If

15   you could, please, it would be helpful to the

16   court reporter if you could pause for a moment to

17   explain what that acronym stands for or what that

18   lingo means.

19        A.   I can do that.

20        Q.   Thank you so much, Mr. Sherald.  Are

21   you on any medications that affect your ability to

22   testify truthfully and accurately today?

23        A.   No, sir.

24        Q.   Did you do anything to prepare for

25   this deposition?

1          A.     Just looked at a couple of documents.

2          Q.     And without telling me anything that

3    you may have said to Sean, tell me what you did to

4    prepare for this deposition.

5          A.     Nothing really.

6          Q.     Did you speak to anyone other than

7    Mr. Sean Perrin or the lawyers for the Mecklenburg

8    County Sheriff's Office to prepare for today's

9    deposition?

10         A.     I did not.

11         Q.     And did you have a chance to review

12   the deposition notice that I served on Mr. Perrin?

13         A.     I did.

14         Q.     Did you bring any documents with you

15   to today's deposition?

16         A.     I did not.

17         Q.     And are you aware that you're being

18   asked to testify about an in-custody death at the

19   Mecklenburg County Detention Center on November

20   21st, 2020?

21         A.     I am.

22         Q.     And are you aware that there is a

23   protective order in this case regarding

24   confidential information that you may disclose

25   today?

1       A.   I am.

2       Q.   And have you had the chance to review

3  or discuss this order with Mr. Perrin?

4       A.   Yes, I have.

5       Q.   Okay.  And have you agreed to be bound

6  by the terms of that protective order?

7       A.   Yes, I do.

8       Q.   Thank you so much.  Could you please

9  state your name for the record?

10       A.   It's Bruce Sherald.

11       Q.   And Mr. Sherald, who is your current

12  employer?

13       A.   Wells Fargo.

14       Q.   When did you start with Wells Fargo?

15       A.   September of '21 -- '22.  It would be

16  '22.  '22, I think.

17       Q.   Okay.

18       A.   Yeah.

19       Q.   And before Wells Fargo, where did you

20  work?

21       A.   Mecklenburg County Sheriff's Office.

22       Q.   When did you first begin working with

23  the Mecklenburg County Sheriff's Office?

24       A.   January of 2020.

25       Q.   And what was your title at that time?

1          A.    Juvenile detention officer.

2          Q.    And what -- where is the specific

3    address or general location of where you worked as

4    a juvenile detention officer?

5          A.    It was on Specter Drive at the

6    sheriff's academy.  I don't know the exact

7    address.

8          Q.    Okay.  Typically, do people call that

9    Jail North?

10         A.    Yes.

11         Q.    Could you explain to me your job

12   duties -- your day-to-day duties as a juvenile

13   detention officer at Jail North?

14         A.    Yes.  It was supervision of juvenile

15   residents in pods.

16         Q.    And were there adult female inmates at

17   Jail North at that time?

18         A.    Adult female inmates?

19         Q.    Yes, sir.

20         A.    No females that I remember.  Adult

21   male juveniles, yes.  Adult -- no.  There was a

22   juvenile -- female juveniles there during that

23   time but not adults.

24         Q.    So you were a juvenile detention

25   officer beginning, roughly, around January 2020.

 1  When did you stop working as a juvenile detention

 2  officer with the Mecklenburg County Sheriff's

 3  Office?

 4       A.   September of '22 -- '21.  I've been at

 5  Wells Fargo for about two years now so '22, I

 6  guess.

 7       Q.   Okay.  Was there a gap in employment

 8  or did you do anything after the Mecklenburg

 9  County Sheriff's Office and before Wells Fargo?

10       A.   No.  I was retired at that point.

11  Before Wells Fargo, yes -- I mean before the

12  juvenile detention center, no time between the

13  Sheriff's office and Wells Fargo.

14       Q.   Okay.  So you left Mecklenburg County

15  Sheriff's Office and went directly to Wells Fargo?

16       A.   Correct.

17       Q.   During that time you were with the

18  Mecklenburg County Sheriff's Office, do you by

19  chance remember who were your supervisors?

20       A.   Yes, it was Sergeant Williams and

21  Captain -- they called her Peaches.  I don't

22  remember her name now.  Yeah, because she was in

23  and out.  I don't remember her name.  It will come

24  back to me.

25       Q.   When you say Williams, is that Tiffany

1  Parker Williams?

2          A.   Yes.

3          Q.   And Peaches, was that -- I'm assuming

4  that's a female?

5          A.   Yes.

6          Q.   Captain Peaches was a female.  Did you

7  have any male supervisors?

8          A.   Yes, there were -- there was a

9  sergeant there that just came back.  I didn't know

10  him very well.  And there was Sergeant -- what was

11  his name?  I don't remember what his name was now.

12  There were a couple of other sergeants there on

13  that shift with us.

14          Q.   Okay.  Could you explain to me, I

15  guess, your particular chain of command?

16          A.   Yes, it would be Sergeant Williams,

17  the Captain and then Major Youngblood.

18          Q.   So did you say Tiffany Parker

19  Williams?  Was she a lieutenant or a captain?

20          A.   She was a sergeant.

21          Q.   Sergeant.

22          A.   I think there was a Sergeant Stevenson

23  there, too.  Stevenson was a big guy.  He was in

24  and out, so I didn't have a whole lot of contact.

25          Q.   So could you explain to me how

1  Sergeant Williams supervised you?  What was she

2  responsible for while supervising you?

3       A.   Yeah, they were responsible for

4  assigning us to the different pods during roll

5  call, and then supervising us and monitoring us

6  during the day on making our checks to make sure

7  we had a hard stream.

8       Q.   So you stated a little earlier you

9  were retired before you came on with Mecklenburg

10  County Sheriff's Office.  What led you to want to

11  become a juvenile detention officer at the

12  Mecklenburg County Sheriff's Office?

13       A.   Well, I spent 21 years in the Army and

14  I'm pretty active.  And sitting at home was

15  literally killing me.  I wanted to do something,

16  and get back into a uniform, and be a part of a

17  team.  I enjoyed working with the kids, to be

18  honest with you.  It was just very meaningful work

19  for me.

20       Q.   Do you have any children?

21       A.   I do.  Two girls.

22       Q.   So on a daily basis, how often were

23  you having to interact with Sergeant Williams, or

24  Peaches or Youngblood, for example?

25       A.   Daily with the Captain and Sergeant

1    Williams.  Major Youngblood -- I mean, maybe once

2    or twice a month, maybe, that I can remember.

3          Q.   If you had any concerns or you needed

4    to make any reports, who would you go to directly?

5          A.   Sergeant Williams or Sergeant

6    Stevenson.  One of the two.

7          Q.   So as a juvenile detention officer,

8    you stated that you would -- you were responsible

9    for supervising the residents.  Did you do any

10   intake with juveniles when they were coming to the

11   facility?

12         A.   No.

13         Q.   How often would you have to interact

14   with juveniles on a daily basis?

15         A.   How often?  That was daily, and that

16   was all day and every day.

17         Q.   How would you come about interacting

18   with a juvenile inmate who was at that facility?

19         A.   I'm not sure I understand the

20   question.

21         Q.   When you say you had to interact or

22   you would do it daily, could you just explain some

23   examples that would cause you to have to interact

24   with an inmate?

25         A.   If I'm supervising all the juveniles

1  in that particular pod.  If I'm working the

2  hallway with transporting them to different areas;

3  maybe to school that day, or medical, or mental

4  health -- wherever they needed to go that day.

5         Q.    I know you were at Mecklenburg County

6  Sheriff's Office for a brief stint, but during

7  that time, were you ever disciplined?

8         A.    No.

9         Q.    Have you ever testified in a

10 deposition?

11        A.    No, not that I can remember.

12        Q.    Have you ever testified on behalf of

13 Mecklenburg County Sheriff's Office previously?

14        A.    No.

15        Q.    Have you ever been before the Civil

16 Service Protection Board?

17        A.    No.

18        Q.    Have you ever been a party to any

19 lawsuit, whether as a plaintiff or a defendant?

20        A.    Yes.

21        Q.    Were you a plaintiff or a defendant in

22 that case?

23        A.    Defendant.

24        Q.    Was this prior to or after your

25 employment with Mecklenburg County Sheriff's

1  Office?

2         A.    Prior to.

3         Q.    Have you ever been convicted of a

4  crime?

5         A.    No.

6         Q.    In that lawsuit -- was it a criminal

7  matter or a civil?

8         A.    Civil.

9         Q.    Had you ever been subject to a

10  complaint before the internal affairs at the

11  Mecklenburg County Sheriff's Office?

12         A.    No.

13         Q.    How did you come to -- excuse me.  How

14  did you come to learn about this juvenile -- this

15  juvenile detention officer role at the Mecklenburg

16  County Sheriff's Office?

17         A.    I actually attended a job fair with my

18  wife, and I spoke with the -- we were walking

19  through and talking with one of the recruiters.

20         Q.    When you say a juvenile detention

21  officer, is that also -- is that the same as a

22  juvenile justice officer?

23         A.    I would imagine so.  I think the

24  titles, kind of, changed while I was there.  The

25  detention officer went to juvenile justice officer

1    so it depends on -- I've seen both terms used.

2         Q.    All right.  So when you applied for

3    the juvenile justice officer -- juvenile detention

4    officer role, did you do that directly through

5    Mecklenburg County Sheriff's Office or did you do

6    that through another entity?

7         A.    It was Mecklenburg County Sheriff's

8    Office.

9         Q.    Who were you interviewed by?

10         A.    Sergeant Dunn and Sergeant Ross.  And

11    then I had to go to a board with Major Youngblood

12    and a couple of other people that -- I don't

13    remember their names.

14         Q.    Was your previous service experience

15    relevant in you being selected for the job?

16         A.    I think so.

17         Q.    Did you have to do basic law

18    enforcement training?

19         A.    I did.  I went through the Mecklenburg

20    County Sheriff's training academy.

21         Q.    Could you explain to me a little bit

22    about what that training academy would entail?

23         A.    Oh, a little bit of everything.  We

24    got into the policies and procedures, different

25    techniques of deescalation.  We went over a lot of

1   the state laws.  How to search the resident.  How

2   to inspect a cell.  It was pretty comprehensive.

3   It didn't -- they didn't leave out that much.

4          Q.   And how long did you have to go to the

5   academy for training?

6          A.   I think it was six weeks.

7          Q.   Did you have to take a test after --

8   after you went through the training?

9          A.   Yes, you took tests all the way

10  through and then a final exam at the end.

11         Q.   And is that final exam, like,

12  pass-fail, or are you given, like, a number you

13  have to meet?

14         A.   We got a number.  We had to get at

15  least 70 percent, I think, on the test.

16         Q.   And are you allowed to retake the test

17  if you do not get the 70 percent?

18         A.   I think you can retest once, if I

19  remember correctly.

20         Q.   Do you know whether or not that was --

21  you know whether you can retake it once within a

22  period of a year, six months, two years or

23  anything like that?

24         A.   I don't know.

25         Q.   Did you pass your first time?

1      A.    Yes, I did.

2      Q.    Do you remember who conducted those

3  trainings?

4      A.    Specific instructors --

5      Q.    I'm so sorry, Mr. Sherald.  Do you

6  remember any specific instructors?

7      A.    There was -- I don't remember the

8  names now.  I think one of them may have been

9  Hayes.  We had so many different instructors for

10  different -- each time we had a subject, we had a

11  different -- we did have one for the platoon, but

12  I don't remember the name.  It was a female

13  sergeant, but I don't remember her name right now.

14      Q.    And is the academy located at Jail

15  North, or is it at Jail Central, or somewhere

16  else?

17      A.    It's at Jail North.

18      Q.    So you had this academy for six weeks.

19  Did you have any other training or courses that

20  you were required to take before you could start?

21      A.    Not to my knowledge.  Not that I can

22  remember, no.

23      Q.    Were you provided with a uniform after

24  you passed the test and you were becoming --

25      A.    Yes.

1        Q.   Could you describe what the uniform

2   looked like?

3        A.   Yeah, they were gray -- gray long

4   sleeved shirt, and gray trousers, and boots and a

5   duty belt.

6        Q.   Were you provided with any equipment

7   that you would have to wear on your person -- on

8   your body?

9        A.   Yes.  Pepper spray container but we

10  couldn't take those into the pods.  Flashlight,

11  pouch for your rubber gloves, and the handcuff

12  holster.

13       Q.   During your training at the academy,

14  were you all instructed on any medical -- were you

15  all instructed on any medical concerns or anything

16  dealing with medical -- anything medically related

17  that wasn't more so the day-to-day operations of

18  the jail but just medical procedures?

19       A.   We got certified in CPR.

20       Q.   And did someone from Mecklenburg

21  County Sheriff's Office, you know, I guess,

22  provide that certification, or was there another

23  entity that provided that certification?

24       A.   I don't remember who actually

25  conducted it.  I think it was somebody from the

1  Mecklenburg County Sheriff's Office, though.

2      Q.   Prior to working at the Mecklenburg

3  County Sheriff's Office, had you worked with

4  juveniles before?

5      A.   Yes.

6      Q.   Could you explain the capacity in

7  which you worked with juveniles?

8      A.   Yes, I have -- I have coached AAU

9  basketball, I've been a high school basketball

10 coach, I'm a former Army drill sergeant -- we had

11 17- and 18-year-olds there -- and I was a

12 substitute teacher in a couple of charter schools

13 and Columbus public schools.

14     Q.   Did you receive any training with

15 respect to trauma and dealing with delinquents?

16     A.   When you say trauma, what do you mean?

17     Q.   Did you have any training, whatsoever,

18 about the emotional state of juvenile inmates that

19 may be in your custody?

20     A.   If I remember correctly, in terms of

21 just paying attention to them and their moves to

22 see what they're going through.  I don't remember,

23 specifically, what the training was.

24     Q.   Are there -- before I move on, can you

25 think of any other classes, or seminars, or any

1    other specialized training that is related to jail

2    operations, juvenile inmates or anything of the

3    like?

4         A.   Well, I worked as a corrections

5    officer for about nine months in Ohio, but that

6    was a medium security adult facility.

7         Q.   Why did you leave that correctional

8    facility?

9         A.   I was doing it when I retired from the

10   Army.  I was doing it while I finished my degree.

11   I was doing it at night and going to school during

12   the day.

13        Q.   What do you have your degree in?

14   Degrees.

15        A.   I've got a PHD in biblical preaching,

16   I've got an MBA, I've got a bachelor's degree in

17   organizational management, and an associate degree

18   in public administration.

19        Q.   I'm sorry.  What in public

20   administration?

21        A.   Associate degree.

22        Q.   What specific training have you

23   received on recognizing suicide risk in juvenile

24   detainees?

25        A.   I remember there was some training on

1  suicide prevention and recognizing it.  I don't

2  remember what all the specifics were right now.

3        Q.    Okay.

4        A.    It was one of the classes that we

5  took.

6        Q.    Okay.  And how long was that -- how

7  long was that training or how long was that class?

8        A.    I do not know.  I don't remember.

9        Q.    What are some of the warning signs you

10  have been trained to look for?

11        A.    Withdrawal.  If they looked depressed,

12  not interacting, not coming out of their rooms.

13  After a while, you get to know the kids pretty

14  well, and you know their personalities, and you

15  know, if they have been there any amount of time,

16  how they're doing.

17        Q.    Did you have any interaction with

18  Desmond Raye Whisonant?

19        A.    I did not.  Just through my tours.

20        Q.    And again, I know you worked there, in

21  the very least, a year or so.  Do you possibly

22  remember what he looked like?

23        A.    I remember he was a tall kid.

24  Didn't -- the cell in the lights were off.  They

25  had been off when I looked in there, but I could

1  see him clearly.  No, the lights weren't off.  It

2  was in the morning.  It wasn't night.  He was a

3  tall kid.  He was sitting on the bed.  And he was

4  sitting -- one time, when I went around, he was

5  standing up.

6          Q.    What was his race?

7          A.    African American from what I could

8  tell.

9          Q.    And I know you said he was a tall kid.

10 I know you can't give me an exact weight.  Was he

11 skinny or was he bigger?

12         A.    I didn't think he was overweight or

13 anything.  He wasn't skinny.  He was a pretty good

14 sized kid from what I remember.  You know, I only

15 saw him for seconds.

16         Q.    How often did you receive refresher

17 training on recognizing suicide risk?

18         A.    There was some periodic updates that

19 we had, but I don't know what the interval was on

20 them.

21         Q.    When you say periodic updates, could

22 you explain what you mean by that?

23         A.    Yeah, there was certain training we

24 had to complete that was web based.  And we had to

25 go online and complete those trainings, but,

 1    again, I don't remember, specifically, when those

 2    were.

 3         Q.   When you completed the training

 4    online, did you receive a certificate?

 5         A.   Not a paper one, no.  I think it just

 6    may have been annotated in our record or our file

 7    somewhere.  I don't remember getting a certificate

 8    for it, no.

 9         Q.   Did you get, like, a confirmation

10    e-mail?

11         A.   Not that I remember.  I think it

12    just -- because you logged in with your

13    credentials, so I think it just went to your

14    records.

15         Q.   And would Sergeant -- yeah, would

16    Sergeant Williams have to approve, I guess, you

17    know, the completion of any training you did?

18         A.   Not to my knowledge.  I imagine they

19    got updates on whether we actually did the

20    training or not, but I didn't need her permission

21    to do it.  They would tell us, when those

22    trainings came up, that we needed to do it.

23         Q.   And who were these trainings conducted

24    by?

25         A.   I think they were web based, if I

1    remember correctly.

2         Q.    Just so I understand, you said web

3    based.  Is that like a webinar or is that --

4         A.    It was -- you log in online and you

5    looked at this video and went through the whole --

6    however the class was set up.

7         Q.    Did you have to answer questions

8    during the class -- during this online class?

9         A.    Yes.  If I remember correctly, yes.

10        Q.    And were you given any test at the end

11   of these periodic updates?

12        A.    If I remember correctly, there were

13   quizzes along the way until you got to the end.

14        Q.    Did you have to get a certain score

15   for those quizzes?

16        A.    Yes, but I don't remember what it was.

17   I know I passed them all the first time, so I

18   don't --

19        Q.    And your chain of command would be

20   notified that you took or -- if you did these

21   periodic updates, that you passed these quizzes?

22        A.    I would imagine so.  I don't remember

23   ever getting any feedback one way or the other.

24        Q.    Did you ever receive any training from

25   anyone in your chain of command?

1       A.    Training?

2       Q.    Hands-on.

3       A.    I'm not sure -- hands-on how?

4       Q.    Inservice training.

5       A.    No.  Usually, if we had any training,

6  somebody came in and did it as far as I can

7  remember.

8       Q.    What were some of the differences

9  between -- other than the inmates, what would you

10  say are some of the differences in training that

11  you received from Mecklenburg County Sheriff's

12  Office and the correctional facility you had

13  worked at in Ohio?

14       A.    Well, in the contact, in how you

15  interact with the residents.  In the medium

16  security prison -- those guys were convicted.  In

17  the juvenile facility, it was more relational --

18  building relationships with the kids than being

19  authoritative.  You have to be firm and very

20  consistent with them, but you're talking about

21  adults and juveniles.  It's totally different

22  personalities and a totally different culture.

23         The guys in prison -- they're in

24  prison.  They know they're -- they know where they

25  are and where they stand.  In the juvenile -- you

1　know, a lot of them are afraid when they come in

2　there.  They're nervous and, really, you just try

3　to settle them down and relax and be okay because

4　they want to act like they're tough, but most of

5　them are pretty scared when they get in there.

6　That was the biggest difference in how you

7　interacted with them.  I would not interact with

8　the medium security guys nearly as much as I would

9　with the juvenile.

10　　　　Q.　Would you say the trainings that you

11　did in Ohio, at the correctional facility, and the

12　trainings that you did with juveniles -- that

13　those were pretty consistent?

14　　　　A.　Absolutely.  I thought the training

15　was excellent.  It was some of the best training I

16　ever received.

17　　　　Q.　If you don't mind, could you expound

18　on the differences between an adult inmate and a

19　juvenile inmate and how you would need to interact

20　with them?

21　　　　A.　Well, adult inmates -- they want to

22　manipulate you a lot of times.  They're on a

23　mission.  They've got a cause.  Juveniles --

24　they're just trying to get through the day.  It's

25　more or less having a conversation with them and

1   building a rapport with the juveniles.  Where with

2   the adults -- you knew they were up to something.

3   And the juveniles not so much.  Occasionally, but

4   most of the time they just wanted somebody to

5   listen to them.

6        Q.   When you were at the previous

7   correctional facility, did you recall any

8   incidents of an inmate suicide or a detainee

9   suicide?

10       A.   No.  No.

11       Q.   What resources -- when you were with

12   the Mecklenburg County Sheriff's Office, what

13   resources were available to you to help you

14   recognize suicide risk in detainees?

15       A.   I think the way the whole program is

16   set up -- because you're always paying attention.

17   Always interacting.  So I think that it -- just by

18   the way that you did everything, you could not

19   help but interact with them and pay attention to

20   what was going on with them.  Because if you see a

21   mood change, it could change the whole pod.

22       Q.   And you stated a little earlier you

23   had nothing to do with intake; is that correct?

24       A.   That is correct.

25       Q.   Okay.  So you would not have had the

1  opportunity to -- for new juveniles that are

2  coming to the facility, you would not have had the

3  opportunity to make any assessment whatsoever?

4          A.   No.  No.

5          Q.   Could you walk me through how you

6  typically learned that a juvenile is at risk for

7  suicide?

8          A.   During roll call, they'll give us a

9  list of names, in the pod we're assigned to, who

10 is on suicide watch and for how long.

11         Q.   Were you aware who was on suicide

12 watch on November 21st, 2020?

13         A.   In my pod, I do not remember.  I don't

14 think I had any juvenile watches in my pod that

15 day.

16         Q.   Can you possibly remember what pod you

17 were in?

18         A.   I want to say --

19         Q.   Let me ask another way.

20         A.   There's nine.  I think I was in six.

21 Weller was in five.  Either six or seven because

22 the numbers were not straight across so I don't

23 remember which one.  I think it was HI-6.

24         Q.   Weller was in pod five?

25         A.   I think he was in HI-5, yeah.

1    Q.   Okay.  And I was wondering this, what
2  does "HI" mean?
3    A.   That's what was on the door.
4    Q.   Okay.  Okay.  So how many juveniles
5  did you have in your particular pod?  I won't say
6  a number because you don't recall.  But how many
7  juveniles did you have in your pod?
8    A.   Maybe six that day.
9    Q.   What was the most you would have in a
10 pod?
11   A.   Eight.
12   Q.   And on the day of November 21st, 2020,
13 a date that Desmond Whisonant committed suicide,
14 did you have to go to Weller's pod?
15   A.   Yes.  I had provided his break.  We
16 broke each other that day.
17   Q.   Did you know that you were going to
18 relieve him for his lunch break at roll call?
19   A.   Yes.
20   Q.   And you said earlier you do not recall
21 which inmates were on suicide watch?
22   A.   In my pod, no.  I think in Weller's
23 pod he told me he had one guy or maybe two that
24 were on suicide watch.  That's why I --
25   Q.   Did you know which particular cells

1  those inmates were in?

2      A.   Yes, he told me which ones.  I think

3  it was four or five.

4      Q.   How do you become aware that an inmate

5  is on suicide alert?

6      A.   I don't know if there's a difference

7  between suicide alert and suicide watch.  I think

8  those terms can be used interchangeably.  If they

9  were on suicide alert, we would maybe put them in

10  the turtle suit, if I remember correctly.  We took

11  all of their clothes from them and they would be

12  in the turtle suit if they were on alert.  And on

13  a watch, they were just in their regular clothes

14  provided by the Sheriff's office.

15      Q.   Do you recall what, if any, suicide

16  alert or watch Desmond Whisonant was on?

17      A.   I think I remember him being on

18  suicide watch but I -- you know, it was just a

19  normal day so that wasn't anything unusual.

20      Q.   In your pod, for example -- pods --

21  you think it's six or seven.  But in your pod,

22  while you were with the Mecklenburg County

23  Sheriff's Office, would a juvenile who is on

24  suicide alert or suicide watch be placed in a

25  special room?

```
 1          A.    No.   They were in their regular cells.
 2          Q.    And do the cells have a sprinkler
 3   system in them?
 4          A.    Yes.
 5          Q.    Do the cells have a smoke detector in
 6   them?
 7          A.    Yes.  As far as I know, yes.
 8          Q.    What does it mean to directly observe
 9   an inmate?
10          A.    You put eyes on them.  You look at
11   them and see if they're breathing.  Make sure
12   they're still alive.
13          Q.    What does it mean if a juvenile inmate
14   is listed as being on a close observation watch?
15          A.    Then the timeframe for checking on
16   them is decreased, and you check more often.
17          Q.    Can you recall how often you check on
18   someone who is on a close observation?
19          A.    No, I don't because I -- I don't think
20   I had anybody on close observation that I can
21   remember.
22          Q.    What is the difference between close
23   observation and constant supervision if an inmate
24   is listed as he needs to be watched on a constant
25   supervision basis?
```

1    A.   It means you need to check on them in

2  whatever the described timeframe is.  I don't

3  recall -- I think it's every 10 minutes we would

4  check if -- they were on suicide watch the first

5  24 hours when they came in.  Every 10 minutes, on

6  a regular basis, you would check on them.  And

7  regular supervision is you just watching them in

8  normal activities throughout the day.

9    Q.   So you have close observation,

10  constant supervision, and then you said regular

11  observation?

12    A.   Yeah.  Close supervision for me was

13  when we were playing cards, or playing basketball,

14  or doing the room inspections.  And then, if I'm

15  at the podium -- to me that's -- that's just

16  regular observation.

17    Q.   In your pod, were juvenile inmates

18  allowed to be in their cell alone?

19    A.   Yes.  Yes.

20    Q.   Do they keep the door closed?

21    A.   Yes.

22    Q.   Could you explain to me what the

23  outside of every individual cell looks like?

24    A.   The outside?

25    Q.   Yes, sir.

1       A.   It depends on the pod, but some of the

2   doors would have a feeding opening.  But it's just

3   a metal door with a window that you can look in

4   and check on them and you can see everything in

5   there.  It's just a big, heavy steel door on the

6   outside of the pod.

7       Q.   And can you see directly into the cell

8   from that window or are the rooms -- or is it

9   like -- are the cells pretty big so you need to

10   get close to it?

11       A.   They're small.  You can look in and

12   see everything in that cell.

13       Q.   If you were directly observing an

14   inmate in your pod, you know, would that require

15   you to stop in front of every door?

16       A.   No, not necessarily.  Because after

17   you do it so long, you know, as soon as that

18   window comes, you look in and you know what you're

19   looking for and you keep moving.  It depends on

20   the kid.  Sometimes I might stop and talk to them.

21   But most of the time -- in the morning, when

22   they're still asleep, you just walk by and make

23   sure they're still breathing and keep moving.

24       Q.   How long would an average pod tour

25   take?

1          A.    About a minute, two minutes at the

2    most.   The pods aren't very big.

3          Q.    Okay.   And when you do a pod tour, how

4    do you -- do you do anything prior to beginning a

5    pod tour?

6

7          A.    Yeah, you annotate, "Pod tour starts"

8    in your log, then you go do your pod tour, and you

9    come back.   If you notice anything, you put it in

10   the thing and then you put, "Pod tour ends."   The

11   start and the end of the pod tour -- you annotate

12   it.

13         Q.    Did you have to press any buttons?

14         A.    Yes, there are buttons along the wall

15   that, when you start the tour -- you hit it on the

16   computer saying the tour begins, and then the

17   lights would all turn red.   And as you pushed

18   them, they went off.

19         Q.    Got it.   Got it.   Were you required to

20   touch the button during every pod tour?

21         A.    Yes.

22         Q.    How many buttons were there?

23         A.    I think there were --

24         Q.    Just in your pod.

25         A.    I think there were six.

1   Q.   Okay.  If you can recall, how were

2   those six buttons situated in the pod?

3   A.   If I'm sitting at the podium, there's

4   one behind the podium, one on the wall, one in the

5   middle, one in the back -- so it might have been

6   seven because there was one on the end -- yeah,

7   might have been seven.  May have been seven of

8   them.

9   Q.   What specific training did you receive

10  on preventative measures for suicide in

11  detainees?

12  A.   Whatever training we received during

13  our academy training.

14  Q.   Is that it?

15  A.   Yes.

16  Q.   If you can recall, Mr. Sherald, what

17  are some of the preventative measures you have

18  been trained to take?

19  A.   If I remember -- to engage them, talk

20  to them, make sure they're -- they're responsive.

21  Mainly, just make sure you're paying attention to

22  watching what they were doing.

23  Q.   How long were you in or on

24  Mr. Weller's pod on November 21st, 2020?

25  A.   Our breaks are 15 minutes.  So I went

1  in just before then so he could go on his break,

2  and he would get back, and I would go on mine.

3      Q.   Did you engage with any of the

4  juveniles in that pod during that 15 minutes?

5      A.   They were all locked down, so I may

6  have talked to somebody in the door, maybe in

7  passing, but not really.

8      Q.   Do you feel that your training

9  adequately prepared you to take preventative

10 measures for suicide in detainees?

11     A.   I do.

12     Q.   Are you familiar with the Mecklenburg

13 County Sheriff's Office policies on suicide

14 prevention?

15     A.   I was.  I'm not too familiar right now

16 but I was at that point.

17     Q.   Were there -- were there different

18 policies for the Mecklenburg County Sheriff's

19 Office and with respect to the juvenile inmates?

20 Were there two sets of policies on suicide

21 prevention, specifically?

22     A.   Not that I can remember.  Not that I

23 can recall off the top of my head, no.

24     Q.   What are some of the key aspects of

25 the suicide prevention policy that you were aware

1  of?  Can you recall?

2          MR. PERRIN:  I'm going to object to

3  the form.  You can answer that.

4          THE WITNESS:  I think the biggest

5  thing was vigilance.  Making sure you were

6  checking on them.

7  BY MR. LITTLEJOHN, JR:

8      Q.   Do you feel that the policies were

9  clear and easy to follow?

10     A.   Yes.

11     Q.   Do you feel that these policies were

12 effective in preventing suicide in detainees?

13     A.   Yes.  Up to that point, yes.

14     Q.   Do you feel as if the suicide policies

15 were adequate enough on November 21st, 2020?

16     A.   I do.

17     Q.   Who all would be present at roll call?

18     A.   Everybody on shift that day.

19     Q.   Were you working on the day before,

20 November 20th, 2020?

21     A.   I do not remember if that was -- if I

22 was coming on that day or if that was day number

23 two.  I don't remember, honestly.

24     Q.   How many juvenile detention officers

25 would be assigned, you know, to a particular pod

1  for a day?  So for example -- yeah.

2      A.    One per pod.

3      Q.    And how many hours would you have to

4  typically work that pod?

5      A.    The entire shift.  12 hours.

6      Q.    So what information are you provided

7  on juvenile inmates at the roll call?

8      A.    If there were any fights, or if they

9  had any particular issues or illnesses, and who

10  all -- how many new people were in there, and who

11  was on suicide watch.

12      Q.    What did Weller tell you about the

13  juvenile inmates in his pod when you relieved him

14  for lunch?

15      A.    He just said, "Everybody is good."

16  He's got -- I've got one suicide watch or two -- I

17  don't remember if one or two in there -- and he'll

18  be back.  I had worked with Weller before so it's

19  pretty standard for what we did.

20      Q.    Did he give you any more information

21  about the particular inmates other than them being

22  on a watch or alert?

23      A.    No.  I was familiar with the other

24  residents in there except the new people.  The

25  other ones -- I knew them.  I had been in that pod

1    before, myself, so I was familiar with them.

2          Q.    So you've worked in pod five before?

3          A.    Correct.

4          Q.    And does pod four have any suicide

5    specific cells that inmates who are suicidal would

6    be assigned to?

7          A.    No.  If we can -- I know a lot of them

8    like to do that.  We try to put them -- if the

9    cells are open -- in the ones closest to the

10   podium.  If there was nobody else in there.  If

11   they weren't occupied, we would try to put them in

12   there but it doesn't always work out.

13         Q.    When you say podium, could you explain

14   what you mean the podium?

15         A.    It's a podium with your computer, your

16   phone, and all your other equipment and supplies,

17   and it's at the head of the pod where you can

18   stand and see the whole pod.

19         Q.    And was that in the same, I guess --

20   was that in the same area as the actual pod, or

21   was it situated outside of the pod where you would

22   go?

23         A.    It's in the pod.

24         Q.    Could you tell me a little bit about

25   the cells in pod five?  What would you typically

1   find in a cell as far as fixtures and furniture?

2          A.   A sink, a metal mirror.  That's about

3   it.

4          Q.   Are inmates -- are juvenile inmates

5   given suicide resistant blankets?

6          A.   Not that I can remember, no.  They

7   just had regular blankets.

8          Q.   Were all juvenile inmates given pen

9   and paper or pencil and paper?

10         A.   Well, we give them pencils but we get

11  them back from them.  If they ask for a pencil, we

12  give them one but we get them back.  So yes.  The

13  answer is yes.

14         Q.   Would they be allowed to have pencils

15  and pens and paper in their cell by themselves?

16         A.   Yes.

17         Q.   And were inmates that were on either

18  suicide watch and suicide alert also allowed to

19  have pens and paper or pencils?

20         A.   I honestly don't remember.  I don't

21  remember anybody being on suicide watch ever

22  asking for a pencil.  We give them reading

23  material sometimes, but I don't remember if we

24  gave them pencils or not, to be honest with you.

25         Q.   What did you observe from Desmond

1  Whisonant that made you think that he could be at

2  risk for suicide?

3      A.   There was nothing about him that made

4  me think he was at risk for suicide except he was

5  new.  There was nothing remarkable about him that

6  I could see.  He was another scared kid in the

7  jail.

8      Q.   And at that time, had you known how

9  long he had been in that particular pod?

10     A.   I did not, no.

11     Q.   Did you know whether or not he was

12  transferred from another facility?

13     A.   I did not.

14     Q.   Did you know if he had had any

15  previous suicide attempts?

16     A.   I do not know.

17     Q.   Would you have known that he was not

18  to previously be provided bed sheets?

19     A.   If it was, I would have been told

20  that.

21     Q.   Would you have known that he was

22  previously not to be provided with pencils or

23  sharp objects?

24     A.   I would have -- someone would have

25  told me if that was the case.

1     Q.    Would you have known that he had

2 previously expressed fleeting suicidal ideations?

3     A.    No.  That was not communicated to me.

4     Q.    Should that have been?

5          MR. PERRIN:  Objection to form.  You

6 can answer.

7          THE WITNESS:  I don't know what

8 difference it would have made.

9 BY MR. LITTLEJOHN, JR.:

10     Q.    Did you communicate with any staff

11 members about Desmond Wisonat's potential risk for

12 suicide?

13     A.    I did not.

14     Q.    When did you learn that Desmond

15 Whisonant committed suicide?

16     A.    After the lockdown, I heard the

17 screaming next door, and they locked -- we locked

18 everybody down, and then they give everybody a

19 call saying what happened.  I didn't know who it

20 was.  I didn't know which -- they said --

21     Q.    Were the pods situated next to each

22 other or were they on, like, floors?

23     A.    We were all on one floor.

24     Q.    Were you called to go to pod five?

25     A.    No, I was not.  I stayed in my pod.

```
 1          Q.   Who was the first person you talked to
 2    after the cell -- the cell was put on lockdown?
 3          A.   When hallway called to tell us about
 4    the lockdown, they said that somebody -- I don't
 5    remember who was on the hallway that day.
 6          Q.   Did you talk with Sergeant Williams
 7    afterwards?
 8          A.   She just came by and just told us what
 9    happened.
10          Q.   Were you asked to give a statement?
11          A.   I believe I was.  If I remember
12    correctly, I was.
13          Q.   Did you give a statement to the
14    Mecklenburg County Sheriff's Office?
15          A.   I'm pretty sure I did, but I'm not 100
16    percent sure.  I believe I did because I would --
17    I broke him that day.  I imagine I would have done
18    a statement.
19          Q.   Do you think that statement would have
20    been written or verbal?
21          A.   It would have been written.
22          Q.   So there should be a written statement
23    after the -- after the lockdown, that you provided
24    to the Sheriff's office?
25          A.   Yes.  If I did one, then, yeah, there
```

1   would be -- it would be in there.

2          Q.   Did you provide any statement to any

3   other governmental agency, state or federal?

4          A.   No, I haven't talked to anybody else.

5          Q.   You did not talk to the State Bureau

6   of Investigation?

7          A.   No.

8          Q.   Who else conducted pod tours on

9   November 21st, 2020, in pod five, other than

10  yourself and Weller?

11         A.   I am -- I wouldn't know.  My door is

12  closed.  I can't see in that pod.  If anybody else

13  came in --

14         Q.   You stated a little earlier about how

15  you go about logging, I guess, your pods.  Could

16  you explain any written logs that you would

17  provide for your juvenile inmates on the pod?

18         A.   The regular log that we had and then,

19  if anyone was on suicide watch, there's an

20  additional document that you annotate on when you

21  check the suicide watch.

22         Q.   And then the buttons you're pressing

23  also create a log?

24         A.   Yes.  Yes.  We never got to see those

25  logs.  We never saw it but I imagine the sergeants

1   probably could.

2        Q.   And so -- if you don't know you can

3   just say that, but with the buttons on the wall,

4   do you believe it is clocking every time that

5   you're hitting a button or when you make a

6   complete tour?

7        A.   Well, the tour would -- it wouldn't

8   show the tour complete until you hit all the

9   buttons.  If you missed a button, it would show up

10  on the computer of the tour not being done.

11       Q.   So I just want to make sure I'm

12  hearing you right.  You said there was a special

13  form you have to do for suicide watch or suicide

14  alert?

15       A.   Yeah.  There was -- it was a purple

16  form.  You just annotated every 10 minutes for

17  them because the other pod times were different.

18       Q.   Who would sign off on the purple form?

19       A.   The juvenile -- the officer in the

20  pod.

21       Q.   And would you initial it or would you

22  sign it?

23       A.   I believe I initialled it.

24       Q.   Would your supervisor also have to

25  initial it?

1    A.    Somebody would sign it when the person
2  came off.   And if they came around to do a pod
3  tour, I think they may have annotated on that same
4  form.

5    Q.    What kind of things would a supervisor
6  typically annotate on that form?

7    A.    "Conducted pod tour.  Everything is
8  safe and secure" or whatever they found -- if they
9  found any discrepancies.  Anything in there.

10    Q.    So would Sergeant Williams typically
11  go back behind you after you had done a pod tour?
12  Would sergeant do her own pod tour?

13    A.    She would do her own.  Her pod tours
14  were totally independent of mine.

15    Q.    So would this happen every day?

16    A.    Yes.

17    Q.    And so the supervisors used the same
18  purple document -- purple form that you would
19  write on, or would they get another form to
20  complete?

21    A.    I believe they used the same form.  As
22  far as I can remember, it was the same form.

23    Q.    And did a mental health clinician have
24  to also review that form?

25    A.    I think that's who signed off on it to

1  take them off of suicide watch, if I'm not
2  mistaken.  I think mental health had to sign off
3  on it.  I know somebody had to sign off on it.
4  Now that you mention it, I think it was the mental
5  health doctor that had to sign off saying they
6  were off suicide watch.
7        Q.    On November 21st, 2020, did all the
8  pods have the same supervisor?
9        A.    Yes.
10        Q.    So on November 21st, 2020, who was the
11  pod supervisor?
12        A.    Now, when you say supervisor -- I'm
13  talking about Sergeant Williams as a supervisor.
14  Are you talking about -- every pod has its
15  own juvenile justice officer in it.
16        Q.    Correct.  Yes, sir.  So on November
17  21st, you stated earlier, you were in a pod?
18        A.    Correct.
19        Q.    Your pod supervisor was Sergeant
20  Williams?
21        A.    Well, yes.  I'm the pod supervisor
22  when I'm in there.  Sergeant Williams is the
23  supervisor.  Maybe it's just --
24        Q.    Sorry about that.  Got it.  So for
25  Weller's pod five, Sergeant Williams would have

1    been supervising his tours, right?

2         A.   Correct.

3         Q.   Does Sergeant Williams have any

4    communication with you before you start a pod tour

5    or after you conclude a pod tour?

6         A.   No.  Because, usually, I'm -- the only

7    person who is in there is me.  When she comes to

8    do her thing, she'll look at my log and see that I

9    had been doing my tours.

10        Q.   Do you know Quaderah Carver who works

11   at the Mecklenburg County Sheriff's Office?

12        A.   Vaguely.  She hadn't been there very

13   long.  I remember the name.  I don't know what her

14   face looks like now.  I remember the name.  She

15   had been working with the --

16        Q.   Did you take any action, on November

17   21st, 2020, to mitigate Desmond Whisonant

18   committing suicide?

19             MR. PERRIN:  Objection to the form.

20   You can answer that.

21             THE WITNESS:  I conducted the tours,

22   but -- yeah, I did my job.  I conducted tours but,

23   no, I don't think I did anything --

24   BY MR. LITTLEJOHN, JR.:

25        Q.   Did you ever speak, one on one, as you

1  and I are doing today -- did you ever speak with

2  Desmond Whisonant?

3        A.   No.

4        Q.   Do the cells have any closed circuit

5  monitoring in them?

6        A.   Inside the cells?

7        Q.   Yes, sir.

8        A.   No.

9        Q.   Did the correctional facility you

10  worked at in Ohio have that?

11        A.   No.  No.

12        Q.   You stated that the cells have light

13  switches in them?

14        A.   No -- yeah, they do, but we have a

15  main switch.  We can give them the ability to turn

16  their lights off and on.

17        Q.   What specific questions did you ask

18  Weller about the suicidal -- the inmates that were

19  put on either watch or alert of which Weller was

20  responsible for in that pod?

21        A.   I just asked him -- I didn't ask him

22  anything about it really, but just which one --

23  which cell is the suicide watch and he was

24  confirming that.

25        Q.   Do you do anything special when it

1   comes to -- do you do anything different as

2   opposed to juvenile inmates who are not on suicide

3   watch or alert when it comes to directly observing

4   them?

5           A.    No.  I -- I do it all the same.

6           Q.    So you watch a potential suicidal

7   juvenile inmate the same -- observe a suicidal

8   inmate the same as an inmate who is not placed on

9   any particular suicide watch or alert?

10          A.    Yes, the only difference is the

11  timeframe that you check on them.

12          Q.    Did you do staggered observations?

13          A.    I did.

14          Q.    Okay.  So would you leave the podium

15  to go, specifically, check one particular cell

16  that may have a suicide alert or watch juvenile

17  inmate?

18          A.    Yes.

19          Q.    So when you went to directly observe

20  an inmate that was on suicide watch or suicide

21  alert, because of the staggered intervals, you

22  were going specifically to that cell?

23          A.    Correct.

24          Q.    Can you recall what the Mecklenburg

25  County Sheriff's Office policies or specific

1  requirements were for direct observation?

2       A.   I don't remember off the top of my

3  head, to be honest with you.

4       Q.   So tell me everything that you did to

5  ensure that the juvenile inmates on your

6  particular pod were being directly observed by

7  you.

8       A.   Just follow the policies and do the

9  tours.  If you do the tours, you can't help but

10 see -- if you're doing your job, it's almost

11 impossible not to observe them because you have to

12 look in there and visually see them there.

13      Q.   Would any -- would anyone other than

14 yourself have logged what you saw, at the time you

15 saw it, on the purple form?

16      A.   No.

17      Q.   What would you typically -- what are

18 the particular annotations you may write down,

19 under observations or comments, on the purple

20 form?

21      A.   I usually put what the juvenile is

22 doing.  "Juvenile is sitting on bench.  Juvenile

23 is standing in cell."  Whatever they're doing in

24 there is what I would put on the form.  "Juvenile

25 asleep."  Whatever was going on in that cell is

1  what I put on the form.

2      Q.   What does it mean for a juvenile

3  inmate to be safe and secure?

4      A.   That they're alive, and breathing and

5  functioning normally.  Not getting into a fight,

6  not bleeding.

7      Q.   Is there any fixed circuit

8  surveillance camera in the pod you were working on

9  November 21st, 2020?

10     A.   Yes, there's video -- there's cameras

11 in every pod.

12     Q.   Do you know where those cameras are

13 situated?

14     A.   Yes.

15     Q.   How many cameras are there?

16     A.   Two or three, I think.

17     Q.   And where, typically, would they be

18 located in a pod?  What are they trying to

19 capture, I guess, is more so what I'm trying to

20 understand?

21     A.   You can see all the doors in the pod

22 and you can see the open floor in the pod.  And

23 there's a camera out on the basketball court.  So

24 four -- probably four cameras there.  I forgot

25 about the basketball court.

1    Q.   Are you able to -- when you were with

2    the Mecklenburg County Sheriff's Office, could you

3    access those cameras, yourself, and watch those?

4    A.   No.

5    Q.   Had you -- have you seen any footage

6    from -- video footage from any fixed surveillance

7    from November 21st, 2020?

8    A.   Just what I saw here this morning.

9    Q.   Could you explain what you saw this

10   morning?

11   A.   I saw myself doing my -- doing checks.

12   Q.   Just bear with me one moment, Mr.

13   Sherald

14   A.   You're fine.

15   Q.   So you previously reviewed video

16   camera footage from your cell checks on pod five,

17   correct?

18   A.   Yes.

19   Q.   I'm going to be showing you right now

20   what I'm including as Exhibit A -- Plaintiff's

21   Exhibit A.   Does this area look familiar to you?

22   A.   Yes, it looks like a pod.

23        (Whereupon Exhibit A was marked for

24   identification and is attached hereto.)

25   BY MR. LITTLEJOHN, JR.:

1      Q.   And is the date at the top right-hand

2  corner November 21st, 2020?

3      A.   Yep.

4      Q.   And is the time at the top 12:16

5  p.m.?

6      A.   Yes, it is.

7           (Video playing.)

8  BY MR. LITTLEJOHN, JR.:

9      Q.   So I'm going to show you -- just for

10 purposes of authentication, could you tell me if

11 the person who just popped up at the bottom of

12 that screen -- is that you, Mr. Sherald?

13     A.   Looks like it, yes.

14     Q.   And is this your pod tour on November

15 21st, 2020?

16     A.   Is this my pod or pod five?

17     Q.   No, sir.  Are you conducting a pod

18 tour in this image?

19     A.   Yes.  Yes.

20     Q.   And I can play it just so you can see

21 it from the front and back.  I know Sheriff

22 McFadden has a bald head as well.  Just making

23 sure that's not him.

24          So Mr. Sherald, did that clip I just

25 showed -- does that accurately depict you on

1  November 21st, 2020?

2      A.   Yes.

3      Q.   And during that time, were you on pod

4  five?

5      A.   Yes.  I probably had the door open

6  from my pod going back and forth, yes.

7      Q.   And as you can see at the top right --

8  I'm stopping the video, but it is 12:17:16 p.m.?

9      A.   Uh-huh.

10     Q.   So when you said that you were going

11 back and forth, were you having to observe -- were

12 you -- when you relieved Officer Weller, were you

13 still responsible for the pod that you were

14 working earlier that day?  Were you doing both?

15     A.   Yes.

16     Q.   Did you have any inmates on suicidal

17 watch in your pod?

18     A.   Not that I can remember.

19     Q.   And on the image that I'm currently

20 showing you, do you recall which cell was Desmond

21 Wisonat's?

22     A.   Yeah, I believe it was the third from

23 the back.

24     Q.   When you say third from the back --

25     A.   On the left-hand side there.  All the

1  way where the door is going out to the basketball

2  court --

3       Q.   Yes, sir?

4       A.   Third door from there.

5       Q.   On the left side or the right side?

6       A.   Left side.

7       Q.   Okay.  Are you referring to this cell

8  right here?

9       A.   Yes.

10      Q.   The left side?

11      A.   Yes.

12      Q.   Okay.  Do you know how long you

13  relieved Officer Weller on November 21st, 2020?

14      A.   Our breaks are 15 minutes and Weller

15  always comes back on time.

16      Q.   You said a little earlier there was a

17  purple form, there was a log notebook, there was a

18  button, and then there was the video.  Are there

19  any other ways, other than the four ways I just

20  named, to validate logs of tours or observations?

21  Am I missing anything?

22      A.   I don't think you are.  I think you

23  got everything.

24      Q.   Did you complete a purple form when

25  you relieved Officer Weller on his pod?

 1          A.    If there was one in there, I did.

 2          Q.    I'm showing you right now what I'm

 3    marking as Plaintiff's Exhibit B.  Does this

 4    document look familiar to you?

 5          A.    Yes.

 6                (Whereupon Exhibit B was marked for

 7    identification and is attached hereto.)

 8    BY MR. LITTLEJOHN, JR.:

 9          Q.    Could you explain to me what this

10    document is?

11          A.    Yes, it's the log from the pod where

12    you log your -- everything that goes on in the pod

13    including your checks.

14          Q.    And did you complete this document on

15    November 21st, 2020?

16          A.    I did.

17          Q.    And is your handwriting on this

18    document?

19          A.    Yes, it is.

20          Q.    Could you tell me right now where your

21    handwriting is on this document?

22          A.    Yes.  At 12:19, down to 12:49.

23          Q.    I can --

24          A.    Yep, 12:49.  I think I put 14:49.  I

25    don't know why I did that but that's 12:49.

1    Q.   So roughly 30 minutes?  From 12:19 to

2  12:49?

3    A.   Yeah.  That was at lunch.  So we get

4  30 minutes for lunch and 15 minutes for the

5  breaks.  So 30 minutes would have been right.

6    Q.   Which one was Officer Weller on?

7    A.   Which --

8    Q.   Which break?  I'm sorry.

9    A.   That had to be the lunch break at

10  12:00 because we take -- the morning break is

11  around anywhere from 9:30 to 10:30.  Somewhere in

12  there, I think.  Depends on how many people we

13  have on the hallway.

14    Q.   So this says 12:19 p.m.  So you stated

15  that if a log was done or if there was purple

16  form -- if there was a purple form for that pod,

17  you would have also completed that, correct?

18    A.   Correct.

19    Q.   And do you recall right now whether or

20  not you did a form for Desmond Whisonant that day?

21    A.   I do not remember.  If there was one

22  in there, then I did it.  It goes along with the

23  pod tours.  If we had the purple forms, then,

24  yeah, I would have filled one --

25    Q.   And no one else would have made note

1  of your record or your log -- no one else would

2  have noted Mr. Bruce Sherald's log of Desmond

3  Whisonant?

4          MR. PERRIN:  Object to form.  You can

5  answer.

6          THE WITNESS:  Not to my knowledge.

7  BY MR. LITTLEJOHN, JR.:

8      Q.   So I'm showing you another document

9  that I'm labeling as Plaintiff's Exhibit C.  Does

10  this document look familiar?

11      A.   Yep.

12          (Whereupon Exhibit C was marked for

13  identification and is attached hereto.)

14          MR. LITTLEJOHN, JR.:  Okay.  And as

15  you can see, it starts around 13 -- it looks like

16  13:55 and he arrives to Mecklenburg County

17  Sheriff's Office.  And I see staff initials for

18  Quaderah Carver.  So I'm going to scroll down to

19  the time where you were working.

20      Q.   At 12:19, in your previous log, you

21  had noted your observation and pod tour.  Are your

22  initials on this document?

23      A.   No.

24      Q.   Did you observe Desmond Whisonant at

25  12:15 p.m. on November 21st, 2020?

1    A.    Whatever the time was on the log that
2  I put on there was the time I observed him.
3    Q.    So this is the purple form that you
4  were stating that you also had to complete.  And
5  you had stated a little earlier that if one had
6  been completed, you would have done it?
7    A.    This isn't the form I was talking
8  about, though.  I don't know what this one is.
9    Q.    Can you see the document I'm sharing
10 right now on my screen?
11    A.    Yes.
12    Q.    Does this document look familiar?
13    A.    Yes, this is the form I was talking
14 about.
15    Q.    And it's just because the color is
16 purple, correct?
17    A.    Correct.
18    Q.    Have you ever completed one of these
19 forms?
20    A.    I have.
21    Q.    What training did you receive about
22 this particular form?
23    A.    I don't remember any specific training
24 except what we probably did in training.  I
25 remember that --

1    Q.   So the Mecklenburg County Sheriff's

2  Office showed you how to complete this form?

3    A.   Yes.

4    Q.   So I know, on the top of this form, it

5  says, "This form shall be printed on lavender

6  purple paper."

7    A.   Yes.

8    Q.   Could you read note two for me,

9  please?

10    A.   Oh, "Document observations at

11  intervals that do not exceed 10 minutes."

12    Q.   And what is your understanding of note

13  two?

14    A.   That you can't go over 10 minutes

15  between checks, and it should be at regular

16  intervals.

17    Q.   What could happen if you did not log

18  in this 10 minutes?

19    A.   I imagine you would get written up.

20  I'm not really sure of --

21    Q.   How would someone know?

22    A.   How would someone know?  Well, I'm

23  sure there's video when you're annotating on your

24  log.

25    Q.   And should this log be consistent with

1  the the other log notebook that you were referring

2  to earlier that --

3      A.    No.

4      Q.    Why not?

5      A.    The time difference.  The part two is

6  for the people not on suicide watch that is

7  longer.  This one is every 10 minutes.  The other

8  one, I think, is every 20.

9      Q.    So you had stated a little earlier

10 that these were staggered observations, right?

11     A.    Correct.

12     Q.    So you would go directly to the

13 suicidal inmate or the inmate that was placed on

14 alert or watch that is indicated on this form?

15     A.    (No audible response.)

16     Q.    But you do -- you know, in your

17 day-to-day, as a juvenile detention officer, this

18 is the document that you would complete?

19     A.    Yes.

20     Q.    Okay.  So I'm going to go back to the

21 document I showed you as Plaintiff's Exhibit B.

22     A.    Okay.

23     Q.    With the exception of the color of the

24 paper, is this not the same document?

25     A.    It looks like it.

1  Q.  Does your time logged from November

2  21st, 2020, appear on this document?

3  A.  No, it does not.

4  Q.  Thank you.

5  (Marilyn Porter joined the

6  deposition.)

7  BY MR. LITTLEJOHN, JR.:

8  Q.  So to your knowledge, was Desmond

9  Whisonant housed in the same cell as inmates who

10  were not on suicide watch or alert?

11  A.  In the same cell, no.  He was in a

12  cell by himself.

13  Q.  Same type of cell?

14  A.  Oh, yes.  All the cells -- all the

15  pods are the same in there.

16  Q.  Do you know or can you recall if

17  Desmond was under close supervision -- under close

18  observation or constant supervision?

19  A.  He was under suicide watch.  I'm not

20  sure what the difference is there.  He was under

21  suicide watch which means check on him no less

22  than every two minutes -- 10 minutes.

23  Q.  I'm going to show you this purple

24  document again, and I'm going to mark this as

25  Plaintiff's Exhibit D.

1          A.   All right.

2               (Whereupon Exhibit D was marked for

3     identification and is attached hereto.)

4     BY MR. LITTLEJOHN, JR.:

5          Q.   I'm going to show you this document

6     again.  Do you see this?

7          A.   Yes.

8          Q.   Do you see, on the right side here,

9     where it says, "Select only one"?

10         A.   Yes.

11         Q.   What is your understanding as to alert

12    and watch?

13         A.   Alert is a little higher level of

14    observation, I think, and watch is the 10-minute

15    tours.

16         Q.   So you said the alert is the higher

17    level.  What comes with the higher level?

18         A.   I think that's when we put them in the

19    turtle suits and take stuff out of their cells,

20    thinking they might hurt themselves.

21         Q.   I've never worked for a correctional

22    facility or a juvenile detention facility.  What's

23    a turtle suit?

24         A.   It's a big plastic suit that -- it

25    keeps -- they have to put it on.  They can't take

1    it off.  It will cover them up.  It's like

2    plastic.

3         Q.   Is it like the white --

4         A.   No.  No.

5         Q.   Oh, okay.  I didn't know.

6         A.   It looks -- they call it a turtle suit

7    because it's green.  It's just a big plastic suit

8    that they put on so they're covered up.

9         Q.   So you're saying suicide alerts

10   receive a turtle suit and you also said belongings

11   are removed from their cell?

12        A.   Anything they can hurt themselves

13   with.  I think the sheets are taken -- most -- I

14   think they take everything out of there if I

15   remember correctly.  I never had anybody on

16   suicide alert.  I had a lot of people on watches.

17   When I went into different pods, I had seen them

18   in there.

19        Q.   I'm going back to Exhibit C really

20   quickly.  So you see Desmond Whisonant is -- the

21   box is checked for alert; is that correct?

22        A.   Yes.

23        Q.   All right.  So as a juvenile inmate on

24   alert, Mr. Whisonant would have needed to be in a

25   turtle suit, correct?

1      A.   If I remember correctly, yes.

2      Q.   So on November 21st, 2020, he wasn't

3  in a turtle suit?

4      A.   No.

5      Q.   Did he have his belongings removed

6  from his cell?

7      A.   Not that I could tell.  He had his

8  blanket and stuff, and he was sitting on the bunk.

9      Q.   I'm just showing you Plaintiff's

10  Exhibit A again.  The video in which only you

11  appeared.

12      A.   Uh-huh.

13      Q.   Could you tell me the time on -- on

14  Plaintiff's Exhibit A, can you tell me the time?

15  Do you see it in the top right-hand corner?

16      A.   12:19.

17      Q.   And is this from -- can you tell me

18  the date that's to the left of that?

19      A.   11-21-20.

20      Q.   Okay.  I just stopped it here at 12:19

21  and 49 seconds.  Is that you to the bottom left of

22  that screen?

23      A.   Looks like it.

24      Q.   Is this you conducting a pod tour?

25      A.   Yes.

1          Q.    Now, is this a particular pod tour

2     that is specifically for Mr. Whisonant or a more

3     regular pod tour?

4          A.    This is a regular pod tour.

5          Q.    Okay.  And what time does it say right

6     now in the top right-hand corner?

7          A.    12:20.

8          Q.    And did that accurately depict -- is

9     it a fair representation of you on November 21st,

10    2020?

11         A.    It looks like it.

12         Q.    So I'm going back to what I have as

13    Plaintiff's Exhibit B; your handwritten log.  In

14    this document, it states that pod tour begins at

15    12:19.  And at 12:12 -- could you read your note

16    at 12:20?

17         A.    "Pod tour completed.  All appears safe

18    and secure."

19         Q.    Does this note apply to Desmond

20    Whisonant?

21         A.    Yes, it would -- that applied to

22    everybody in the pod.

23         Q.    So is there a document that you would

24    have written on regarding your specific

25    observation of Desmond Whisonant on November 21st,

1   2020?

2          A.   If I remember, it should have been the

3   purple form.  The one that was there previously.

4   If there was one in there.  I'm not sure when we

5   started using those purple forms, but if they were

6   in there, we would fill them out.

7          Q.   Who reviews the handwritten suicide --

8   the suicide observation record?  Who reviews those

9   for you?

10          A.   I would think the sergeants, and

11  mental health may come in to take a look at them,

12  as far as I know.

13          Q.   Sergeant Tiffany Parker Williams would

14  have reviewed your handwritten log and the suicide

15  observation record?

16          A.   Yes.

17          Q.   Do you remember discussing those logs

18  and records with Tiffany Parker Williams?

19          A.   No.

20          Q.   Did you ever discuss them with

21  Henrietta Saunders, who I believe you are saying

22  is Peaches?

23          A.   Yeah -- no, I did not.

24          Q.   Did you ever discuss those logs or

25  records with Akeem Comas?

1           A.    No.

2           Q.    Was Akeem Comas working on November

3    21st, 2020?

4           A.    Honestly, I don't remember.  He wasn't

5    in my pod and he wasn't in Weller's pod.  If he

6    was there that day, I don't know where he was.

7           Q.    What is your understanding as to how

8    often Desmond Whisonant should have been

9    checked?

10          A.    Not to exceed every 10 minutes.

11          Q.    So in the last video and the last clip

12   I just showed you that was at 12:20 -- you just

13   stated that you had to watch him every 10 minutes.

14   Could you tell me right now when you would have

15   needed to observe Desmond Whisonant again after

16   12:20?

17          A.    Before 12:30.

18          Q.    And did you do that, by chance, on

19   November 21st, 2020?

20          A.    I would have to look at the log and

21   see, but I'm pretty sure I probably did.

22          Q.    I'm still on Plaintiff's Exhibit A,

23   Mr. Sherald.  The time is 12:35 p.m.

24          A.    Uh-huh.

25          Q.    Is that you coming into the frame

1   right now?

2          A.   Yes.

3          Q.   What time right now is at the top

4   right-hand corner?

5          A.   12:36.

6          Q.   Mr. Sherald, do you see yourself in

7   this photo?

8          A.   I do.

9          Q.   Is that you in the bottom left-hand

10  corner?

11         A.   Yes, it is.

12         Q.   And what time is it?

13         A.   12:49.

14         Q.   I believe this concludes you filling

15  in for Weller.  So is this a regular pod tour or

16  is this a pod tour where you're going to check on

17  Mr. Whisonant?

18         A.   This is a regular pod tour.

19         Q.   Okay.  So I just saw you touch those

20  two buttons as we were talking a little earlier.

21  Are these the buttons you're referring to as to

22  the type of log that is recorded?

23         A.   Yes.

24         Q.   The way you just looked into that

25  particular cell, would you say that you directly

1  observed --

2      A.   I think I might have been talking to

3  one of the juveniles there.

4      Q.   All right.  Now, we pointed to, a

5  little earlier, where Desmond's cell was.  Did you

6  directly observe Desmond's cell during that time?

7      A.   Can you say that again?  I didn't hear

8  you.

9      Q.   Did you just directly observe

10 Mr. Desmond Whisonant in cell four?

11     A.   Yes.  On my last tour, he was just

12 sitting on his bunk.

13     Q.   And by the last tour, are you saying

14 the one that was at 12:35?

15     A.   The last one -- this one I just did at

16 12:49.

17     Q.   Okay.  So -- and remind me again which

18 cell you believe -- if you can remember, Mr.

19 Sherald, which cell you believe Mr. Whisonant was

20 in?

21     A.   Third from the rear on the left.

22     Q.   So again, did you just directly

23 observe that cell?

24     A.   I did.

25     Q.   I'm just going to go ahead and get the

1  timestamp of this and then review it later, if you

2  can.  Did you see what time -- is that you in the

3  bottom left-hand corner, Mr. Sherald?

4      A.   Yes.

5      Q.   What time is on it?

6      A.   12:49.

7      Q.   Does this accurately and fairly

8  represent you in pod five on November 21st, 2020?

9      A.   Yes.

10     Q.   And would you like to see any of the

11 four tours you did from 12:16 to 12:49?  Would any

12 of those refresh your memory?

13     A.   No, none.

14     Q.   Okay.  And during the 12:16 p.m. to

15 12:49 p.m., would there have been a time frame

16 where you interacted directly with Mr. Whisonant?

17     A.   Would there have been a time?

18     Q.   Yes, sir.

19     A.   When you say interact, you mean talk

20 to him?

21     Q.   Yes, sir.

22     A.   If I did, it was just in passing.

23 Because usually, if I'm going by, I say, "Hey, are

24 you good?"  But usually that's about it.  I don't

25 think I -- if I said something, I don't remember

1  if he responded or --

2      Q.   So is it your understanding that

3  directly observing inmates is just a general scan

4  of the pod?

5         MR. PERRIN:  Objection to form.  Asked

6  and answered.  You can answer.

7         THE WITNESS:  I'm -- yeah, just

8  observing what's going on in the cell.

9  BY MR. LITTLEJOHN, JR.:

10      Q.   So is that you putting eyes inside

11  every individual cell?

12      A.   Yes.

13      Q.   And you haven't answered this:  So on

14  November 21st, 2020, did you put your eyes in

15  Desmond Wisonat's individual cell?

16      A.   Yes.

17      Q.   Is there any training that you have to

18  undergo, as it relates to the Sheriff's office,

19  receiving new juvenile inmates as opposed to

20  juvenile inmates who have been there for a while?

21  Do you have to do anything different?

22      A.   No, not to my recollection.  No, they

23  were all done the same way.

24      Q.   Aside from Weller's pod -- I want to

25  talk about that day in your pod.

1      A.    Okay.

2      Q.    What -- you stated a little earlier

3  that you're notified about an inmate being on

4  suicide alert or watch at roll call, correct?

5      A.    Uh-huh.

6      Q.    What other info is given to you,

7  generally, about the medical or mental health of

8  juvenile inmates?

9      A.    Not a lot unless there's a problem.

10  Like someone needs to take a medication if their

11  mood changes and that type of stuff.  Nothing

12  else.

13      Q.    Do the mental health clinicians just

14  arrive on the floor when they want to or do you

15  have to request them to come to the cell or come

16  to a pod?

17      A.    I can request them but they come in

18  and make regular rounds.

19      Q.    So they make rounds as well?

20      A.    Yes.

21      Q.    What does it mean to be on a special

22  watch?

23      A.    I am not familiar with a special

24  watch.

25      Q.    Okay.  In your experience with the

```
 1   Mecklenburg County Sheriff's Office and your
 2   previous experience with the correctional facility
 3   in Ohio, why would an inmate be placed in a turtle
 4   suit?
 5        A.   If they have -- I think, in my mind,
 6   demonstrated that they have the potential to
 7   seriously hurt themselves.  And that determination
 8   is made by the mental health professionals not
 9   us.
10        Q.   Right.  But it is fair to say that you
11   are not a mental health clinician, correct?
12        A.   That is correct.
13        Q.   You didn't do any intake screening,
14   correct?
15        A.   Right.
16        Q.   But you are still responsible for the
17   custody of inmates, correct?
18        A.   Right.
19        Q.   So was your job to assure that they
20   are safe?
21        A.   Yes.
22        Q.   Why would the -- why would you need to
23   remove sheets or bed sheets from a juvenile
24   inmate's cell?
25        A.   Why would you?  I don't know if --
```

1    when they say to take those things -- again, it's
2    up to the mental health professionals.  I don't
3    know what the requirements are for them to do it.
4         Q.    What could bed sheets be used for?
5         A.    To hurt themselves?
6         Q.    Yes, sir?
7         A.    They could hang themselves.
8         Q.    How would an inmate go about fastening
9    a noose?
10        A.    A -- honestly, I would not know.  I've
11   never done that so I would not know.
12        Q.    Could sprinkler systems be used to tie
13   a bed sheet?
14        A.    I would have thought not.  I didn't
15   think those things were in the walls that
16   strongly, to be perfectly honest with you, because
17   we have juveniles that remove them all the time.
18   Take the gauges off the --
19        Q.    Pop sockets?
20        A.    Yeah.  So I didn't think they were
21   strong enough to hold somebody up, to be honest
22   with you.
23        Q.    So the cells also have outlets,
24   correct?
25        A.    Electrical outlets?

1      Q.   Yes, sir.

2      A.   No.  No.

3      Q.   Okay.  So would you say that a -- a

4   juvenile inmate who has been placed on suicide

5   alert or suicide watch could use a bed sheet to

6   hang themselves?

7      A.   I guess they could, yes.  I guess they

8   could, yeah.

9      Q.   Are you aware of how Desmond Whisonant

10  died on November 21st, 2020?

11     A.   I am.

12     Q.   What is your understanding of that?

13     A.   That he hung himself from the fire --

14  the cage on the fire alarm.  That's all I know.

15     Q.   Do you know what he used to hang

16  himself?

17     A.   Not really, no.  He had on his

18  clothes.  He could have used anything.  I didn't

19  really get into the particulars of that.

20     Q.   Which is why you would give a juvenile

21  inmate a turtle suit so they couldn't use their

22  clothes?

23     A.   That's my understanding.

24     Q.   Do you recall whether or not the

25  furniture was secured to the floor?

1      A.   Inside the cell?

2      Q.   Yes, sir.

3      A.   They don't have any furniture.  Just a

4  toilet, and a desk, and a cement slab with a

5  mattress pad on it.  No other furniture.

6      Q.   They don't have a chair for the desk

7  or anything?

8      A.   They may have a stool.  A little

9  plastic stool.

10     Q.   And if they have a plastic stool, bed

11 sheets, and a fire alarm or pipe on the wall, are

12 those instruments that could be used to commit

13 suicide?

14     A.   I guess they are.  I mean, I'm sure

15 they are.  I'm not an expert on suicides but

16 apparently they are.

17     Q.   Have you done watches -- have you ever

18 relieved Dwight Weller while he was on lunch or

19 needed to take a break prior to the death of

20 Desmond?

21     A.   Yes.

22     Q.   Is that just typical?  Is that

23 something officers --

24     A.   It depends on how many people we had

25 that day.  If we didn't have enough people in the

1   hallway, we would have to break ourselves.  If

2   there were enough people in the hallway, somebody

3   would come in.

4        Q.   Okay.  Were you aware of any

5   inspection from the Department of Health and Human

6   Services on November 21st, 2020?

7        A.   No.

8        Q.   Before you left for Wells Fargo, were

9   there any other incidents that occurred or any

10  deaths at Jail North?

11       A.   No, not while I was there.

12       Q.   Did you leave for Wells Fargo because

13  of the closure of the detention facility?

14       A.   No, I did not.  My wife got me a job

15  over there.

16       Q.   And why did you want to go to Wells

17  Fargo?  You spoke a little earlier about how much

18  you love working with the youth and you were a

19  coach.  Why did you leave for Wells Fargo?

20       A.   My wife did not like me working there.

21  She thought I was a little old to be doing it.  I

22  was 65 at the time and I'm 68 now.  She thought I

23  was a little too old to be dealing with the

24  physicalities of the -- of dealing with the

25  juveniles.  I loved working there.

```
1          Q.    You said --
2          A.    Okay.
3          Q.    You said it was a time intensive
4    effort working with juveniles, right, as opposed
5    to working with adults -- in your previous
6    experience with adults?
7          A.    Yes.
8          Q.    Do you feel like there was adequate
9    staffing at Jail North?
10         A.    We always had enough, on our shift at
11   least, to fill the pods.  We could always use more
12   people but -- you know, I don't know what the --
13   the number of people they needed to have on staff.
14   I didn't concern myself with that.
15         Q.    After the death of Desmond Whisonant,
16   did you become -- did you become aware of any
17   deaths that occurred at Jail Central?
18         A.    No, I wasn't.
19         Q.    Did they have to send any of the Jail
20   North officers to Jail Central?
21         A.    You mean after the closure?
22         Q.    No, sir, before the closure.  So after
23   the death of Desmond Whisonant, did you ever have
24   to go to work at Jail Central?
25         A.    No, I didn't.  No.
```

1          MR. PERRIN:  Michael, can we take a

2    break at an appropriate time?

3          MR. LITTLEJOHN, JR.:  Yes, sir.

4          MR. PERRIN:  Is now okay?

5          MR. LITTLEJOHN, JR.:  Yes, sir.

6          (At 11:08 a break was taken.)

7    BY MR. LITTLEJOHN, JR.:

8          Q.   Mr. Sherald, again, thank you so much

9    for your time today.  You're not a defendant in

10   this case, right?

11         A.   No.

12         Q.   I do want to learn a little bit more

13   about the case you were previously a defendant in.

14   What kind of case was that?

15         A.   It was a civil case.  I owned a

16   recruiting business, and I had a contract with a

17   subcontractor.  I didn't want to pay him because I

18   didn't think he did the work correctly, so we went

19   to court and I lost.

20         Q.   And do you remember the specific

21   claims?  Was it, like, a wage and hour claim?  Was

22   it a breach of contract?

23         A.   No.  It was for the -- a contract --

24   we subbed part of the contract out.  I had a

25   contract with the State of Ohio, and we

1  subcontracted out for them to supply STNEs, and

2  they didn't.

3       Q.   So was the claim revolving around

4  misrepresentation of facts?

5       A.   No, it was -- they didn't do the work.

6       Q.   Have you talked to Mr. Weller since

7  the death of Desmond?

8       A.   When he came back off -- he went on

9  sabbatical for a while.  After that, I just asked

10  how he was doing.  He was struggling a little bit.

11  That was about it.  We didn't talk about anything

12  specific.

13       Q.   When you say he was -- am I correct in

14  you saying he was pretty messed up about it?  What

15  do you mean?

16       A.   It affected him.  He's one of the most

17  caring guys that I ever worked with it, and it

18  really bothered him that it happened on his watch.

19       Q.   Did he say what he would have done

20  differently?

21       A.   No.  I don't think he could have done

22  anything differently because -- if you know

23  Weller, this guy is a machine, man.  He does

24  everything by the book, by the numbers.  He is one

25  of the most conscientious people I've ever met.

1    I've learned a lot from him.  Just watching him

2    and how he managed his pods and interacted with

3    the kids.

4         Q.   Did Weller train you at all?

5         A.   No, he did not.

6         Q.   All right.  Wrapping up here.  So on

7    November 21st, 2020, you were an employee of the

8    Mecklenburg County Sheriff's Office?

9         A.   Yes.

10        Q.   As far as your -- well -- and you were

11   a juvenile detention officer at that time or a

12   juvenile justice officer, correct?

13        A.   Uh-huh.

14             MR. PERRIN:  If you could answer

15   yes --

16             THE WITNESS:  Yes.

17   BY MR. LITTLEJOHN, JR.:

18        Q.   And part of your job was to ensure the

19   safety of inmates, correct?

20        A.   Correct.

21        Q.   And when an inmate is placed on

22   suicide alert or suicide watch, your job is to

23   keep the inmate alive, correct?

24             MR. PERRIN:  Objection to form.  You

25   can answer.

```
1              THE WITNESS: Yes.
2    BY MR. LITTLEJOHN, JR.:
3         Q.   On November 21st, 2020, Weller was
4    responsible for Desmond?
5              MR. PERRIN:  Objection to form.  You
6    can answer that.
7              THE WITNESS:  I imagine.  As much as
8    he could control, yes.
9    BY MR. LITTLEJOHN, JR.:
10        Q.   Were you responsible for the juvenile
11   inmates in your pod?
12        A.   Yes.
13        Q.   And it was your job to keep them
14   alive?
15        A.   Yes.
16        Q.   And does the same go for Weller in his
17   pod?
18        A.   Yes.
19        Q.   Okay.  So that would include the
20   inmates in his pod, correct?
21        A.   Yes.
22        Q.   Okay.  So Weller was responsible for
23   Desmond?
24        A.   He was responsible for his safety, but
25   he can't be responsible for his actions.
```

1    Q.   Weller can't be responsible for

2  Weller's actions or Desmond's actions?

3    A.   He can't be responsible for Desmond's

4  actions.

5         MR. LITTLEJOHN, JR.:  No further

6  questions at this time.  I don't know if, Sean,

7  you want to cross, or Jake or --

8         MR. PERRIN:  They may have questions

9  for us.

10         MS. TATE:  I just have a few very

11  quick questions or -- Jake do you want to jump in?

12         MR. STEWART:  Go for it if you're

13  ready.

14

15              DIRECT EXAMINATION

16  BY MS. TATE:

17    Q.   All right.  Bear with me just a

18  second.  Mr. Sherald, my name is Jillian Tate.  I

19  represent the defendants, Charles Moore and Tammy

20  Guess, in this case.  Do you have any idea who

21  they are?

22    A.   I do not.

23    Q.   And I believe you testified you have

24  nothing to do with the transfer or intake of new

25  inmates into Jail North; is that correct?

1      A.   That is correct.

2      Q.   Or you didn't when you were in that

3 position over at Jail North?

4      A.   Uh-huh.

5      Q.   Okay.  So is it typical for you to

6 ever speak with providers from the transferring

7 facility when an inmate goes from one facility to

8 Jail North?

9      A.   No.  No.

10      Q.   Would you ever expect -- did you ever

11 expect, in that role, to speak with anybody from

12 the transferring facility?

13      A.   No.  No reason to.

14      Q.   And I believe I know the answer to

15 this, based on those answers, but did you ever

16 speak with my clients, Tammy or Charles?

17      A.   No, I did not.

18      Q.   Would you have ever expected to speak

19 with Tammy or Charles?

20      A.   No, I wouldn't.

21      Q.   And in general, would information from

22 a transferring facility have affected your job or

23 what you did at Jail North?

24      A.   Not to my knowledge.  Maybe something

25 extreme like a guy that attacks officers.  We had

1  a couple like that but that was only -- and that

2  wasn't from the facility.  That was from

3  transportation.

4       Q.  So is it typical for you to

5  communicate with transportation then?

6       A.  I didn't communicate with them.  That

7  information was given to us --

8       Q.  Okay.

9       A.  -- from the transportation.

10       Q.  So for example, if an inmate were on

11  suicide watch or alert at a prior facility, before

12  moving to Jail North, would your knowledge of that

13  have changed your job at all?

14       A.  No.

15       Q.  Would it have changed the intake

16  procedures, to your knowledge, at Jail North?

17       A.  Not to my knowledge, no.  The

18  procedures would be the same.

19       MS. TATE:  That's all I have.  Thank

20  you so much.

21       THE WITNESS:  All right.

22       MR. STEWART:  Good afternoon, Mr.

23  Sherald.  I'm representing two or three of the

24  other defendants.  Sheriff Page, Detective Webster

25  and then Liberty Mutual.  I don't have any

1    questions for you.  I appreciate your time this

2    morning and this afternoon.

3             THE WITNESS:  Thank you.

4

5                 DIRECT EXAMINATION

6    BY MR. PERRIN:

7        Q.    Mr. Sherald, I have a few questions.

8    Mr. Littlejohn asked you about the difference

9    between suicide alert and suicide watch.  Do you

10   recall those questions?

11       A.    Yes.

12       Q.    And Mr. Whisonant was on suicide

13   alert; is that correct?

14       A.    Yes.

15       Q.    And what is the difference between --

16   you mention one has a turtle suit.  Is that alert

17   or watch?

18       A.    I thought it was alert but I believe

19   it's flip-flopped for watch.

20       Q.    So if you're on suicide watch, you get

21   a turtle suit and things are removed from your

22   cell?

23       A.    If that's determined by the mental

24   health provider.

25       Q.    Versus alert, which Mr. Whisonant was

1  on, which is no turtle suit and removal of the

2  sheet; is that right?

3      A.    Correct.

4          MR. PERRIN:  Thank you.

5          MR. LITTLEJOHN, JR.:  If you all don't

6  mind, I just have a couple of quick follow-up

7  questions.

8

9              REDIRECT EXAMINATION

10  BY MR. LITTLEJOHN, JR.:

11      Q.    Mr. Sherald, you said a little earlier

12  you had nothing to do with the intake process at

13  Mecklenburg County Sheriff's Office, correct?

14      A.    Yes, sir.

15      Q.    You received no training with respect

16  to intake, correct?

17      A.    Correct.

18      Q.    A little earlier -- a moment ago, you

19  were asked about if you had received certain

20  information that would have affected your job, do

21  you remember that?

22      A.    Yes.

23      Q.    And you made reference or

24  hypothetically to if an inmate had been violent

25  previously somewhere else or had harmed correction

1  officers.  Did you not just say that?

2       A.   Yes.

3       Q.   So regardless of if a juvenile -- if a

4  juvenile inmate was either on suicide alert or

5  suicide watch and you had learned that previously

6  before he arrived -- he or she arrived at your

7  facility, they had expressed suicidal ideations,

8  that would not have affected your job at the

9  Mecklenburg County Sheriff's Office?

10      A.   It wouldn't change how I did the

11 checks, no.  They're designed for that.  So no, I

12 don't think it would have.

13           MR. LITTLEJOHN, JR.:  Okay.  Nothing

14 further from me.

15           MR. PERRIN:  Anyone else?

16           MS. TATE:  Nothing else from me.

17           MR. STEWART:  I've got nothing else.

18           MR. PERRIN:  Madam Court Reporter, he

19 will waive.

20           THE COURT REPORTER:  Thank you.  And

21 would anyone like a copy?

22           MR. PERRIN:  We would like a copy.

23 This is Sean.

24           MS. TATE:  We would.  Just an e-trans

25 is fine.

1          MR. STEWART:  Same for me.  Thank you.

2          (At 12:18 a.m. the deposition

3     concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF REPORTER

2

3        I, Charla Lynch, Court Reporter and Notary
Public for the State of North Carolina at Large,
do hereby certify:

4

5        That the foregoing deposition was taken
before me on the date and at the time and location
stated on Page 1 of this transcript; that the

6    deponent was duly sworn to testify to the truth,
the whole truth, and nothing but the truth; that

7    the testimony of the deponent and all objections
made at the time of the examination were recorded

8    stenographically by me and were thereafter
transcribed; that the foregoing deposition as

9    typed is a true, accurate, and complete record of
the testimony of the deponent and of all

10   objections made at the time of the examination to
the best of my ability.

11

12       I further certify that I am neither
related to nor counsel for any party to the cause
pending or interested in the events thereof.

13

14       Witness my hand, this 6th of May, 2024,
at Camp Lejeune, Onslow County, North Carolina.

15

16

17

18

19       _Charla Lynch_

20   _____

21   Charla N. Lynch,
     Notary Public

22   State of North Carolina at Large
     My Commission expires:
     August 3, 2027

23

24

25

## **WORD INDEX**

**< 1 >**
**1** 92:5
**10** 32:3, 5 45:16
61:11, 14, 18 62:7
63:22 69:10, 13
**10:30** 58:11
**100** 43:15
**10-minute** 64:14
**11:08** 81:6
**11-21-20** 66:19
**12** 38:5
**12:00** 58:10
**12:12** 67:15
**12:15** 59:25
**12:16** 54:4 72:11,
14
**12:17:16** 55:8
**12:18** 1:12 91:2
**12:19** 57:22 58:1,
14 59:20 66:16, 20
67:15
**12:20** 67:7, 16
69:12, 16
**12:30** 69:17
**12:35** 69:23 71:14
**12:36** 70:5
**12:49** 57:22, 24, 25
58:2 70:13 71:16
72:6, 11, 15
**13** 59:15
**13:55** 59:16
**14:49** 57:24
**15** 35:25 36:4
56:14 58:4
**17** 19:11
**18-year-olds** 19:11

**< 2 >**
**20** 62:8
**200** 2:11
**2020** 6:20 7:24
8:25 28:12 29:12
35:24 37:15, 20
44:9 47:7, 10
48:17 52:9 53:7
54:2, 15 55:1
56:13 57:15 59:25
63:2 66:2 67:10

68:1 69:3, 19 72:8
73:14 77:10 79:6
83:7 84:3
**2024** 1:12 92:12
**2027** 92:22
**20th** 37:20
**21** 7:15 9:4 11:13
**21st** 6:20 28:12
29:12 35:24 37:15
44:9 47:7, 10, 17
48:17 52:9 53:7
54:2, 15 55:1
56:13 57:15 59:25
63:2 66:2 67:9, 25
69:3, 19 72:8
73:14 77:10 79:6
83:7 84:3
**22** 7:15, 16 9:4, 5
**227** 2:3
**24** 1:12 32:5
**27101** 2:15
**28202** 2:4, 8
**28211** 2:11
**2907** 2:11

**< 3 >**
**3** 92:22
**3:22-CV-167-RJC-
DCK** 1:2
**30** 58:1, 4, 5
**301** 2:7
**336)725-8385** 2:15
**341-1114** 1:22
**3500** 2:7

**< 4 >**
**4** 3:4
**49** 66:21
**4th** 2:3

**< 5 >**
**53** 3:5
**57** 3:5
**59** 3:5

**< 6 >**
**635** 2:14
**64** 3:14
**65** 79:22

**68** 79:22
**6th** 92:12

**< 7 >**
**70** 16:15, 17
**704)322-4581** 2:4
**704)331-4900** 2:8
**704)332-8300** 2:12

**< 8 >**
**85** 3:4
**88** 3:5
**888** 1:22
**89** 3:4

**< 9 >**
**9:30** 58:11
**9:55** 1:12

**< A >**
**a.m** 1:12 91:2
**AAU** 19:8
**ability** 5:21 49:15
92:10
**able** 53:1
**Absolutely** 26:14
**academy** 8:6 15:20,
22 16:5 17:14, 18
18:13 35:13
**access** 53:3
**accurate** 4:25 92:9
**accurately** 5:22
54:25 67:8 72:7
**acronym** 5:17
**acronyms** 5:12, 14
**act** 26:4
**action** 48:16
**actions** 84:25 85:2,
4
**active** 11:14
**activities** 32:8
**actual** 39:20
**additional** 44:20
**address** 8:3, 7
**adequate** 37:15
80:8
**adequately** 36:9
**administration**
20:18, 20
**Adminitratrix** 1:2

**ADRIANNA** 1:2
4:11
**adult** 8:16, 18, 20,
21 20:6 26:18, 21
**adults** 8:23 25:21
27:2 80:5, 6
**affairs** 14:10
**affect** 5:21
**afraid** 26:1
**African** 22:7
**afternoon** 87:22
88:2
**agency** 44:3
**ago** 89:18
**agreed** 7:5
**ahead** 71:25
**AKEEM** 1:9 68:25
69:2
**alarm** 77:14 78:11
**alert** 30:5, 7, 9, 12,
16, 24 38:22 40:18
45:14 49:19 50:3,
9, 16, 21 62:14
63:10 64:11, 13, 16
65:16, 21, 24 74:4
77:5 83:22 87:11
88:9, 13, 16, 18, 25
90:4
**alerts** 65:9
**alive** 31:12 52:4
83:23 84:14
**allow** 5:7
**allowed** 16:16
32:18 40:14, 18
**American** 22:7
**amount** 21:17
**ANGIE** 1:10
**annotate** 34:7, 11
44:20 46:6
**annotated** 23:6
45:16 46:3
**annotating** 61:23
**annotations** 51:18
**answer** 4:17, 25
5:6, 8, 11 24:7
37:3 40:13 42:6
48:20 59:5 73:6
83:14, 25 84:6
86:14

answered 73:6, *13*
answers 86:*15*
anybody 31:*20*
  40:*21* 44:*4*, *12*
  65:*15* 86:*11*
apparently 78:*16*
appear 63:*2*
appeared 66:*11*
appears 67:*17*
applied 15:2 67:2*1*
apply 67:*19*
appreciate 88:*1*
appropriate 81:2
approve 23:*16*
April 1:*12*
area 39:*20* 53:*21*
areas 13:2
Army 11:*13* 19:*10*
  20:*10*
arrive 74:*14*
arrived 90:6
arrives 59:*16*
Aside 73:*24*
asked 6:*18* 43:*10*
  49:*21* 73:5 82:9
  88:8 89:*19*
asking 40:*22*
asleep 33:22 51:25
aspects 36:*24*
assessment 28:*3*
assigned 28:9
  37:25 39:6
assigning 11:*4*
associate 20:*17*, *21*
assuming 10:*3*
assure 75:*19*
attached 53:*24*
  57:7 59:*13* 64:*3*
attacks 86:25
attempt 5:*8*
attempts 41:*15*
attended 14:*17*
attention 19:*21*
  27:*16*, *19* 35:*21*
audible 62:*15*
August 92:22
authentication
  54:*10*
authoritative 25:*19*

< B >

available 27:*13*
average 33:*24*
aware 6:*17*, *22*
  28:*11* 30:*4* 36:25
  77:9 79:*4* 80:*16*

< B >
B-113 2:*3*
bachelor's 20:*16*
back 9:*24* 10:9
  11:*16* 34:9 35:5
  36:2 38:*18* 40:*11*,
  *12* 46:*11* 54:2*1*
  55:*6*, *11*, *23*, *24*
  56:*15* 62:*20* 65:*19*
  67:*12* 82:*8*
bald 54:22
based 22:*24* 23:25
  24:*3* 86:*15*
basic 15:*17*
basis 11:22 12:*14*
  31:25 32:6
basketball 19:9
  32:*13* 52:*23*, 25
  56:*1*
bear 53:*12* 85:*17*
becoming 17:*24*
bed 22:*3* 41:*18*
  75:*23* 76:*4*, *13*
  77:5 78:*10*
BEGAN 1:*12*
beginning 8:*25*
  34:*4*
begins 34:*16* 67:*14*
behalf 2:*2*, *6* 4:*12*
  13:*12*
believe 43:*11*, *16*
  45:*4*, *23* 46:*21*
  55:22 68:2*1* 70:*14*
  71:*18*, *19* 85:*23*
  86:*14* 88:*18*
belongings 65:*10*
  66:*5*
belt 18:*5*
bench 51:22
best 26:*15* 92:*10*
better 4:*24*
biblical 20:*15*
big 10:*23* 33:*5*, *9*

34:2 64:*24* 65:*7*
bigger 22:*11*
biggest 26:*6* 37:*4*
bit 15:*21*, *23* 39:*24*
  81:*12* 82:*10*
BLACKWELL 1:2
  4:*12*
Blank 3:*14*
blanket 66:*8*
blankets 40:*5*, *7*
bleeding 52:*6*
Board 13:*16* 15:*11*
body 18:*8*
BOND 2:*7*
book 82:*24*
boots 18:*4*
bothered 82:*18*
bottom 54:*11*
  66:2*1* 70:*9* 72:*3*
bound 7:*5*
box 65:2*1*
breach 81:22
break 4:*23* 29:*15*,
  *18* 36:*1* 58:*8*, *9*, *10*
  78:*19* 79:*1* 81:2, *6*
breaks 35:25
  56:*14* 58:5
breathing 31:*11*
  33:*23* 52:*4*
brief 13:*6*
bring 6:*14*
broke 29:*16* 43:*17*
BRUCE 1:*12* 3:*3*
  4:*1* 7:*10* 59:2
BUFFALOE 1:9
building 25:*18* 27:*1*
bunk 66:*8* 71:*12*
Bureau 44:5
business 81:*16*
button 34:*20* 45:*5*,
  *9* 56:*18*
buttons 34:*13*, *14*,
  22 35:2 44:22
  45:*3*, *9* 70:*20*, 2*1*

< C >
cage 77:*14*
call 8:*8* 11:5 28:*8*
  29:*18* 37:*17* 38:*7*
  42:*19* 65:*6* 74:*4*

called 9:2*1* 42:*24*
  43:*3*
camera 52:*8*, *23*
  53:*16*
cameras 52:*10*, *12*,
  *15*, 24 53:*3*
Camp 92:*14*
capacity 19:6
Captain 9:2*1* 10:*6*,
  *17*, *19* 11:25
capture 52:*19*
cards 32:*13*
caring 82:*17*
CAROLINA 1:*1*, *8*
  92:*3*, *14*, *21*
CAROLINAS 1:*24*
Carver 48:*10* 59:*18*
Case 1:2 4:*13*
  6:*23* 13:22 41:25
  81:*10*, *13*, *14*, *15*
  85:*20*
casual 4:*19*
cause 12:*23* 26:*23*
  92:*12*
cell 16:2 21:*24*
  32:*18*, *23* 33:*7*, *12*
  40:*1*, *15* 43:2
  49:*23* 50:*15*, 22
  51:*23*, 25 53:*16*
  55:*20* 56:*7* 63:*9*,
  *11*, *12*, *13* 65:*11*
  66:*6* 70:25 71:5, *6*,
  *10*, *18*, *19*, *23* 73:*8*,
  *11*, *15* 74:*15* 75:*24*
  78:*1* 88:22
cells 29:25 31:*1*, *2*,
  *5* 33:*9* 39:*5*, *9*, 25
  49:*4*, *6*, *12* 63:*14*
  64:*19* 76:*23*
cement 78:*4*
Center 6:*19* 9:*12*
Central 17:*15*
  80:*17*, *20*, 24
certain 22:*23*
  24:*14* 89:*19*
certificate 23:*4*, *7*
  92:*1*
certification 18:22,
  *23*

certified 18:*19*
certify 92:*3*, *10*
chain 10:*15* 24:*19*, *25*
chair 78:*6*
chance 6:*11* 7:*2* 9:*19* 69:*18*
change 27:*21* 90:*10*
changed 14:*24* 87:*13*, *15*
changes 74:*11*
Charla 1:*12* 92:*1*, *14*
CHARLES 1:*9* 85:*19* 86:*16*, *19*
CHARLOTTE 1:*2* 2:*4*, *8*, *11*
charter 19:*12*
check 31:*16*, *17* 32:*1*, *4*, *6* 33:*4* 44:*21* 50:*11*, *15* 63:*21* 70:*16*
checked 65:*21* 69:*9*
checking 31:*15* 37:*6*
checks 11:*6* 53:*11*, *16* 57:*13* 61:*15* 90:*11*
children 11:*20*
circuit 49:*4* 52:*7*
Civil 13:*15* 14:*7*, *8* 81:*15*
claim 81:*21* 82:*3*
claims 81:*21*
clarify 4:*21*
class 21:*7* 24:*6*, *8*
classes 19:*25* 21:*4*
clear 37:*9*
clearly 22:*1*
clients 86:*16*
clinician 46:*23* 75:*11*
clinicians 74:*13*
clip 54:*24* 69:*11*
clocking 45:*4*
close 31:*14*, *18*, *20*, *22* 32:*9*, *12* 33:*10* 63:*17*
closed 32:*20* 44:*12*

49:*4*
closest 39:*9*
closure 79:*13* 80:*21*, *22*
clothes 30:*11*, *13* 77:*18*, *22*
coach 19:*10* 79:*19*
coached 19:*8*
College 2:*7*
color 60:*15* 62:*23*
Columbus 19:*13*
COMAS 1:*9* 68:*25* 69:*2*
come 9:*23* 12:*17* 14:*13*, *14* 26:*1* 34:*9* 68:*11* 74:*15*, *17* 79:*3*
comes 33:*18* 48:*7* 50:*1*, *3* 56:*15* 64:*17*
coming 12:*10* 21:*12* 28:*2* 37:*22* 69:*25*
command 10:*15* 24:*19*, *25*
comments 51:*19*
Commission 92:*22*
commit 78:*12*
committed 29:*13* 42:*15*
committing 48:*18*
communicate 42:*10* 87:*5*, *6*
communicated 42:*3*
communication 48:*4*
COMPANY 1:*11*
complaint 14:*10*
complete 5:*5* 22:*24*, *25* 45:*6*, *8* 46:*20* 56:*24* 57:*14* 60:*4* 61:*2* 62:*18* 92:*9*
Completed 3:*5* 23:*3* 58:*17* 60:*6*, *18* 67:*17*
completion 23:*17*
comprehensive 16:*2*
computer 34:*16* 39:*15* 45:*10*
concern 80:*14*
concerns 12:*3*

18:*15*
conclude 48:*5*
concluded 91:*3*
concludes 70:*14*
conducted 17:*2* 18:*25* 23:*23* 44:*8* 46:*7* 48:*21*, *22*
conducting 54:*17* 66:*24*
confidential 6:*24*
confirmation 23:*9*
confirming 49:*24*
conscientious 82:*25*
consistent 25:*20* 26:*13* 61:*25*
constant 31:*23*, *24* 32:*10* 63:*18*
contact 10:*24* 25:*14*
container 18:*9*
contract 81:*16*, *22*, *23*, *24*, *25*
control 84:*8*
conversation 4:*19* 26:*25*
convicted 14:*3* 25:*16*
copy 90:*21*, *22*
corner 54:*2* 66:*15* 67:*6* 70:*4*, *10* 72:*3*
Correct 9:*16* 27:*23*, *24* 39:*3* 47:*16*, *18* 48:*2* 50:*23* 53:*17* 58:*17*, *18* 60:*16*, *17* 62:*11* 65:*21*, *25* 74:*4* 75:*11*, *12*, *14*, *17* 76:*24* 82:*13* 83:*12*, *19*, *20*, *23* 84:*20* 85:*25* 86:*1* 88:*13* 89:*3*, *13*, *16*, *17*
correction 89:*25*
correctional 20:*7* 25:*12* 26:*11* 27:*7* 49:*9* 64:*21* 75:*2*
corrections 20:*4*
correctly 16:*19* 19:*20* 24:*1*, *9*, *12* 30:*10* 43:*12* 65:*15* 66:*1* 81:*18*
counsel 92:*12*

COUNTY 1:*8* 6:*8*, *19* 7:*21*, *23* 9:*2*, *9*, *14*, *18* 11:*10*, *12* 13:*5*, *13*, *25* 14:*11*, *16* 15:*5*, *7*, *20* 18:*21* 19:*1*, *3* 25:*11* 27:*12* 30:*22* 36:*13*, *18* 43:*14* 48:*11* 50:*25* 53:*2* 59:*16* 61:*1* 75:*1* 83:*8* 89:*13* 90:*9* 92:*14*
couple 6:*1* 10:*12* 15:*12* 19:*12* 87:*1* 89:*6*
courses 17:*19*
COURT 1:*1*, *12* 4:*14* 5:*3*, *16* 52:*23*, *25* 56:*2* 81:*19* 90:*18*, *20* 92:*1*
cover 65:*1*
covered 65:*8*
COWART 1:*10*
CPR 18:*19*
CRANFILL 2:*10*
create 44:*23*
credentials 23:*13*
crime 14:*4*
criminal 14:*6*
cross 85:*7*
culture 25:*22*
current 7:*11*
currently 55:*19*
custody 19:*19* 75:*17*

**< D >**
D.W 1:*5*
daily 11:*22*, *25* 12:*14*, *15*, *22*
DATE 1:*12* 29:*13* 54:*1* 66:*18* 92:*5*
DAVIS 2:*14*
day 11:*6* 12:*16* 13:*3*, *4* 20:*12* 26:*24* 28:*15* 29:*8*, *12*, *16* 30:*19* 32:*8* 37:*18*, *19*, *22* 38:*1* 43:*5*, *17* 46:*15*

55:*14*  58:*20*  69:6
73:*25*  78:*25*
**day-to-day**  8:*12*
18:*17*  62:*17*
**dealing**  18:*16*
19:*15*  79:*23, 24*
**death**  6:*18*  78:*19*
80:*15, 23*  82:7
**deaths**  79:*10*  80:*17*
**decreased**  31:*16*
**deescalation**  15:*25*
**defendant**  13:*19, 21*,
*23*  81:*9, 13*
**Defendants**  1:*12*
2:6  85:*19*  87:*24*
**degree**  20:*10, 13, 16,
17, 21*
**Degrees**  20:*14*
**delinquents**  19:*15*
**Demond**  4:*12*
**demonstrated**  75:6
**Department**  79:5
**depends**  15:*1*  33:*1,
19*  58:*12*  78:*24*
**depict**  54:*25*  67:8
**deponent**  92:6, 7, 9
**DEPOSITION**  1:*12*
5:*25*  6:*4, 9, 12, 15*
13:*10*  63:6  91:2
92:*3, 8*
**depressed**  21:*11*
**describe**  18:*1*
**described**  32:2
**DESCRIPTION**  3:5
**designed**  90:*11*
**desk**  78:*4, 6*
**Desmond**  21:*18*
29:*13*  30:*16*  40:*25*
42:*11, 14*  48:*17*
49:2  55:*20*  58:*20*
59:2, *24*  63:8, *17*
65:*20*  67:*19, 25*
69:8, *15*  71:*10*
73:*15*  77:9  78:*20*
80:*15, 23*  82:7
84:*4, 23*
**Desmond's**  71:*5, 6*
85:2, *3*
**detainee**  27:8

**detainees**  20:*24*
27:*14*  35:*11*  36:*10*
37:*12*
**Detective**  87:*24*
**detector**  31:5
**Detention**  6:*19*  8:*1,
4, 13, 24*  9:*1, 12*
11:*11*  12:7  14:*15,
20, 25*  15:*3*  37:*24*
62:*17*  64:22  79:*13*
83:*11*
**determination**  75:7
**determined**  88:*23*
**DICKINSON**  2:7
**died**  77:*10*
**difference**  26:6
30:6  31:22  42:8
50:*10*  62:5  63:*20*
88:8, *15*
**differences**  25:*8, 10*
26:*18*
**different**  11:*4*  13:2
15:*24*  17:9, *10, 11*
25:*21, 22*  36:*17*
45:*17*  50:*1*  65:*17*
73:*21*
**differently**  82:*20, 22*
**DIRECT**  4:5  51:*1*
85:*15*  88:5
**directly**  9:*15*  12:*4*
15:*4*  31:8  33:7, *13*
50:*3, 19*  51:6
62:*12*  70:*25*  71:6,
9, 22*  72:*16*  73:3
**disciplined**  13:7
**disclose**  6:*24*
**discrepancies**  46:9
**discuss**  7:3  68:*20,
24*
**discussing**  68:*17*
**DISTRICT**  1:*1*
**DIVISION**  1:2
**doctor**  47:5
**document**  44:*20*
46:*18*  57:*4, 10, 14,
18, 21*  59:8, *10, 22*
60:9, *12*  61:*10*
62:*18, 21, 24*  63:2,
24*  64:5  67:*14, 23*
**documents**  6:*1, 14*

**doing**  4:9  20:9, *10,
11*  21:*16*  32:*14*
35:*22*  48:9  49:*1*
51:*10, 22, 23*  53:*11*
55:*14*  79:*21*  82:*10*
**door**  29:*3*  32:*20*
33:*3, 5, 15*  36:6
42:*17*  44:*11*  55:5
56:*1, 4*
**doors**  33:2  52:*21*
**drill**  19:*10*
**Drive**  8:5
**duly**  4:*1*  92:6
**Dunn**  15:*10*
**duties**  8:*12*
**duty**  18:5
**DWAYNE**  1:*8, 9*
**DWIGHT**  1:*8*
78:*18*

**< E >**
**earlier**  11:*8*  27:*22*
29:*20*  44:*14*  47:*17*
55:*14*  56:*16*  60:5
62:2, *9*  70:*20*  71:5
74:2  79:*17*  89:*11,
18*
**easy**  37:9
**EDDIE**  1:9
**effective**  37:*12*
**effort**  80:*4*
**Eight**  29:*11*
**Either**  28:*21*  40:*17*
49:*19*  90:*4*
**Electrical**  76:*25*
**e-mail**  23:*10*
**emotional**  19:*18*
**employee**  83:7
**employer**  7:*12*
**employment**  9:7
13:*25*
**ENDED**  1:*12*
**ends**  34:*10*
**enforcement**  5:*13*
15:*18*
**engage**  35:*19*  36:3
**enjoyed**  11:*17*
**ensure**  51:5  83:*18*
**entail**  15:22

**entire**  4:*23*  38:5
**entity**  15:6  18:*23*
**equipment**  18:6
39:*16*
**Esquire**  2:2, *6, 10,
12*
**Estate**  1:5  4:*12*
**ESTHER**  1:2
**e-trans**  90:*24*
**events**  92:*24*
**Everybody**  37:*18*
38:*15*  42:*18*  67:22
**EVERYWORD**
1:22
**exact**  8:6  22:*10*
**exam**  16:*10, 11*
**EXAMINATION**
4:5  85:*15*  88:5
89:9  92:7, *10*
**examined**  4:2
**example**  11:*24*
30:20  38:*1*  87:*10*
**examples**  12:*23*
**exceed**  61:*11*  69:*10*
**excellent**  26:*15*
**exception**  62:23
**excuse**  14:*13*
**EXHIBIT**  3:5
53:*20, 21, 23*  57:*3,
6*  59:9, *12*  62:*21*
63:*25*  64:2  65:*19*
66:*10, 14*  67:*13*
69:22
**expect**  86:*10, 11*
**expected**  86:*18*
**experience**  15:*14*
74:*25*  75:2  80:6
**expert**  78:*15*
**expires**  92:22
**explain**  5:*17*  8:*11*
10:*14, 25*  12:22
15:*21*  19:6  22:22
32:22  39:*13*  44:*16*
53:9  57:9
**expound**  26:*17*
**expressed**  42:2
90:7
**extreme**  86:*25*
**eyes**  31:*10*  73:*10,*

*14*

< F >
face 48:*14*
facility 12:*11*, *18*
20:6, *8* 25:*12*, *17*
26:*11* 27:7 28:2
41:*12* 49:9 64:22
75:2 79:*13* 86:7,
*12*, *22* 87:2, *11* 90:7
facts 82:*4*
fair 14:*17* 67:9
75:*10*
fairly 72:7
familiar 36:*12*, *15*
38:23 39:*1* 53:*21*
57:*4* 59:*10* 60:*12*
74:23
far 25:6 31:7 40:*1*
46:22 68:*12* 83:*10*
Fargo 7:*13*, *14*, *19*
9:5, 9, *11*, *13*, *15*
79:8, *12*, *17*, *19*
fastening 76:8
federal 44:*3*
feedback 24:*23*
feeding 33:2
feel 36:8 37:8, *11*,
*14* 80:8
female 8:*16*, *18*, *22*
10:*4*, *6* 17:*12*
females 8:*20*
fight 52:5
fights 38:8
file 23:6
fill 68:6 80:*11*
filled 58:2*4*
filling 70:*14*
final 16:*10*, *11*
find 40:*1*
fine 5:2 53:*14*
90:25
finish 5:*11*
finished 20:*10*
fire 77:*13*, *14* 78:*11*
firm 25:*19*
first 4:*1* 7:22
16:25 24:*17* 32:4
43:*1*

five 28:*21*, *24* 30:*3*
39:2, *25* 42:24
44:9 47:25 53:*16*
54:*16* 55:*4* 72:8
fixed 52:7 53:6
fixtures 40:*1*
Flashlight 18:*10*
fleeting 42:2
flip-flopped 88:*19*
floor 42:23 52:22
74:*14* 77:25
floors 42:22
follow 37:9 51:8
follows 4:2
follow-up 89:6
footage 53:5, 6, *16*
foregoing 92:*3*, *8*
forgot 52:*24*
form 37:*3* 42:5
45:*13*, *16*, *18* 46:*4*,
6, *18*, *19*, *21*, *22*, *24*
48:*19* 51:*15*, *20*, *24*
52:*1* 56:*17*, *24*
58:*16*, *20* 59:*4*
60:*3*, *7*, *13*, *22* 61:2,
*4*, *5* 62:*14* 68:*3*
73:5 83:*24* 84:5
former 19:*10*
forms 58:23 60:*19*
68:5
forth 55:6, *11*
found 46:8, *9*
four 30:*3* 39:*4*
52:*24* 56:*19* 71:*10*
72:*11*
Fourth 2:*14*
frame 69:25 72:*15*
front 33:*15* 54:*21*
functioning 52:5
furniture 40:*1*
77:25 78:*3*, *5*
further 85:5 90:*14*
92:*10*

< G >
gap 9:7
GARRY 1:8
gauges 76:*18*
general 8:*3* 73:*3*

86:*21*
generally 74:7
getting 23:7 24:*23*
52:5
girls 11:*21*
give 4:*16* 22:*10*
28:8 38:20 40:*10*,
*12*, *22* 42:*18* 43:*10*,
*13* 49:*15* 77:20
given 16:*12* 24:*10*
40:5, *8* 74:6 87:7
gloves 18:*11*
go 12:*4* 13:*4*
15:*11* 16:*4* 22:25
29:*14* 34:8 36:*1*, *2*
39:22 42:*24* 44:*15*
46:*11* 50:*15* 61:*14*
62:*12*, *20* 71:25
76:8 79:*16* 80:24
84:*16* 85:*12*
goes 57:*12* 58:22
86:7
going 4:*14* 5:5
19:22 20:*11* 27:20
29:*17* 37:2 50:22
51:25 53:*19* 54:9
55:6, *10* 56:*1*
59:*18* 62:20 63:23,
*24* 64:5 65:*19*
67:*12* 70:*16* 71:25
72:23 73:8
Good 4:8, *10* 22:*13*
38:*15* 72:*24* 87:22
governmental 44:*3*
gray 18:*3*, *4*
green 65:7
GUESS 1:*10* 9:6
10:*15* 18:*21* 23:*16*
39:*19* 44:*15* 52:*19*
77:7 78:*14* 85:20
guy 10:*23* 29:*23*
82:23 86:25
guys 25:*16*, *23*
26:8 82:*17*

< H >
hallway 13:2 43:*3*,
*5* 58:*13* 79:*1*, *2*
HAMRICK 2:*14*

hand 92:*12*
handcuff 18:*11*
Hands-on 25:2, *3*
handwriting 57:*17*,
*21*
Handwritten 3:5
67:*13* 68:7, *14*
hang 76:7 77:6, *15*
happen 46:*15*
61:*17*
happened 42:*19*
43:9 82:*18*
hard 11:7
harmed 89:*25*
Hayes 17:9
head 4:*18* 36:23
39:*17* 51:*3* 54:22
health 13:*4* 46:*23*
47:2, *5* 68:*11* 74:7,
*13* 75:8, *11* 76:2
79:5 88:*24*
hear 71:7
heard 42:*16*
hearing 45:*12*
heavy 33:5
he'll 38:*17*
help 27:*13*, *19* 51:9
helpful 5:*15*
HENRIETTA 1:9
68:*21*
hereto 53:*24* 57:7
59:*13* 64:*3*
Hey 72:23
HI 29:2
HI-5 28:25
HI-6 28:23
high 19:9
higher 64:*13*, *16*, *17*
hit 34:*15* 45:8
hitting 45:5
hold 76:*21*
holster 18:*12*
home 11:*14*
honest 11:*18* 40:24
51:*3* 76:*16*, *21*
honestly 37:*23*
40:20 69:*4* 76:*10*
hop 5:6
hour 81:*21*

hours 32:5 38:*3, 5*
housed 63:*9*
Human 79:*5*
hung 77:*13*
hurt 64:20 65:*12*
  75:*7* 76:*5*
hypothetically 89:*24*

**< I >**
idea 85:*20*
ideations 42:2 90:*7*
identification 53:*24*
  57:7 59:*13* 64:*3*
illnesses 38:*9*
image 54:*18* 55:*19*
imagine 14:*23*
  23:*18* 24:22 43:*17*
  44:25 61:*19* 84:*7*
important 4:*17*
impossible 51:*11*
incidents 27:8 79:*9*
include 84:*19*
including 53:*20*
  57:*13*
in-custody 6:*18*
independent 46:*14*
indicated 62:*14*
individual 32:*23*
  73:*11, 15*
info 74:*6*
information 6:*24*
  38:6, *20* 86:*21*
  87:7 89:*20*
initial 45:*21, 25*
initialled 45:*23*
initials 59:*17, 22*
inmate 12:*18, 24*
  26:*18, 19* 27:*8*
  30:*4* 31:*9, 13, 23*
  33:*14* 50:7, *8, 17,*
  *20* 52:3 62:*13*
  65:*23* 74:*3* 75:*3*
  76:8 77:*4, 21*
  83:*21, 23* 86:*7*
  87:*10* 89:*24* 90:*4*
inmates 8:*16, 18*
  19:*18* 20:2 25:*9*
  26:*21* 29:*21* 30:*1*
  32:*17* 36:*19* 38:*7,*
  *13, 21* 39:*5* 40:4, *8,*

*17* 44:*17* 49:*18*
  50:2 51:*5* 55:*16*
  63:*9* 73:*3, 19, 20*
  74:*8* 75:*17* 83:*19*
  84:*11, 20* 85:*25*
inmate's 75:*24*
Inservice 25:*4*
Inside 49:6 73:*10*
  78:*1*
inspect 16:*2*
inspection 79:*5*
inspections 32:*14*
instructed 18:*14, 15*
instructors 17:*4, 6,*
  *9*
instruments 78:*12*
INSURANCE 1:*10,*
  *11*
intake 12:*10* 27:*23*
  75:*13* 85:*24* 87:*15*
  89:*12, 16*
intensive 80:*3*
interact 11:*23*
  12:*13, 21, 23* 25:*15*
  26:7, *19* 27:*19*
  72:*19*
interacted 26:*7*
  72:*16* 83:*2*
interacting 12:*17*
  21:*12* 27:*17*
interaction 21:*17*
interchangeably
  30:*8*
interested 92:*12*
internal 14:*10*
interval 22:*19*
intervals 50:*21*
  61:*11, 16*
interviewed 15:*9*
Investigation 44:*6*
issues 38:*9*
its 47:*14*

**< J >**
Jail 8:*9, 13, 17*
  17:*14, 15, 17* 18:*18*
  20:*1* 41:*7* 79:*10*
  80:*9, 17, 19, 20, 24*
  85:*25* 86:*3, 8, 23*

87:*12, 16*
Jake 2:*10* 85:7, *11*
January 7:*24* 8:*25*
Jillian 85:*18*
Jilliann 2:*12*
Jilliann@davisandha
  mrick.com 2:*16*
job 8:*11* 14:*17*
  15:*15* 48:22 51:*10*
  75:*19* 79:*14* 83:*18,*
  *22* 84:*13* 86:*22*
  87:*13* 89:*20* 90:*8*
joined 63:*5*
JR 1:*9* 2:2 3:*4*
  4:*7* 37:*7* 42:*9*
  48:*24* 53:*25* 54:*8*
  57:8 59:*7, 14* 63:*7*
  64:*4* 73:*9* 81:*3, 5,*
  *7* 83:*17* 84:*2, 9*
  85:*5* 89:*5, 10* 90:*13*

Jstewart#cshlaw.com
  2:*12*
jump 85:*11*
justice 14:*22, 25*
  15:*3* 47:*15* 83:*12*
Juvenile 8:*1, 4, 12,*
  *14, 22, 24* 9:*1, 12*
  11:*11* 12:7, *18*
  14:*14, 15, 20, 22, 25*
  15:*3* 19:*18* 20:*2,*
  *23* 25:*17, 25* 26:*9,*
  *19* 28:*6, 14* 30:*23*
  31:*13* 32:*17* 36:*19*
  37:*24* 38:*7, 13*
  40:*4, 8* 44:*17*
  45:*19* 47:*15* 50:*2,*
  *7, 16* 51:*5, 21, 22,*
  *24* 52:2 62:*17*
  64:*22* 65:*23* 73:*19,*
  *20* 74:*8* 75:*23*
  77:*4, 20* 83:*11, 12*
  84:*10* 90:*3, 4*
juveniles 8:*21, 22*
  12:*10, 14, 25* 19:*4,*
  *7* 25:*21* 26:*12, 23*
  27:*1, 3* 28:*1* 29:*4,*
  *7* 36:*4* 71:*3* 76:*17*
  79:*25* 80:*4*

**< K >**
keep 32:*20* 33:*19,*
  *23* 83:*23* 84:*13*
keeps 64:*25*
key 36:*24*
kid 21:*23* 22:*3, 9,*
  *14* 33:*20* 41:*6*
kids 11:*17* 21:*13*
  25:*18* 83:*3*
killing 11:*15*
KIM 1:*10*
kind 14:*24* 46:*5*
  81:*14*
knew 27:2 38:*25*
know 4:*20, 24* 5:*12*
  8:*6* 10:*9* 13:*5*
  16:*20, 21, 24* 18:*21*
  21:*8, 13, 14, 15, 20*
  22:*9, 10, 14, 19*
  23:*17* 24:*17* 25:*24*
  26:*1* 29:*17, 25*
  30:*6, 18* 31:*7*
  33:*14, 17, 18* 37:*25*
  39:*7* 41:*11, 14, 16*
  42:*7, 19, 20* 44:*11*
  45:*2* 47:*3* 48:*10,*
  *13* 52:*12* 54:*21*
  56:*12* 57:*25* 60:*8*
  61:*4, 21, 22* 62:*16*
  63:*16* 65:*15* 68:*12*
  69:*6* 75:*25* 76:*3,*
  *10, 11* 77:*14, 15*
  80:*12* 82:22 85:*6*
  86:*14*
knowledge 17:*21*
  23:*18* 59:*6* 63:*8*
  86:*24* 87:*12, 16, 17*
known 41:*8, 17, 21*
  42:*1*

**< L >**
labeling 59:*9*
Large 92:*3, 21*
lavender 61:*5*
LAW 2:*3* 5:*13*
  15:*17*
laws 16:*1*
lawsuit 13:*19* 14:*6*
lawyers 6:*7*

**learn** 14:*14* 42:*14* 81:*12*

**learned** 28:6 83:*1* 90:5

**leave** 16:*3* 20:7 50:*14* 79:*12*, *19*

**led** 11:*10*

**left** 9:*14* 56:5, *6*, *10* 66:*18*, *21* 71:*21* 79:8

**left-hand** 55:*25* 70:9 72:*3*

**Lejeune** 92:*14*

**level** 64:*13*, *17*

**LIBERTY** 1:*10* 87:*25*

**lieutenant** 10:*19*

**light** 49:*12*

**lights** 21:*24* 22:*1* 34:*17* 49:*16*

**lingo** 5:*12*, *14*, *18*

**list** 28:9

**listed** 31:*14*, *24*

**listen** 27:5

**literally** 11:*15*

**little** 11:*8* 15:*21*, *23* 27:22 39:*24* 44:*14* 56:*16* 60:5 62:9 64:*13* 70:*20* 71:5 74:2 78:8 79:*17*, *21*, *23* 81:*12* 82:*10* 89:*11*, *18*

**Littlejohn** 2:2, *3* 3:*4* 4:7 37:7 42:9 48:*24* 53:*25* 54:8 57:8 59:7, *14* 63:7 64:*4* 73:9 81:*3*, *5*, *7* 83:*17* 84:2, *9* 85:5 88:8 89:5, *10* 90:*13*

**LLP** 2:7, *10*, *14*

**located** 17:*14* 52:*18*

**LOCATION** 1:*12* 8:*3* 92:5

**lockdown** 42:*16* 43:2, *4*, *23*

**locked** 36:5 42:*17*

**log** 24:4 34:8 44:*18*, *23* 48:8 56:*17* 57:*11*, *12*

**58**:*15* 59:*1*, 2, *20* 60:*1* 61:*17*, *24*, *25* 62:*1* 67:*13* 68:*14* 69:*20* 70:22

**logged** 23:*12* 51:*14* 63:*1*

**logging** 44:*15*

**Logs** 3:5 44:*16*, *25* 56:20 68:*17*, *24*

**long** 16:*4* 18:*3* 21:*6*, *7* 28:*10* 33:*17*, *24* 35:*23* 41:9 48:*13* 56:*12*

**longer** 62:*7*

**look** 21:*10* 31:*10* 33:*3*, *11*, *18* 48:*8* 51:*12* 53:*21* 57:*4* 59:*10* 60:*12* 68:*11* 69:*20*

**looked** 6:*1* 18:2 21:*11*, *22*, *25* 24:5 70:*24*

**looking** 33:*19*

**looks** 32:*23* 48:*14* 53:22 54:*13* 59:*15* 62:*25* 65:6 66:*23* 67:*11*

**lost** 81:*19*

**lot** 5:*13* 10:*24* 15:*25* 26:*1*, 22 39:7 65:*16* 74:9 83:*1*

**loud** 4:*17*

**love** 79:*18*

**loved** 79:*25*

**lunch** 29:*18* 38:*14* 58:*3*, *4*, *9* 78:*18*

**Lynch** 1:*12* 92:*1*, *14*

**< M >**

**machine** 82:*23*

**Madam** 90:*18*

**main** 49:*15*

**Major** 10:*17* 12:*1* 15:*11*

**making** 11:6 37:5 54:22

**male** 8:*21* 10:7

**man** 82:*23*

**managed** 83:2

**management** 20:*17*

**manipulate** 26:22

**Marilyn** 63:5

**mark** 63:*24*

**marked** 53:23 57:6 59:*12* 64:2

**marking** 57:*3*

**material** 40:*23*

**matter** 14:7

**mattress** 78:5

**MBA** 20:*16*

**MCFADDEN** 1:*8* 54:22

**mean** 9:*11* 12:*1* 19:*16* 22:22 29:2 31:*8*, *13* 39:*14* 52:2 72:*19* 74:*21* 78:*14* 80:*21* 82:*15*

**meaningful** 11:*18*

**means** 5:*18* 32:*1* 63:*21*

**measures** 35:*10*, *17* 36:*10*

**MECKLENBURG** 1:*8* 6:7, *19* 7:*21*, *23* 9:*2*, *8*, *14*, *18* 11:*9*, *12* 13:*5*, *13*, *25* 14:*11*, *15* 15:5, *7*, *19* 18:*20* 19:*1*, *2* 25:*11* 27:*12* 30:22 36:*12*, *18* 43:*14* 48:*11* 50:*24* 53:2 59:*16* 61:*1* 75:*1* 83:*8* 89:*13* 90:9

**medical** 13:*3* 18:*14*, *15*, *16*, *18* 74:7

**medically** 18:*16*

**medication** 74:*10*

**medications** 5:*21*

**medium** 20:6 25:*15* 26:8

**meet** 16:*13*

**members** 42:*11*

**memory** 72:*12*

**mental** 13:*3* 46:*23* 47:2, *4* 68:*11* 74:7, *13* 75:8, *11* 76:2

**88**:*23*

**mention** 47:4 88:*16*

**messed** 82:*14*

**met** 82:*25*

**metal** 33:*3* 40:2

**Michael** 2:2 81:*1*

**middle** 35:5

**mind** 26:*17* 75:5 89:6

**mine** 36:2 46:*14*

**minute** 34:*1*

**minutes** 32:*3*, *5* 34:*1* 35:*25* 36:*4* 45:*16* 56:*14* 58:*1*, *4*, 5 61:*11*, *14*, *18* 62:7 63:22 69:*10*, *13*

**mirror** 40:2

**misrepresentation** 82:*4*

**missed** 45:9

**missing** 56:*21*

**mission** 26:*23*

**mistaken** 47:2

**mitigate** 48:*17*

**moment** 5:*16* 53:*12* 89:*18*

**monitoring** 11:5 49:5

**month** 12:2

**months** 16:22 20:5

**mood** 27:*21* 74:*11*

**MOORE** 1:*10* 85:*19*

**morning** 4:*8* 22:2 33:*21* 53:*8*, *10* 58:*10* 88:2

**move** 19:*24*

**moves** 19:*21*

**moving** 33:*19*, *23* 87:*12*

**MUTUAL** 1:*10* 87:*25*

**< N >**

**name** 7:9 9:22, *23* 10:*11* 17:*12*, *13* 48:*13*, *14* 85:*18*

**named** 56:20

**names** 15:*13* 17:*8*
28:*9*
**NC** 2:*4, 8, 11, 15*
**nearly** 26:*8*
**necessarily** 33:*16*
**need** 23:*20* 26:*19*
32:*1* 33:*9* 75:*22*
**needed** 12:*3* 13:*4*
23:*22* 65:*24* 69:*15*
78:*19* 80:*13*
**needs** 31:*24* 74:*10*
**neither** 92:*10*
**nervous** 26:*2*
**never** 44:*24, 25*
64:*21* 65:*15* 76:*11*
**new** 28:*1* 38:*10, 24*
41:*5* 73:*19* 85:*24*
**night** 20:*11* 22:*2*
**nine** 20:*5* 28:*20*
**nod** 4:*18*
**noose** 76:*9*
**normal** 30:*19* 32:*8*
**normally** 52:*5*
**NORTH** 1:*1, 8* 8:*9,*
*13, 17* 17:*15, 17*
79:*10* 80:*9, 20*
85:*25* 86:*3, 8, 23*
87:*12, 16* 92:*3, 14,*
*21*
**Notary** 92:*1, 21*
**note** 58:*25* 61:*8, 12*
67:*15, 19*
**notebook** 56:*17*
62:*1*
**noted** 59:*2, 21*
**notice** 6:*12* 34:*9*
**notified** 24:*20* 74:*3*
**November** 6:*19*
28:*12* 29:*12* 35:*24*
37:*15, 20* 44:*9*
47:*7, 10, 16* 48:*16*
52:*9* 53:*7* 54:*2, 14*
55:*1* 56:*13* 57:*15*
59:*25* 63:*1* 66:*2*
67:*9, 25* 69:*2, 19*
72:*8* 73:*14* 77:*10*
79:*6* 83:*7* 84:*3*
**number** 16:*12, 14*
29:*6* 37:*22* 80:*13*

**numbers** 28:*22*
82:*24*

**< O >**
**object** 37:*2* 59:*4*
**Objection** 42:*5*
48:*19* 73:*5* 83:*24*
84:*5*
**objections** 92:*7, 10*
**objects** 41:*23*
**Observation** 3:*5, 14*
31:*14, 18, 20, 23*
32:*9, 11, 16* 51:*1*
59:*21* 63:*18* 64:*14*
67:*25* 68:*8, 15*
**observations** 50:*12*
51:*19* 56:*20* 61:*10*
62:*10*
**observe** 31:*8* 40:*25*
50:*7, 19* 51:*11*
55:*11* 59:*24* 69:*15*
71:*6, 9, 23*
**observed** 51:*6* 60:*2*
71:*1*
**observing** 33:*13*
50:*3* 73:*3, 8*
**Occasionally** 27:*3*
**occupied** 39:*11*
**occurred** 79:*9*
80:*17*
**Office** 6:*8* 7:*21, 23*
9:*3, 9, 13, 15, 18*
11:*10, 12* 13:*6, 13*
14:*1, 11, 16* 15:*5, 8*
18:*21* 19:*1, 3*
25:*12* 27:*12* 30:*14,*
*23* 36:*13, 19* 43:*14,*
*24* 48:*11* 50:*25*
53:*2* 59:*17* 61:*2*
73:*18* 75:*1* 83:*8*
89:*13* 90:*9*
**officer** 8:*1, 4, 13, 25*
9:*2* 11:*11* 12:*7*
14:*15, 21, 22, 25*
15:*3, 4* 20:*5* 45:*19*
47:*15* 55:*12* 56:*13,*
*25* 58:*6* 62:*17*
83:*11, 12*

**officers** 37:*24*
78:*23* 80:*20* 86:*25*
90:*1*
**Oh** 15:*23* 61:*10*
63:*14* 65:*5*
**Ohio** 20:*5* 25:*13*
26:*11* 49:*10* 75:*3*
81:*25*
**old** 79:*21, 23*
**once** 12:*1* 16:*18, 21*
**ones** 30:*2* 38:*25*
39:*9*
**online** 22:*25* 23:*4*
24:*4, 8*
**Onslow** 92:*14*
**open** 39:*9* 52:*22*
55:*5*
**opening** 33:*2*
**operations** 18:*17*
20:*2*
**opportunity** 28:*1, 3*
**opposed** 50:*2*
73:*19* 80:*4*
**order** 6:*23* 7:*3, 6*
**organizational**
20:*17*
**outlets** 76:*23, 25*
**outside** 32:*23, 24*
33:*6* 39:*21*
**overweight** 22:*12*
**owned** 81:*15*

**< P >**
**p.m** 1:*12* 54:*5*
55:*8* 58:*14* 59:*25*
69:*23* 72:*14, 15*
**pad** 78:*5*
**PAGE** 1:*10* 3:*2, 5*
87:*24* 92:*5*
**paper** 23:*5* 40:*9,*
*15, 19* 61:*6* 62:*24*
**PARKER** 1:*9* 10:*1,*
*18* 68:*13, 18*
**part** 4:*22* 11:*16*
62:*5* 81:*24* 83:*18*
**particular** 10:*15*
13:*1* 29:*5, 25*
37:*25* 38:*9, 21*
41:*9* 50:*9, 15* 51:*6,*

*18* 60:*22* 67:*1*
70:*25*
**particulars** 77:*19*
**party** 13:*18* 92:*12*
**pass** 16:*25*
**passed** 17:*24* 24:*17,*
*21*
**pass-fail** 16:*12*
**passing** 36:*7* 72:*22*
**pause** 5:*16*
**pay** 27:*19* 81:*17*
**paying** 19:*21*
27:*16* 35:*21*
**Peaches** 9:*21* 10:*3,*
*6* 11:*24* 68:*22*
**pen** 40:*8*
**pencil** 40:*9, 11, 22*
**pencils** 40:*10, 14,*
*19, 24* 41:*22*
**pending** 92:*12*
**pens** 40:*15, 19*
**people** 8:*8* 15:*12*
38:*10, 24* 58:*12*
62:*6* 65:*16* 78:*24,*
*25* 79:*2* 80:*12, 13*
82:*25*
**Pepper** 18:*9*
**percent** 16:*15, 17*
43:*16*
**perfectly** 76:*16*
**period** 16:*22*
**periodic** 22:*18, 21*
24:*11, 21*
**permission** 23:*20*
**Perrin** 2:*6* 3:*5* 6:*7,*
*12* 7:*3* 37:*2* 42:*5*
48:*19* 59:*4* 73:*5*
81:*1, 4* 83:*14, 24*
84:*5* 85:*8* 88:*6*
89:*4* 90:*15, 18, 22*
**person** 18:*7* 43:*1*
46:*1* 48:*7* 54:*11*
**personalities** 21:*14*
25:*22*
**PHD** 20:*15*
**phone** 39:*16*
**photo** 70:*7*
**physicalities** 79:*24*
**pipe** 78:*11*

**placed** 30:*24* 50:*8* 62:*13* 75:*3* 77:*4* 83:*21*
**plaintiff** 4:*11* 13:*19, 21*
**Plaintiffs** 1:*6* 2:*2*
**Plaintiff's** 53:*20* 57:*3* 59:*9* 62:*21* 63:*25* 66:*9, 14* 67:*13* 69:*22*
**plastic** 64:*24* 65:*2, 7* 78:*9, 10*
**platoon** 17:*11*
**PLATTE** 1:*11*
**play** 54:*20*
**playing** 32:*13* 54:*7*
**please** 4:*20, 23* 5:*10, 15* 7:*8* 61:*9*
**PLLC** 2:*3*
**pod** 13:*1* 27:*21* 28:*9, 13, 14, 16, 24* 29:*5, 7, 10, 14, 22, 23* 30:*20, 21* 32:*17* 33:*1, 6, 14, 24* 34:*3, 5, 7, 8, 10, 11, 20, 24* 35:*2, 24* 36:*4* 37:*25* 38:*2, 4, 13, 25* 39:*2, 4, 17, 18, 20, 21, 23, 25* 41:*9* 42:*24, 25* 44:*8, 9, 12, 17* 45:*17, 20* 46:*2, 7, 11, 12, 13* 47:*11, 14, 17, 19, 21, 25* 48:*4, 5* 49:*20* 51:*6* 52:*8, 11, 18, 21, 22* 53:*16, 22* 54:*14, 16, 17* 55:*3, 6, 13, 17* 56:*25* 57:*11, 12* 58:*16, 23* 59:*21* 66:*24* 67:*1, 3, 4, 14, 17, 22* 69:*5* 70:*15, 16, 18* 72:*8* 73:*4, 24, 25* 74:*16* 84:*11, 17, 20*
**podium** 32:*15* 35:*3, 4* 39:*10, 13, 14, 15* 50:*14*
**pods** 8:*15* 11:*4* 18:*10* 30:*20* 34:*2* 42:*21* 44:*15* 47:*8*

**procedures** 15:*24* 18:*18* 87:*16, 18*
**process** 89:*12*
**professionals** 75:*8* 76:*2*
**program** 27:*15*
**Protection** 13:*16*
**protective** 6:*23* 7:*6*
**provide** 18:*22* 44:*2, 17*
**provided** 17:*23* 18:*6, 23* 29:*15* 30:*14* 38:*6* 41:*18, 22* 43:*23*
**Providence** 2:*11*
**provider** 88:*24*
**providers** 86:*6*
**public** 19:*13* 20:*18, 19* 92:*3, 21*
**purple** 45:*15, 18* 46:*18* 51:*15, 19* 56:*17, 24* 58:*15, 16, 23* 60:*3, 16* 61:*6* 63:*23* 68:*3, 5*
**purposes** 54:*10*
**pushed** 34:*17*
**put** 30:*9* 31:*10* 34:*9, 10* 39:*8, 11* 43:*2* 49:*19* 51:*21, 24* 52:*1* 57:*24* 60:*2* 64:*18, 25* 65:*8* 73:*14*
**putting** 73:*10*

**< Q >**
**Quaderah** 48:*10* 59:*18*
**question** 4:*15, 21, 23* 5:*8, 11* 12:*20*
**questions** 4:*20* 24:*7* 49:*17* 85:*6, 8, 11* 88:*1, 7, 10* 89:*7*
**quick** 85:*11* 89:*6*
**quickly** 65:*20*
**quizzes** 24:*13, 15, 21*

**< R >**
**race** 22:*6*
**rapport** 27:*1*

**Raye** 21:*18*
**read** 61:*8* 67:*15*
**reading** 40:*22*
**ready** 85:*13*
**really** 6:*5* 26:*2* 36:*7* 49:*22* 61:*20* 65:*19* 77:*17, 19* 82:*18*
**rear** 71:*21*
**reason** 86:*13*
**recall** 27:*7* 29:*6, 20* 30:*15* 31:*17* 32:*3* 35:*1, 16* 36:*23* 37:*1* 50:*24* 55:*20* 58:*19* 63:*16* 77:*24* 88:*10*
**receive** 19:*14* 22:*16* 23:*4* 24:*24* 35:*9* 60:*21* 65:*10*
**received** 20:*23* 25:*11* 26:*16* 35:*12* 89:*15, 19*
**receiving** 73:*19*
**recognize** 27:*14*
**recognizing** 20:*23* 21:*1* 22:*17*
**recollection** 73:*22*
**Record** 3:*13, 14* 7:*9* 23:*6* 59:*1* 68:*8, 15* 92:*9*
**recorded** 4:*14* 70:*22* 92:*7*
**records** 23:*14* 68:*18, 25*
**recruiters** 14:*19*
**recruiting** 81:*16*
**red** 34:*17*
**REDIRECT** 89:*9*
**reference** 89:*23*
**referring** 56:*7* 62:*1* 70:*21*
**refresh** 72:*12*
**refresher** 22:*16*
**regarding** 6:*23* 67:*24*
**regardless** 90:*3*
**regular** 30:*13* 31:*1* 32:*6, 7, 10, 16* 40:*7* 44:*18* 61:*15* 67:*3, 4* 70:*15, 18* 74:*18*

**point** 9:*10* 36:*16* 37:*13*
**pointed** 71:*4*
**policies** 15:*24* 36:*13, 18, 20* 37:*8, 11, 14* 50:*25* 51:*8*
**policy** 36:*25*
**Pop** 76:*19*
**popped** 54:*11*
**Porter** 63:*5*
**position** 86:*3*
**possible** 4:*18* 5:*10*
**possibly** 21:*21* 28:*16*
**potential** 42:*11* 50:*6* 75:*6*
**pouch** 18:*11*
**preaching** 20:*15*
**prepare** 5:*24* 6:*4, 8*
**prepared** 36:*9*
**present** 37:*17*
**press** 34:*13*
**pressing** 44:*22*
**pretty** 11:*14* 16:*2* 21:*13* 22:*13* 26:*5, 13* 33:*9* 38:*19* 43:*15* 69:*21* 82:*14*
**preventative** 35:*10, 17* 36:*9*
**preventing** 37:*12*
**prevention** 21:*1* 36:*14, 21, 25*
**previous** 15:*14* 27:*6* 41:*15* 59:*20* 75:*2* 80:*5*
**previously** 13:*13* 41:*18, 22* 42:*2* 53:*15* 68:*3* 81:*13* 89:*25* 90:*5*
**printed** 61:*5*
**prior** 13:*24* 14:*2* 19:*2* 34:*4* 78:*19* 87:*11*
**prison** 25:*16, 23, 24*
**probably** 45:*1* 52:*24* 55:*5* 60:*24* 69:*21*
**problem** 74:*9*

**63:***15* 65:*17* 80:*11* 83:*2*

**related** 18:*16* 20:*1* 92:*12*
**relates** 73:*18*
**relational** 25:*17*
**relationships** 25:*18*
**relax** 26:*3*
**relevant** 15:*15*
**relieve** 29:*18*
**relieved** 38:*13* 55:*12* 56:*13*, *25* 78:*18*
**remarkable** 41:*5*
**remember** 8:*20* 9:*19*, *22*, *23* 10:*11* 12:*2* 13:*11* 15:*13* 16:*19* 17:*2*, *6*, *7*, *12*, *13*, *22* 18:*24* 19:*20*, *22* 20:*25* 21:*2*, *8*, *22*, *23* 22:*14* 23:*1*, *7*, *11* 24:*1*, *9*, *12*, *16*, *22* 25:*7* 28:*13*, *16*, *23* 30:*10*, *17* 31:*21* 35:*19* 36:*22* 37:*21*, *23* 38:*17* 40:*6*, *20*, *21*, *23* 43:*5*, *11* 46:*22* 48:*13*, *14* 51:*2* 55:*18* 58:*21* 60:*23*, *25* 65:*15* 66:*1* 68:*2*, *17* 69:*4* 71:*18* 72:*25* 81:*20* 89:*21*
**remind** 71:*17*
**Remote** 1:*12*
**removal** 89:*1*
**remove** 75:*23* 76:*17*
**removed** 65:*11* 66:*5* 88:*21*
**rephrase** 4:*22*
**REPORTED** 1:*12*
**Reporter** 1:*12* 4:*14* 5:*3*, *16* 90:*18*, *20* 92:*1*
**reports** 12:*4*
**represent** 4:*11* 72:*8* 85:*19*
**representation** 67:*9*
**representing** 87:*23*
**request** 74:*15*, *17*
**require** 33:*14*

**required** 17:*20* 34:*19*
**requirements** 51:*1* 76:*3*
**resident** 16:*1*
**residents** 8:*15* 12:*9* 25:*15* 38:*24*
**resistant** 40:*5*
**resources** 27:*11*, *13*
**respect** 19:*15* 36:*19* 89:*15*
**responded** 73:*1*
**response** 62:*15*
**responsible** 11:*2*, *3* 12:*8* 49:*20* 55:*13* 75:*16* 84:*4*, *10*, *22*, *24*, *25* 85:*1*, *3*
**responsive** 35:*20*
**retake** 16:*16*, *21*
**retest** 16:*18*
**retired** 9:*10* 11:*9* 20:*9*
**review** 6:*11* 7:*2* 46:*24* 72:*1*
**reviewed** 53:*15* 68:*14*
**reviews** 68:*7*, *8*
**revolving** 82:*3*
**right** 15:2 17:*13* 21:2 36:*15* 45:*12* 48:*1* 53:*19* 55:*7* 56:*5*, *8* 57:*2*, *20* 58:*5*, *19* 60:*10* 62:*10* 64:*1*, *8* 65:*23* 67:*5* 69:*14* 70:*1*, *3* 71:*4* 75:*10*, *15*, *18* 80:*4* 81:*10* 83:*6* 85:*17* 87:*21* 89:*2*
**right-hand** 54:*1* 66:*15* 67:*6* 70:*4*
**risk** 20:*23* 22:*17* 27:*14* 28:*6* 41:2, *4* 42:*11*
**RIVER** 1:*11*
**Road** 2:*11*
**role** 14:*15* 15:*4* 86:*11*

**roll** 11:*4* 28:*8* 29:*18* 37:*17* 38:*7* 74:*4*
**room** 30:*25* 32:*14*
**rooms** 21:*12* 33:*8*
**Ross** 15:*10*
**roughly** 8:*25* 58:*1*
**rounds** 74:*18*, *19*
**rubber** 18:*11*

**< S >**
**sabbatical** 82:*9*
**safe** 46:*8* 52:*3* 67:*17* 75:*20*
**safety** 83:*19* 84:*24*
**SAMUEL** 1:*10*
**SAUNDERS** 1:*9* 68:*21*
**saw** 22:*15* 44:*25* 51:*14*, *15* 53:*8*, *9*, *11* 70:*19*
**saying** 34:*16* 42:*19* 47:*5* 65:*9* 68:*21* 71:*13* 82:*14*
**says** 58:*14* 61:*5* 64:*9*
**scan** 73:*3*
**scared** 26:*5* 41:*6*
**school** 13:*3* 19:*9* 20:*11*
**schools** 19:*12*, *13*
**score** 24:*14*
**screaming** 42:*17*
**screen** 54:*12* 60:*10* 66:*22*
**screening** 75:*13*
**scroll** 59:*18*
**Sean** 2:*6* 6:*3*, *7* 85:*6* 90:*23*
**Sean.perrin@wbd-us.com** 2:*9*
**search** 16:*1*
**second** 85:*18*
**seconds** 22:*15* 66:*21*
**secure** 46:*8* 52:*3* 67:*18*
**secured** 77:*25*
**security** 20:*6* 25:*16* 26:*8*

**see** 19:*22* 22:*1* 27:*20* 31:*11* 33:*4*, *7*, *12* 39:*18* 41:*6* 44:*12*, *24* 48:*8* 51:*10*, *12* 52:*21*, *22* 54:*20* 55:*7* 59:*15*, *17* 60:*9* 64:*6*, *8* 65:*20* 66:*15* 69:*21* 70:*6* 72:*2*, *10*
**seen** 15:*1* 53:*5* 65:*17*
**Select** 64:*9*
**selected** 15:*15*
**seminars** 19:*25*
**send** 80:*19*
**September** 7:*15* 9:*4*
**Sergeant** 9:*20* 10:*9*, *10*, *16*, *20*, *21*, *22* 11:*1*, *23*, *25* 12:*5* 15:*10* 17:*13* 19:*10* 23:*15*, *16* 43:*6* 46:*10*, *12* 47:*13*, *19*, *22*, *25* 48:*3* 68:*13*
**sergeants** 10:*12* 44:*25* 68:*10*
**seriously** 75:*7*
**served** 6:*12*
**Service** 13:*16* 15:*14*
**Services** 79:*6*
**SERVING** 1:*24*
**set** 24:*6* 27:*16*
**sets** 36:*20*
**settle** 26:*3*
**seven** 28:*21* 30:*21* 35:*6*, *7*
**sharing** 60:*9*
**sharp** 41:*23*
**sheet** 76:*13* 77:*5* 89:*2*
**sheets** 41:*18* 65:*13* 75:*23* 76:*4* 78:*11*
**she'll** 48:*8*
**SHERALD** 1:*12* 3:*3* 4:*1*, *8* 5:*20* 7:*10*, *11* 17:*5* 35:*16* 53:*13* 54:*12*, *24* 69:*23* 70:*6* 71:*19* 72:*3* 81:*8* 85:*18* 87:*23* 88:*7*

89:*11*

**Sherald's** 59:2

**Sheriff** 54:2*1* 87:*24*

**Sheriff's** 6:8 7:2*1,
23* 8:6 9:2, 9, *13,
15, 18* 11:*10, 12*
13:*6, 13, 25* 14:*11,
16* 15:5, *7, 20*
18:*21* 19:*1, 3*
25:*11* 27:*12* 30:*14,
23* 36:*13, 18* 43:*14,
24* 48:*11* 50:25
53:2 59:*17* 61:*1*
73:*18* 75:*1* 83:8
89:*13* 90:9

**shift** 10:*13* 37:*18*
38:5 80:*10*

**shirt** 18:*4*

**show** 45:8, 9 54:9
63:23 64:5

**showed** 54:25 61:2
62:*21* 69:*12*

**showing** 53:*19*
55:20 57:2 59:8
66:9

**side** 55:25 56:5, 6,
10 64:8

**sign** 45:*18, 22* 46:*1*
47:2, 3, 5

**signed** 46:25

**signs** 21:9

**sink** 40:2

**sir** 4:*10* 5:*23* 8:*19*
32:25 47:*16* 49:7
54:*17* 56:3 72:*18,
21* 76:6 77:*1* 78:2
80:22 81:3, 5 89:*14*

**sitting** 11:*14* 22:3,
4 35:3 51:22 66:8
71:*12*

**situated** 35:2
39:*21* 42:*21* 52:*13*

**six** 16:6, *22* 17:*18*
28:*20, 21* 29:8
30:*21* 34:25 35:2

**sized** 22:*14*

**skinny** 22:*11, 13*

**slab** 78:*4*

**sleeved** 18:*4*

**small** 33:*11*

**smoke** 31:5

**sockets** 76:*19*

**somebody** 18:25
25:6 27:4 36:6
43:4 46:*1* 47:3
76:*21* 79:2

**soon** 33:*17*

**sorry** 17:5 20:*19*
47:*24* 58:8

**speak** 6:6 48:25
49:*1* 86:6, *11, 16, 18*

**special** 30:25
45:*12* 49:25 74:2*1,
23*

**specialized** 20:*1*

**specific** 8:2 17:*4, 6*
20:22 35:9 39:5
49:*17* 50:25 60:23
67:24 81:20 82:*12*

**specifically** 5:*14*
19:23 23:*1* 36:2*1*
50:*15, 22* 67:2

**specifics** 21:2

**Specter** 8:5

**spent** 11:*13*

**spoke** 14:*18* 79:*17*

**spray** 18:9

**sprinkler** 31:2
76:*12*

**Sreet** 2:*14*

**staff** 42:*10* 59:*17*
80:*13*

**staffing** 80:9

**staggered** 50:*12, 21*
62:*10*

**stand** 25:25 39:*18*

**standard** 38:*19*

**standing** 22:5
51:23

**stands** 5:*17*

**start** 5:*11* 7:*14*
17:20 34:*11, 15*
48:*4*

**started** 68:5

**starts** 34:7 59:*15*

**STATE** 1:8 7:9
16:*1* 19:*18* 44:3, 5
81:25 92:3, *21*

**stated** 11:8 12:8
27:22 44:*14* 47:*17*
49:*12* 58:*14* 60:5
62:9 69:*13* 74:2
92:5

**statement** 43:*10, 13,
18, 19, 22* 44:2

**STATES** 1:*1* 67:*14*

**stating** 60:*4*

**stayed** 42:25

**steel** 33:5

**stenographically**
92:8

**Stevenson** 10:22, *23*
12:6

**Stewart** 2:*10* 85:*12*
87:22 90:*17* 91:*1*

**stint** 13:6

**STNEs** 82:*1*

**stool** 78:8, 9, *10*

**stop** 9:*1* 33:*15, 20*

**stopped** 66:20

**stopping** 55:8

**straight** 28:22

**stream** 11:7

**Street** 2:*3, 7*

**strong** 76:2*1*

**strongly** 76:*16*

**struggling** 82:*10*

**stuff** 64:*19* 66:8
74:*11*

**subbed** 81:*24*

**subcontracted** 82:*1*

**subcontractor** 81:*17*

**subject** 14:9 17:*10*

**substitute** 19:*12*

**suicidal** 39:5 42:2
49:*18* 50:6, 7
55:*16* 62:*13* 90:7

**Suicide** 3:5, *14*
20:23 21:*1* 22:*17*
27:8, 9, *14* 28:7, *10,
11* 29:*13, 21, 24*
30:5, 7, 9, *15, 18, 24*
32:4 35:*10* 36:*10,
13, 20, 25* 37:*12, 14*
38:*11, 16* 39:*4*
40:5, *18, 21* 41:2, *4,
15* 42:*12, 15* 44:*19,
21* 45:*13* 47:*1, 6*

**stated** 48:*18* 49:23 50:2,
9, *16, 20* 62:6
63:*10, 19, 21* 65:9,
16 68:7, 8, *14* 74:4
77:*4, 5* 78:*13*
83:22 87:*11* 88:9,
*12, 20* 90:*4, 5*

**suicides** 78:*15*

**suit** 30:*10, 12*
64:23, *24* 65:6, 7,
*10, 25* 66:3 75:4
77:2*1* 88:*16, 21*
89:*1*

**Suite** 2:7, *11*

**suits** 64:*19*

**SUMMER** 2:*10*

**supervised** 11:*1*

**supervising** 11:2, 5
12:9, 25 48:*1*

**supervision** 8:*14*
31:23, 25 32:7, *10,
12* 63:*17, 18*

**supervisor** 45:24
46:5 47:8, *11, 12,
13, 19, 21, 23*

**supervisors** 9:*19*
10:7 46:*17*

**supplies** 39:*16*

**supply** 82:*1*

**sure** 4:25 11:6
12:*19* 25:3 31:*11*
33:23 35:20, *21*
37:5 43:*15, 16*
45:*11* 54:23 61:2*0,
23* 63:20 68:*4*
69:2*1* 78:*14*

**surveillance** 52:8
53:6

**switch** 49:*15*

**switches** 49:*13*

**sworn** 4:*1, 13* 92:6

**system** 31:3

**systems** 76:*12*

**< T >**

**take** 16:7 17:2*0*
18:*10* 33:25 35:*18*
36:9 47:*1* 48:*16*
58:*10* 64:*19, 25*

65:*14* 68:*11* 74:*10* 76:*1*, *18* 78:*19* 81:*1*
**TAKEN** 1:*12* 4:*16* 65:*13* 81:6 92:*3*
**talk** 33:*20* 35:*19* 43:6 44:5 72:*19* 73:*25* 82:*11*
**talked** 36:6 43:*1* 44:*4* 82:6
**talking** 5:5 14:*19* 25:20 47:*13*, *14* 60:7, *13* 70:20 71:2
**tall** 21:*23* 22:*3*, 9
**TAMMY** 1:*10* 85:*19* 86:*16*, *19*
**Tate** 2:*12* 3:*4* 85:*10*, *16*, *18* 87:*19* 90:*16*, *24*
**teacher** 19:*12*
**team** 11:*17*
**techniques** 15:*25*
**tell** 6:*3* 22:8 23:*21* 38:*12* 39:*24* 43:*3* 51:4 54:*10* 57:20 66:7, *13*, *14*, *17* 69:*14*
**telling** 6:2
**terms** 7:6 15:*1* 19:20 30:8
**test** 16:7, *15*, *16* 17:*24* 24:*10*
**testified** 4:2 13:*9*, *12* 85:*23*
**testify** 5:22 6:*18* 92:6
**testimony** 4:*13* 92:7, 9
**tests** 16:9
**Thank** 5:*20* 7:8 63:*4* 81:8 87:*19* 88:*3* 89:*4* 90:*20* 91:*1*
**thereof** 92:*12*
**thing** 34:*10* 37:5 48:8
**things** 46:5 76:*1*, *15* 88:*21*
**think** 7:*16* 10:22 14:*23* 15:*16* 16:6, *15*, *18* 17:8 18:25

19:*25* 22:*12* 23:*5*, *11*, *13*, *25* 27:*15*, *17* 28:*14*, *20*, *23*, *25* 29:22 30:*2*, *7*, *17*, *21* 31:*19* 32:*3* 34:*23*, *25* 37:*4* 41:*1*, *4* 43:*19* 46:*3*, *25* 47:*2*, *4* 48:*23* 52:*16* 56:22 57:24 58:*12* 62:8 64:*14*, *18* 65:*13*, *14* 68:*10* 71:2 72:*25* 75:5 76:*15*, *20* 81:*18* 82:*21* 90:*12*
**thinking** 64:*20*
**third** 55:22, *24* 56:*4* 71:*21*
**thought** 26:*14* 76:*14* 79:*21*, *22* 88:*18*
**three** 52:*16* 87:*23*
**tie** 76:*12*
**TIFFANY** 1:*8* 9:*25* 10:*18* 68:*13*, *18*
**TIME** 1:*12* 3:5 7:*25* 8:*17*, *23* 9:*12*, *17* 13:7 16:*25* 17:*10* 21:*15* 22:*4* 24:*17* 27:*4* 33:*21* 41:*8* 45:*4* 51:*14* 54:*4* 55:*3* 56:*15* 59:*19* 60:*1*, *2* 62:5 63:*1* 66:*13*, *14* 67:5 69:*23* 70:*3*, *12* 71:6 72:2, *5*, *15*, *17* 76:*17* 79:22 80:*3* 81:2, 9 83:*11* 85:6 88:*1* 92:5, *7*, *10*
**timeframe** 31:*15* 32:2 50:*11*
**times** 5:*13* 26:22 45:*17*
**timestamp** 72:*1*
**title** 7:*25*
**titles** 14:*24*
**today** 4:*13* 5:22 6:*25* 49:*1* 81:9

today's 6:8, *15*
**toilet** 78:*4*
**told** 29:*23* 30:2 41:*19*, *25* 43:8
**top** 36:*23* 51:2 54:*1*, *4* 55:7 61:*4* 66:*15* 67:6 70:*3*
**totally** 25:*21*, *22* 46:*14*
**touch** 34:*20* 70:*19*
**tough** 26:*4*
**tour** 33:*24* 34:*3*, *5*, *7*, *8*, *10*, *11*, *15*, *16*, *20* 45:6, *7*, *8*, *10* 46:*3*, *7*, *11*, *12* 48:*4*, *5* 54:*14*, *18* 59:*21* 66:*24* 67:*1*, *3*, *4*, *14*, *17* 70:*15*, *16*, *18* 71:*11*, *13*
**tours** 21:*19* 44:8 46:*13* 48:*1*, 9, *21*, 22 51:9 56:20 58:*23* 64:*15* 72:*11*
**train** 83:*4*
**trained** 21:*10* 35:*18*
**training** 15:*18*, 20, 22 16:5, 8 17:*19* 18:*13* 19:*14*, *17*, 23 20:*1*, 22, *25* 21:7 22:*17*, *23* 23:*3*, *17*, 20 24:*24* 25:*1*, *4*, *5*, *10* 26:*14*, *15* 35:9, *12*, *13* 36:8 60:*21*, *23*, *24* 73:*17* 89:*15*
**trainings** 17:*3* 22:*25* 23:22, *23* 26:*10*, *12*
**transcribed** 92:*8*
**transcript** 92:5
**transfer** 85:*24*
**transferred** 41:*12*
**transferring** 86:*6*, *12*, 22
**transportation** 87:*3*, *5*, 9
**transporting** 13:2
**trauma** 19:*15*, *16*
**trousers** 18:*4*

**true** 92:9
**truth** 92:6
**truthfully** 5:22
**try** 4:*18* 26:2 39:*8*, *11*
**trying** 26:*24* 52:*18*, *19*
**turn** 34:*17* 49:*15*
**turtle** 30:*10*, *12* 64:*19*, *23* 65:6, *10*, *25* 66:*3* 75:*3* 77:*21* 88:*16*, *21* 89:*1*
**twice** 12:2
**two** 9:5 11:*21* 12:6 16:22 29:*23* 34:*1* 36:20 37:*23* 38:*16*, *17* 52:*16* 61:*8*, *13* 62:5 63:22 70:20 87:*23*
**type** 63:*13* 70:22 74:*11*
**typed** 92:9
**typical** 78:22 86:5 87:*4*
**Typically** 8:*8* 28:6 38:*4* 39:*25* 46:6, *10* 51:*17* 52:*17*

**< U >**
**Uh-huh** 55:9 66:*12* 69:*24* 74:5 83:*13* 86:*4*
**undergo** 73:*18*
**understand** 4:*19*, *24* 12:*19* 24:2 52:*20*
**understanding** 61:*12* 64:*11* 69:7 73:2 77:*12*, *23*
**uniform** 11:*16* 17:*23* 18:*1*
**UNITED** 1:*1*
**unusual** 30:*19*
**updates** 22:*18*, *21* 23:*19* 24:*11*, *21*
**use** 77:5, *21* 80:*11*
**Usually** 25:5 48:6 51:*21* 72:*23*, *24*

**< V >**
**Vaguely** 48:*12*
**validate** 56:*20*
**verbal** 43:*20*
**verbatim** 4:*16*
**Versus** 88:*25*
**Video** 3:*5* 24:*5*
52:*10* 53:*6, 15*
54:*7* 55:*8* 56:*18*
61:*23* 66:*10* 69:*11*
**vigilance** 37:*5*
**violent** 89:*24*
**visually** 51:*12*

**< W >**
**wage** 81:*21*
**wait** 5:*5, 10*
**waive** 90:*19*
**walk** 28:*5* 33:*22*
**walking** 14:*18*
**wall** 34:*14* 35:*4*
45:*3* 78:*11*
**walls** 76:*15*
**want** 11:*10* 26:*4,*
*21* 28:*18* 45:*11*
73:*24* 74:*14* 79:*16*
81:*12, 17* 85:*7, 11*
**wanted** 11:*15* 27:*4*
**warning** 21:*9*
**watch** 28:*10, 12*
29:*21, 24* 30:*7, 13,*
*16, 18, 24* 31:*14*
32:*4* 38:*11, 16, 22*
40:*18, 21* 44:*19, 21*
45:*13* 47:*1, 6*
49:*19, 23* 50:*3, 6, 9,*
*16, 20* 53:*3* 55:*17*
62:*6, 14* 63:*10, 19,*
*21* 64:*12, 14* 69:*13*
74:*4, 22, 24* 77:*5*
82:*18* 83:*22* 87:*11*
88:*9, 17, 19, 20* 90:*5*
**watched** 31:*24*
**watches** 28:*14*
65:*16* 78:*17*
**watching** 32:*7*
35:*22* 83:*1*

**way** 16:*9* 24:*13, 23*
27:*15, 18* 28:*19*
56:*1* 70:*24* 73:*23*
**ways** 56:*19*
**wear** 18:*7*
**web** 22:*24* 23:*25*
24:*2*
**webinar** 24:*3*
**WEBSTER** 1:*10*
87:*24*
**weeks** 16:*6* 17:*18*
**weight** 22:*10*
**well** 5:*7* 10:*10*
11:*13* 20:*4* 21:*14*
25:*14* 26:*21* 40:*10*
45:*7* 47:*21* 54:*22*
61:*22* 74:*19* 83:*10*
**WELLER** 1:*8*
28:*21, 24* 38:*12, 18*
44:*10* 49:*18, 19*
55:*12* 56:*13, 14, 25*
58:*6* 70:*15* 78:*18*
82:*6, 23* 83:*4* 84:*3,*
*16, 22* 85:*1*
**Weller's** 29:*14, 22*
35:*24* 47:*25* 69:*5*
73:*24* 85:*2*
**Wells** 7:*13, 14, 19*
9:*5, 9, 11, 13, 15*
79:*8, 12, 16, 19*
**went** 9:*15* 14:*25*
15:*19, 25* 16:*8*
22:*4* 23:*13* 24:*5*
34:*18* 35:*25* 50:*19*
65:*17* 81:*18* 82:*8*
**we're** 28:*9*
**West** 2:*3, 14*
**WESTERN** 1:*1*
**whatsoever** 19:*17*
28:*3*
**Whisonant** 21:*18*
29:*13* 30:*16* 41:*1*
42:*15* 48:*17* 49:*2*
58:*20* 59:*3, 24*
63:*9* 65:*20, 24*
67:*2, 20, 25* 69:*8,*
*15* 70:*17* 71:*10, 19*
72:*16* 77:*9* 80:*15,*
*23* 88:*12, 25*
**white** 65:*3*

**wife** 14:*18* 79:*14,*
*20*
**WILLIAMS** 1:*9*
9:*20, 25* 10:*1, 16,*
*19* 11:*1, 23* 12:*1, 5*
23:*16* 43:*6* 46:*10*
47:*13, 20, 22, 25*
48:*3* 68:*13, 18*
**window** 33:*3, 8, 18*
**Winston-Salem** 2:*15*
**Wisonant** 4:*13*
**Wisonat's** 42:*11*
55:*21* 73:*15*
**Withdrawal** 21:*11*
**WITNESS** 3:*2*
37:*4* 42:*7* 48:*21*
59:*6* 73:*7* 83:*16*
84:*1, 7* 87:*21* 88:*3*
92:*12*
**WOMBLE** 2:*7*
**wondering** 29:*1*
**work** 7:*20* 11:*18*
38:*4* 39:*12* 80:*24*
81:*18* 82:*5*
**worked** 8:*3* 19:*3, 7*
20:*4* 21:*20* 25:*13*
38:*18* 39:*2* 49:*10*
64:*21* 82:*17*
**working** 7:*22* 9:*1*
11:*17* 13:*1* 19:*2*
37:*19* 48:*15* 52:*8*
55:*14* 59:*19* 69:*2*
79:*18, 20, 25* 80:*4, 5*
**works** 48:*10*
**Wrapping** 83:*6*
**write** 5:*3* 46:*19*
51:*18*
**written** 43:*20, 21,*
*22* 44:*16* 61:*19*
67:*24*

**< Y >**
**Yeah** 7:*18* 9:*22*
11:*3* 18:*3* 22:*23*
23:*15* 28:*25* 32:*12*
34:*7* 35:*6* 38:*1*
43:*25* 45:*15* 48:*22*
49:*14* 55:*22* 58:*3,*
*24* 68:*23* 73:*7*

76:*20* 77:*8*
**year** 16:*22* 21:*21*
**years** 9:*5* 11:*13*
16:*22*
**Yep** 54:*3* 57:*24*
59:*11*
**Youngblood** 10:*17*
11:*24* 12:*1* 15:*11*
**youth** 79:*18*

**< Z >**
**Zoom** 1:*12*